IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DR. MELISSA MCCOUL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | |
| | § | |
| THE TEXAS A&M UNIVERSITY | § | |
| SYSTEM; | § | |
| | § | |
| ROBERT L. ALBRITTON, | § | |
| JAY GRAHAM, DAVID C. BAGGETT, | § | |
| JOHN W. BELLINGER, JAMES R. | § | |
| BROOKS, MICHAEL A. HERNANDEZ, | § | |
| III, WILLIAM MAHOMES, JR., | § | |
| KELLEY SULLIVAN GEORGIADES, | § | |
| and SAM TORN, *in their official* | § | |
| *capacities as members of the Board of* | § | CIVIL ACTION NO. _____ |
| *Regents of the Texas A&M University* | § | |
| *System*; | § | |
| | § | ORIGINAL COMPLAINT |
| TOMMY WILLIAMS, *in his individual* | § | AND JURY DEMAND |
| *and official capacity as Interim President* | § | |
| *of the Texas A&M University System*; | § | |
| | § | |
| MARK A. WELSH III, *in his individual* | § | |
| *capacity*; | § | |
| | § | |
| GLENN HEGAR, *in his individual and* | § | |
| *official capacity as Chancellor of the* | § | |
| *Texas A&M University System*; and | § | |
| | § | |
| JAMES R. HALLMARK, *in his* | § | |
| *individual and official capacity as Vice* | § | |
| *Chancellor for Academic Affairs,* | § | |
| | § | |
| *Defendants.* | § | |

- 1 -

Plaintiff, Dr. Melissa McCoul ("Dr. McCoul" or "Plaintiff"), files this complaint against Defendants, as follows:

## PRELIMINARY STATEMENT

Nearly 60 years ago the Supreme Court underscored the critical importance of academic freedom, and its sacrosanct place within First Amendment jurisprudence:

> "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multiple of tongues, rather than through any kind of authoritative selection'".
>
> *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603, 87 S. Ct. 675, 683, 17 L. Ed. 2d 629 (1967) (citations omitted).

Despite this guidance, academic freedom is under attack. Professor Melissa McCoul was terminated because of the content of her course; content that was consistent with her syllabus, the course description, and the approved purpose of the course. Texas A&M University ran roughshod over Dr. McCoul's due process rights in its haste to meet Texas Governor Greg Abbott's demand that the University fire her. Two separate, independent bodies determined the University was unjustified in terminating Dr. McCoul, and that her termination violated Dr. McCoul's right to due process of law. Despite these findings Texas A&M University has refused to right these wrongs, necessitating this lawsuit.

## JURISDICTION AND VENUE

1.      This suit is brought under 42 U.S.C. § 1983 for violations of Dr. McCoul's rights under the First and Fourteenth Amendments of the United States Constitution. Professor McCoul

also seeks declaratory relief under 28 U.S.C. §§ 2201–02.  Jurisdiction therefore lies under 28 U.S.C. § 1331.

2.     Venue is proper in this District and Division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Dr. McCoul's claims arose in Brazos County, Texas.

**PARTIES**

3.     Dr. McCoul is an individual who resides in Bryan, Brazos County, Texas.

4.     Defendant Texas A&M University System ("TAMU" or "the University") is a statewide public higher education system. It is located in College Station, Brazos County, Texas. It is a governmental entity under the laws of the State of Texas. TAMU may be served by serving Tommy Williams, Office of the President, Texas A&M University System 1246 TAMU, Texas A&M University, College Station, Texas 77843.

5.     Defendant Robert L. Albritton, sued in his official capacity, is a member of and serves as Chairman of the Board of Regents of the Texas A&M University System. Albritton may be served at the Office of the Board of Regents, Memorial Student Center, Suite L500, 1123 TAMU, Texas A&M University, College Station, Texas 77843.

6.     Defendant Jay Graham, sued in his official capacity, is a member of and serves as Vice-Chairman of the Board of Regents of the Texas A&M University System. Graham may be served at the Office of the Board of Regents, Memorial Student Center, Suite L500, 1123 TAMU, Texas A&M University, College Station, Texas 77843.

7.     Defendants David C. Baggett, John W. Bellenger, James R. Brooks, Michael A. Hernandez III, William Mahomes, Jr., Kelley Sullivan Georgiades, and Sam Torn are members of the Board of Regents of the Texas A&M University System. They are sued in their official

capacities. They may be served at the Office of the Board of Regents, Memorial Student Center, Suite L500, 1123 TAMU, Texas A&M University, College Station, Texas 77843.

8.      Defendant Gen. (Ret.) Mark A. Welsh III, sued in his individual capacity, is the former President of the Texas A&M University System. While President, he made the decision to terminate Dr. McCoul's employment with TAMU.

9.      Defendant Tommy Williams, sued in his individual and official capacities, is the Interim President of the Texas A&M University System. As President, Mr. Williams is responsible for administering Texas A&M University and supervising all student programs and services. Mr. Williams recommended that Dr. McCoul's termination be upheld following the successful appeal of her termination to the University's Committee on Academic Freedom, Responsibility, and Tenure. He may be served at 1246 TAMU, Texas A&M University, College Station, Texas 77843-1246.

10.     Defendant Glenn Hegar, sued in his individual and official capacities, is the Chancellor of the Texas A&M University System. As Chancellor, Hegar is the chief executive officer of the Texas A&M University System and ensures the general management and success of the system, including delegating such duties to subordinate system members. Mr. Hegar referred the final decision to terminate Dr. McCoul to the Vice Chancellor for Academic Affairs, Defendant James R. Hallmark. Mr. Hegar may be served at the Office of the Chancellor, at the Moore/Connally Building, 301 Tarrow Street, Texas A&M University, College Station, Texas 77840.

11.     Defendant James R. Hallmark, sued in his individual and official capacities, is the Vice Chancellor for Academic Affairs. As Vice Chancellor, Mr. Hallmark advises the Chancellor in academic matters. As Mr. Hegar's designee, Mr. Hallmark upheld Dr. McCoul's termination.

He may be served at the Moore/Connally Building, 301 Tarrow Street, Texas A&M University, College Station, Texas 77840.

12.    At all relevant times, Defendants acted under color of state law.

## FACTUAL ALLEGATIONS

**A.  Professor Melissa McCoul is a highly regarded English Literature professor.**

13.    In 2017, Dr. McCoul graduated from the University of Notre Dame with a Ph.D. in English, a graduate minor in Gender Studies, and specializations in 18th and 19th Century Children's Literature.

14.    In the fall of 2017, she began a lengthy and distinguished career at TAMU, as a Lecturer, and then a Senior Lecturer, within the English Department.

15.    Dr. McCoul had a long record of effective teaching in composition, 19th Century novels, and children's literature. Her Children's Literature and Young Adult Literature courses, in particular, were extremely popular, often filling within hours of class registration going live, with many students waiting semesters for a spot to be available. Many students took multiple courses from Dr. McCoul, and still others took self-directed independent study with her, a testament to the effectiveness of her pedagogy.

16.    Dr. McCoul is a recognized leader in the field of children's literature, with two forthcoming publications in the field, four presentations at the Children's Literature Association conference (and one coming up), and selection to the Accessibility Committee for the Association.

17.    McCoul has been commended for, among other things, her contributions to the University both within and outside her department, the strength and clarity of her syllabi, high quality instruction, commitment to accessibility and equity, and overall commitment to her students' learning. Historically, her student satisfaction scores were "well above" satisfactory, and

she was also recognized for her commitment to mentoring students and service to student organizations. Her most recent annual evaluation noted she "exceeded expectations."

18.    Dr. McCoul was never reprimanded during her employment with TAMU. She was a team player, TAMU's biggest fan, and the first to volunteer for service opportunities and ways to promote the University. A Northern transplant, Dr. McCoul considered her colleagues and students to be her Texas family. She was fully committed and devoted to her students and colleagues and intended to work at TAMU until she was "carried out feet first."

19.    Overall, Dr. McCoul was an asset to the University, beloved by her students, and highly regarded as an expert in her field. Dr. McCoul excelled as a senior lecturer, pouring herself into her students and their education on par with her tenure-track colleagues.

**B.    Dr. McCoul's Children's Literature summer course was disrupted by a student and then ended early.**

20.    By the time Dr. McCoul taught ENGL 360, Children's Literature, in the summer of 2025, she had taught the course eleven times, successfully and without challenge.

21.    ENGL 360 is not intended as an overview of books that educators or parents might read with or to children; rather, ENGL 360 uses children's literature as a lens through which various aspects of society are examined. For this reason, the Children's Literature course satisfies the "KPLC"—language, philosophy, and culture"—foundational component area within the University's core curriculum. Courses within the KPLC category focus on "how ideas, values, beliefs, and other aspects of culture express and affect human experience." To this end, the Children's Literature course was *specifically designed* to address the "moral and ethical issues that arise in class readings," and, as germane to this lawsuit, "the socializing effects of children's literature, competing world views, [and] *gender roles and representation.*"

22.     Dr. McCoul's course syllabus reflected this focus:

> Maybe you grew up reading Harry Potter or Holes, Nancy Drew or the Narnia stories. Maybe you were a comic-book kid. Whatever your personal predilections, you probably already have a pretty good sense of what children's literature is. But as soon as you try to define it, you'll find that safe-seeming category becomes slippery. In this course, we will begin to tease out the boundaries of this capacious category called "children's literature." What counts? Who decides? What differentiates writing for children from writing for adults? Why should we, as adults, read children's literature?

> In this course, we will explore a range of children's literature in English, including picture books, poetry, contemporary novels, historical fiction, and fantasy. Our task is to think critically about what these books can tell us about how we (and others) understand childhood, how those definitions have changed over time, and how these books participate in larger movements of history, culture, and literature.

23.     This syllabus description is consistent with the (necessarily skeletal) catalog description of the course, which described it as an exploration of "representative writers, genres, texts and movements."

24.     On July 11, 2025, a student took a screenshot of a PowerPoint slide from the class, which explored themes of sexual orientation and its place in children's literature. The slide was posted to the social media platform X by the account "Son of Aragorn." The post criticized Dr. McCoul for leading an "onslaught of woke propaganda" and tagged the account of Texas State Representative Brian Harrison. Rep. Harrison retweeted the post as an example of what he characterized as "liberal indoctrination" in higher education.

25.     Initially, the University supported Dr. McCoul and assured her the school valued her academic freedom to teach the class as she was.

26.     But later, Dr. McCoul's department head told her the X post had gained traction and an observer would be monitoring her class to determine if anything was amiss. This is standard procedure within the University, as complaints about professors are not uncommon, though usually

unfounded. An associate dean observed Dr. McCoul's class on July 28. That day the class was exploring a book that addressed themes of gender identity and sexual orientation. The associate dean concluded that Dr. McCoul was "doing a great job."

27.     During class on July 29, Dr. McCoul was reviewing the book discussed on July 28, when suddenly a student stood up and claimed the lesson violated President Donald Trump's "executive order" and her religious beliefs. This student appeared to be reading from a script while video-recording her exchange with Dr. McCoul on her phone.

28.     Dr. McCoul respectfully engaged with the student, explaining that the lesson did not violate any executive order. The student continued to disrupt the class, suggesting that transgender people were "against the law," prompting a tense exchange with a classmate. Throughout the ordeal, the student continued to stand and record the exchange. Ultimately, consistent with University policy, Dr. McCoul invited the student to leave because she was disrupting the learning experience for the other students.

29.     The student left the class and proceeded to have a meeting with the President of Texas A&M University, Gen. Mark Welsh. The student demanded that TAMU terminate Dr. McCoul. President Welsh supported Dr. McCoul and rebuffed the student's demand. Unbeknownst to President Welsh, the student also secretly recorded her discussion with him.

30.     University administration determined the course would end early for that student and she would receive the grade she had at that point. The University then determined that the course would end early for the rest of the class as well.

**C.     Dr. McCoul's Children's Literature course is politicized by Governor Greg Abbott and other elected officials**

31.     Dr. McCoul was scheduled to teach ENGL 361, Young Adult Literature, in the fall semester. The course catalog described ENGL 361 as a "[s]urvey of historical and contemporary

literature for adolescents, including such forms as fantasy, domestic fiction, and the problem novel."

32.     Dr. McCoul's syllabus echoed the course description, summarizing the course as "a survey of historical and contemporary literature for adolescents, including such forms as fantasy, domestic fiction, and the problem novel."

33.     In mid-August, the department head informed Dr. McCoul that the disruptive student from the Children's Literature course had learned Dr. McCoul was teaching another course with some of the same themes the student found objectionable.  According to the department head, the student and her parents complained to President Welsh that "nothing had been done" to prevent the teaching of material they found offensive.

34.     Dr. McCoul's department head presented Dr. McCoul with three options: (1) teach the course as planned; (2) change her syllabus to meet the student's demands; or (3) teach a different class altogether.

35.     Dr. McCoul elected to teach the course as planned because teaching a different course would not be feasible given the semester was to start in a matter of days; nor would it be academically honest to change the course content to satisfy the uninformed whims of one student who wasn't even enrolled in the course.

36.     Dr. McCoul's department head supported this choice, confirming her "complete support for [Dr. McCoul] and the content of her class".

37.     A few days later, however, Dr. McCoul's department head told her that President Welsh determined she was <u>not</u> to teach Young Adult Literature that fall; instead, Dr. McCoul would teach ENGL 394, "Studies in Genre," the "genre" being young adult literature.

38.     Dr. McCoul did not argue or otherwise resist this decision. In a matter of days, TAMU made this operational change, the students enrolled in the Young Adult Literature course were notified of the course number change, and all but one re-enrolled in ENGL 394.

39.     The semester was off and running and going well, and Dr. McCoul assumed the events of that summer were behind her.

40.     But on September 8, in the middle of class, Dr. McCoul began receiving angry emails from unrecognized email addresses. She learned that State Rep. Harrison had posted on X the July 29 exchange between Dr. McCoul and the disruptive student.

41.     Later that day, President Welsh posted a statement on X, indicating he had "learned this afternoon that key leaders in the College of Arts & Sciences approved plans to continue teaching course content that was not consistent with the course's published description [and as] a result, I directed the provost to remove the dean and department head from their administrative positions, effective immediately."

42.     In response, Texas Governor Greg Abbott retweeted President Welsh's post, stating, "Good. *Now fire the professor who acted contrary to Texas law*."[1]

43.     The very same day, TAMU summarily dismissed Dr. McCoul from her employment, notifying her by email from Vice Provost of Faculty Affairs Blanca Lupiani. Dr. McCoul had never met or interacted with Dr. Lupiani before receiving her email.

**D.     Dr. McCoul's "summary dismissal" was based on shifting, false, and nonsensical reasons**

44.     Dr. McCoul's termination notice stated, in part, as follows:

---

[1] Upon information and belief, Governor Abbott's Chief of Staff separately reached out to President Welsh to press for Dr. McCoul's termination.

"On July 10, 2025, the Office of the President was made aware of material being introduced into your ENGL 360 Literature for Children curriculum that did not align with the course catalog. You were instructed on multiple occasions to change the course content to align with the catalog description and the course description that was originally submitted and approved. However, you chose not to follow the directive."

45.     There is no truth to this explanation. Dr. McCoul was _**never**_ instructed, not once, to change her course content. It was false for a second reason as well—her course content was 100 percent aligned with the catalog description, course description, and the KPLC foundational component area.

46.     Incredibly, President Welsh announced Dr. McCoul's termination on Facebook, a stunning, inexplicable, and unprecedented decision that underscored that her termination had everything to do with appeasing political concerns with Dr. McCoul's course content, and nothing else.

47.     Notably, President Welsh's public statement differed from the explanation communicated to Dr. McCoul.  Specifically, the public statement provided as follows: "I made it clear to our <u>academic leadership</u> that course content must match catalog descriptions for each and every one of our course sections. However, I learned late yesterday that despite that directive, <u>the college</u> continued to teach content that was inconsistent with the published course description for another course this fall."

48.     Notably lacking from President Welsh's announcement is any explanation of Dr. McCoul's culpability, as she is neither "academic leadership" nor "the college." The notice also failed to account for the fact that "the college"—not Dr. McCoul--decided to recast ENGL 361 as ENGL 394 to meet any concerns about course content, and Dr. McCoul willingly complied with

its decision. Finally, the explanation in the notice is factually inaccurate because Dr. McCoul's course content was completely aligned with the applicable course description.

49.    Of course, the explanations offered for Dr. McCoul's termination are inconsistent and nonsensical because they are untrue. Dr. McCoul was terminated because of the so-called "liberal," "woke" themes she explored in her courses.

**E.    Plaintiff was denied basic due process as codified in TAMU policy.**

50.    TAMU "summarily terminated" Dr. McCoul.

51.    University Policy 12.01.99.M1, "University Statement on Academic Freedom, Responsibility, Tenure, and Promotion," mandates the following with respect to summary dismissals, like Dr. McCoul's:

> [A] non-tenured faculty member whose term appointment has not expired may be subject to summary dismissal if the stated cause for dismissal is a ***finding of serious misconduct*** that has been ***substantiated by an investigation*** and ***decision conducted in accordance with system policy or regulation, university rule, or standard administrative procedure***.

TAMU's stated reasons for Dr. McCoul's termination, even taking them as true (which they are not), would not qualify as "serious misconduct" within the meaning of TAMU policy.[2] Moreover, this non-existent "serious misconduct" was not "substantiated" by any "investigation."

52.    TAMU Policy 12.01.99.M1 provides:

> Prior to issuing the notice of intent to summarily dismiss, the ***department head*** shall seek approval from the ***College/School Dean***. To this end, the department head shall provide the Dean with ***the written charges*** for the dismissal and an ***explanation of the evidence***.

The decision to terminate Dr. McCoul did not originate with Dr. McCoul's "department head" and was not approved by the "college/school dean." As President Welsh admitted in his

---

[2] Examples of "serious misconduct" include infractions such as sexual harassment, research misconduct, fraud, and violations of law such as theft, violence or threat of violence in the workplace.

public statement posted on Facebook, the decision was "mine alone." Since the decision to terminate Dr. McCoul was not made by her department head, Dr. McCoul's department head could not—and thus did not—provide the Dean with "written charges for the dismissal and an explanation of the evidence" as required by TAMU policy.

53.    TAMU Policy 12.01.99.M1 further provides:

> ***Upon approval by the Dean***, the ***faculty member will be provided by the department head with a notice of intent to summarily dismiss which shall contain the written charges for the dismissal, explanation of the evidence, and an opportunity to respond to the Provost*** within five (5) business days from the receipt of the notice of intent to summarily dismiss. ***The Provost, in accordance with section 8.2.5 of Policy 12.01, is designated to hear a faculty member's response to the charges prior to summary dismissal, and to determine, after considering the faculty member's response, whether to proceed with summary dismissal***. Should the Provost determine to proceed with the summary dismissal, ***the faculty member will be notified, and a formal notice of dismissal shall be issued by the department head***.

In violation of these safeguards, the Dean never approved Dr. McCoul's termination; Dr. McCoul was never provided notice of intent to summarily dismiss by anyone; Dr. McCoul was never given the opportunity to respond to such a notice;  Dr. McCoul was never afforded a hearing on these charges before her dismissal;[3] And Dr. McCoul never received "formal notice" of her dismissal from her department head.

Instead, she received an email from Dr. Lupiani, a person she had never met, containing allegations that were not true and never investigated, at which point she was immediately removed from payroll and terminated from an institution she loved and had devoted the entirety of academic career.

---

[3] When Provost Alan Sams was asked why a hearing was not held, he responded ***"I was told not to do a hearing by my superiors."***

- 13 -

**F.     TAMU's Academic Freedom Council found Dr. McCoul's academic freedom was violated**

54.     TAMU failed to honor a single one of the due process protections guaranteed to Dr. McCoul. Had it done so, this lawsuit would not have been necessary, as the stated reasons for Dr. McCoul's termination would have never passed internal muster.

55.     This has since been established by two separate, independent University bodies.

56.     TAMU's Academic Freedom Council issued a report addressing the reasons and circumstances of Dr. McCoul's termination. Noting that "a university cannot respect the academic freedom of faculty and students while also violating due process rights pertaining to academic freedom," the Council found a "clear violation" in how TAMU terminated Dr. McCoul.

57.     More to the point, it determined Dr. McCoul "was fired for the content of her class. Even if every procedural step had been followed, her termination would be a violation of academic freedom…"

**G.     TAMU's CAFRT Committee unanimously determined the University violated Plaintiff's right to due process and lacked cause to terminate her employment**

58.     Following her termination Dr. McCoul invoked her right to a post-termination evidentiary hearing of her summary dismissal before TAMU's Committee on Academic Freedom, Responsibility, and Tenure (CAFRT) Committee, the hearing body for faculty appeals.

59.     The CAFRT Committee held a full-day hearing on November 3, and issued its findings November 18.

60.     The eight-member CAFRT Committee unanimously rejected the notion that Dr. McCaul violated the policies put forth by TAMU as supporting Dr. McCoul's termination:

> "The first allegation asserted by the University is that Dr. McCoul's behavior constituted good cause for Summary Dismissal based on University Policy "6.3.2 Continuing or repeated failure to perform duties or meet responsibilities to the institution or to students or associates."

A **<u>unanimous vote of eight (8)</u>**, stated that the University **<u>did not meet the burden of proof that Dr. McCoul's Summary Dismissal was based on good cause</u>**, based on the documents provided and testimony of the witnesses during the hearings.

The second allegation asserted by the University is that Dr. McCoul's behavior constituted good cause for Summary Dismissal based on University Policy "6.3.5 Violation of system policies, system regulations, system academic institution rules, or laws substantially related to performance of faculty duties."

A **<u>unanimous vote of eight (8)</u>**, stated that the University **<u>did not meet the burden of proof that Dr. McCoul's Summary Dismissal was based on good cause</u>**, based on the documents provided and testimony of the witnesses during the hearings.

The third allegation asserted by the University is that Dr. McCoul's behavior constituted good cause for Summary Dismissal based on University Policy "6.3.7 Unprofessional conduct adversely affecting to a material or substantial degree the performance of duties or the meeting of responsibilities to the institution, or to students or associates, including misconduct or professional misconduct".

A **<u>unanimous vote of eight (8)</u>**, stated that the University **<u>did not meet the burden of proof that Dr. McCoul's Summary Dismissal was based on good cause</u>**, based on the documents provided and testimony of the witnesses during the hearings.

**<u>Overall, the CAFRT committee unanimously agreed that the summary dismissal of Dr. McCoul was not justified.</u>**"

61.    Addressing the facts of Dr. McCoul's case, the CAFRT Committee:

"… noted the testimony of multiple witnesses from the University that uniformly acknowledged that the University did not follow the processes outlined in Section Nine of TAMU Rule 12.01.99.M1. The CAFRT committee was especially concerned by the lack of a rigorous investigation into the circumstances, details, specific events, and timeline leading to Dr. McCoul's Summary Dismissal. Section 9.2.1 of TAMU Rule 12.01.99.M1 clearly states: "A tenured faculty member or a non-tenured faculty member whose term appointment has not expired may be dismissed for serious misconduct at the conclusion of an investigation process and decision thereof." The University did not provide any documentary evidence that it had conducted an investigation, nor did it provide compelling testimony to explain the decision to forgo due process and violate Section 9.2.1 of TAMU

- 15 -

Rule 12.01.99.M1. This lack of a thorough and considered investigation caused considerable confusion in the president's office and the TAMU administration, as evident from the inconsistencies in the testimony of multiple University officials.

The CAFRT committee discussed Section 9.1.1 of TAMU Rule 12.01.99.M1, which states: "Before any formal notice of the intended dismissal of a tenured faculty member, a non-tenured tenure track faculty member, or a fixed-term academic professional track faculty member is issued, the department head must advise that faculty member in a personal conference that dismissal is being considered..." The University failed to explain why it denied Dr. McCoul the basic due process assured all tenure-track and non-tenure-track faculty members under TAMU Rule 12.01.99.M1, nor provide documentary evidence that it had engaged in meaningful dialogue with Dr. McCoul.

The CAFRT committee unanimously agreed that the lack of a thorough investigative process and failure to engage in meaningful direct dialogue with Dr. McCoul led to multiple inconsistencies in the College of Art and Sciences and the English Departments administration's understanding. For instance, the CAFRT committee was unable to find documentary evidence that the Texas A&M administration had clearly and directly communicated the president's directives regarding the mandated course change. While it was apparent that the president and provost wanted Dr. McCoul to teach a special topics 489 course, the College of Arts and Sciences Executive Associate Dean and English Department head altered this directive to an "ENGL 394 Studies in Genre" course due to transcript considerations of how ENGL 489 Special Topics courses are listed on students' TAMU transcripts. Furthermore, the CAFRT committee also found no evidence that the College of Arts and Sciences or the English department directed Dr. McCoul to change her course content to align with the catalog description. Instead, through testimony, it was clear that TAMU administrators only considered moving Dr. McCoul to an upper-level course and did not discuss altering the course content. Therefore, The College of Arts and Sciences and the English department administration did not follow the directive to change Dr. McCoul's course content and excluded [Dr.] McCoul from this directive.

Importantly, concerning the alleged violations of 6.3.5, one University official stated that the failure to change the course number constituted one of "three strikes" against Dr. McCoul. However, the CAFRT committee found no documentary evidence that Dr. McCoul was included in discussions about the special topics course. More critically, Dr. McCoul does not have the authority to designate her own courses[.]  [I]t is the College of Arts and Sciences and the English department administration's responsibility to do so. The confusion surrounding the course assignment exemplifies an alleged violation of a presidential directive that was beyond Dr. McCoul's direct control."

- 16 -

**H.    TAMU upholds Dr. McCoul's termination anyway**

62.    Pursuant to University Policy 12.01.99.M1, the recommendation of the CAFRT Committee was conveyed to the President of TAMU.

63.    TAMU Interim President Tommy Williams rejected the CAFRT Committee's recommendation, so the appeal proceeded to the Chancellor for his review and final determination.

64.    Chancellor Glenn Hegar delegated the decision to Vice Chancellor for Academic Affairs James R. Hallmark.

65.    On December 19, Hallmark upheld Dr. McCoul's termination.

66.    Hallmark's decision was final and unappealable.

**I.    TAMU has now implemented policies prohibiting the types of themes Dr. McCoul explored**

67.    In the weeks following Dr. McCoul's termination, TAMU implemented changes to its policies to significantly curtail, if not completely foreclose, the kinds of materials Dr. McCoul addressed in her courses, making it crystal clear that Dr. McCoul was not fired based on the shifting reasons offered by the University.

68.    University Policy 08.01, "Civil Rights Protections and Compliance" now provides:

> No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.

69.    University Policy 12.01, "Academic Freedom, Responsibility and Tenure," now provides:

"…a faculty member will not introduce a controversial matter that has no relation to the classroom subject or teach material that is inconsistent with the approved syllabus for the course…."

70.    TAMU has commenced a full-scale review of course syllabi for compliance with these (constitutionally infirm) policies, with dozens of professors made to explain to TAMU's satisfaction why concepts related to gender and race are covered in their courses—he very topics that Dr. McCoul covered in her course, but with no prohibiting policy and no opportunity to explain her legitimate pedagogical purposes for doing so.

## **CAUSES OF ACTION**

### **42 U.S.C. § 1983 – First Amendment Retaliation**

71.    The First Amendment of the United States Constitution via 42 U.S.C. §1983 guarantees Dr. McCoul's right to free speech.

72.    Public employees do not surrender their First Amendment rights by reason of their employment. This principle is embodied in University Policy 12.01.99.M1:

Academic Freedom: Institutions of higher education exist for the common good. The common good depends upon an uninhibited search for truth and its open expression. Hence, it is essential that faculty members be free to pursue scholarly inquiry and creative scholarship without undue restriction, and to voice and publish individual conclusions concerning the significance of evidence that they consider relevant. Each faculty member must be free from the corrosive fear threat that others inside or outside the university community because their views may differ, may threaten the faculty member's professional career or the material benefits accruing from it.

Each faculty member is entitled to full freedom in the classroom in discussing the subject being taught. Within the bounds of professional behavior, faculty members also have full freedom to express disagreement with other members of the university community. Although a faculty member observes the regulations of the institution, they maintain the right to criticize and seek revision. Faculty members also are citizens of the nation, state, and community; therefore, when speaking, writing, or acting outside their academic appointment, they must be free from institutional censorship or discipline. On such occasions, faculty members should make it clear that they are not speaking for the institution.

- 18 -

The policy goes on to acknowledge the "constitutionally protected rights of faculty members, as citizens, to freedom of expression on matters of public concern."

73.     Academic freedom is "a special concern of the First Amendment." *Buchanan v. Alexander*, 919 F.3d 847, 850 (5th Cir. 2019), *citing Keyishian*, 385 U.S. at 603.

74.     Dr. McCoul was retaliated against for her speech, in that (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighed the University's interest in promoting workplace efficiency; and (4) her speech was a substantial or motivating factor in her termination. In fact, there can be no question Dr. McCoul was terminated based on the exercise of her right to academic freedom. The subject matter that the student, and then the University, found problematic was germane to her lesson, consistent with the syllabus, the course description, and the catalog description, The subject matter  met the University's explicit requirement that the course  address "how ideas, values, beliefs, and other aspects of culture express and affect human experience," to qualify for KPLC credit. In fact, themes related to "gender roles and representation" were specifically approved by the University for exploration in this course.

75.     The university presidents, chancellor, and vice chancellor for academic affairs terminated Dr. McCoul or upheld her termination because she exercised her clearly-established First Amendment rights.

76.     They acted under color of law in doing so.

77.     When these officials personally deprived Dr. McCoul of her First Amendment rights they acted with reckless or callous disregard of these rights.

78.     Dr. McCoul seeks monetary damages against these defendants in their individual capacities.

79.     Dr. McCoul seeks declaratory and injunctive relief against all defendants to address these violations.

### 42 U.S.C. § 1983 – Due Process of Law

80.     As set forth above, University Policy 12.01.99.M1, "University Statement on Academic Freedom, Responsibility, Tenure, and Promotion" contains detailed and robust requirements and procedures the University must meet to "summarily terminate" faculty like Dr. McCoul.

81.     These procedures give Dr. McCoul a property interest in her continued employment with the University that is entitled to protection under the due process clause of the United States Constitution, pursuant to 42 U.S.C. §1983.

82.      University policy 12.01.M1.99 is meant to effectuate commonly recognized academic due process rights.

83.     TAMU failed to meet the requirements of University Policy 12.01.99.M1 on all counts. Dr. McCoul never received a "notice of intent" to summarily dismiss her from the University that included "the written charges for dismissal", "an explanation of the evidence", and "an opportunity to respond to the Provost." Moreover, Dr. McCoul received no hearing "prior to summary dismissal" before the Provost decided whether to proceed with the summary dismissal.

84.     Instead, Dr. McCoul received an *email* from Vice Provost Lupiani notifying her that she *was* summarily dismissed. Vice Provost Lupiani did not provide her with an explanation of the evidence or any opportunity to be heard by anyone. Dr. McCoul was forced to hire an attorney to learn she was permitted even a *post-termination* appeal to the CAFRT Committee.

85.    And as noted by the CAFRT Committee, multiple University officials admitted they did not follow these procedures. And when asked why there was no pre-dismissal hearing, Provost Sams tellingly replied, ***"I was told not to do a hearing by my superiors."***

86.    This was no oversight; while acting under color of state law, defendants made a deliberate decision to deprive Dr. McCoul of her right to due process.

87.    The board of regents, university presidents, chancellor, and vice chancellor for academic affairs deprived Dr. McCoul of her clearly established right to due process of law.

88.    They acted under color of law in doing so.

89.    When these officials personally deprived Dr. McCoul of her due process rights they acted with reckless or callous disregard of these rights.

90.    Dr. McCoul seeks monetary damages against these defendants in their individual capacities.

91.    Dr. McCoul seeks declaratory and injunctive relief against all defendants to address these violations.

## **Breach of Contract**

92.    When Dr. McCoul was terminated, she was in year two of a three-year term of employment.

93.    Dr. McCoul satisfied the terms of this contract.

94.    Dr. McCoul's contract was issued pursuant to University Policy 12.01.99.M1 and incorporated its terms. By violating University Policy 12.01.99.M1, TAMU also breached its term contract with Dr. McCoul.

95.    TAMU's policies also impose contractual obligations on the University, one of which is contained in University Policy 12.01.99.M1.  This policy provides that "[e]ach faculty

member is *entitled* to full freedom in the classroom in discussing the subject that the faculty member teaches …." TAMU breached this policy as well, and McCoul has suffered damages as a result.

96.    Dr. McCoul has been damaged by these contractual breaches, as she has been deprived of her salary and employment benefits, including retirement contributions and health insurance, as a result of the early termination of her assignment. Additionally, as a result of these breaches, Dr. McCoul will likely be forced to relocate and start over at another college or university, at great expense to her.

97.    Dr. McCoul seeks reinstatement to remedy its breach of contract.

98.    Dr. McCoul seeks monetary damages from the members of the board of regents, university presidents, chancellor, and vice chancellor for academic affairs, in their individual capacities, to remedy the University's breach of Dr. McCoul's contract.

## **Declaratory Relief**

99.    Dr. McCoul was terminated shortly after Governor Abbott accused her, on X, of violating state law, a blatant falsehood but one that garnered **2.2 million** views.

100.    Shortly thereafter, Dr. McCoul's termination was announced on Facebook by President Welsh on the "Texas A&M Office of the President" account, creating the appearance that Governor Abbott was correct that she had violated state law. This post garnered 2,100 comments, 5,300 "likes", and was shared 190 times.

101.    Dr. McCoul's livelihood and reputation have been severely impacted by the University's violation of her Constitutional rights, the public manner in which it announced her termination, and the ensuing international media attention it created.

102.    Dr. McCoul seeks declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201–02, that (1) she did not violate state law; (2) she did not violate a directive; (3) she did not violate policy, and (4) was, instead, terminated for exercising her academic freedom as guaranteed to her by the First Amendment.

### 42 U.S.C. § 1988 – Attorney's Fees

103.    Dr. McCoul has brought this proceeding to enforce her rights under 42 U.S.C. § 1983.

104.    In its discretion, this Court may allow the prevailing party a reasonable attorney's fee as part of its costs. 42 U.S.C. § 1988(b).

105.    It may also award expert fees as part of the attorney's fee.

106.    Dr. McCoul seeks an award of both.

### PRAYER FOR RELIEF

WHEREFORE, Dr. McCoul requests that this Honorable Court enter judgment against Defendants providing the following relief:

(a) Reasonable attorney's and expert's fees;

(b) Compensatory damages;

(c) Punitive damages, as Defendants acted with reckless or callous indifference to Dr. McCoul's federally protected rights;

(d) Lost wages and compensation, including back pay and front pay;

(e) Expectancy, reliance, restitution, and consequential damages;

(f) Mental anguish damages in the past, present, and future;

(g) Reinstatement;

(h) Declaratory relief; and

(i) Such other and further relief, at law or in equity as afforded by law, to which Dr. McCoul may be entitled.

## **JURY DEMAND**

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Dr. McCoul demands trial by jury in this action of all issues so triable.

Date: February 4, 2026

Respectfully Submitted,

/s/ *Amanda L. Reichek*
Amanda L. Reichek
Texas State Bar No. 24041762
S.D. Texas Bar No. 840975
**TILLOTSON JOHNSON & PATTON**
(214) 382-3041 Telephone
(214) 292-6564 Facsimile
areichek@tillotsonlaw.com

Attorney for Plaintiff