# Exh. 1

CERTIFIED TRANSCRIPTION OF

HEARING BEFORE THE TEXAS A&M UNIVERSITY

COMMITTEE ON ACADEMIC FREEDOM, RESPONSIBILITY, AND

TENURE (CAFRT)

CIVIL ACTION NO. 4:26-CV-00865

NOVEMBER 3, 2025

Page 1

remaining students -- or the few remaining classes for the summer term were canceled and students received the grade they had at the end of the class.

Despite Dr. McCoul prioritizing her personal agenda to teach such a controversial subject over her obligation to teach the core class as described in the course description and the materials used to approve that class, General Welsh defended her and pushed back against calls for her to be removed from the classroom at that time.

However, the administration also made it clear that a similar situation would not occur again in the fall. Dr. McCoul was scheduled to teach another survey course in the class, English 361, young adult literature, which is de- -- which is described as a, quote, survey of historical and contemporary literature for adolescents; again, another survey class.

The administration made it clear that this course must be taught in accordance with the course description and then left it to the college and the department to implement this directive. However, Dr. Johansen and Dr. McCoul ignored this directive and made the decision to teach English 361 the way Dr. McCoul wanted to teach it, regardless of the course description.

Page 8

In her own words, this is what she said. So I'm doing Option 1, teaching my queer, trans, disabled, multiracial, young adort [sic] cor- -- young adult course as planned, knowing that bad actors may try to enroll or already be enrolled or that the student may pressure the president or even the board of regents to have further action taken, including, perhaps, removing these courses from the core curriculum.

That was what her plan was after the whole summer had happened. When the administration found out about these plans just days before the class started, they, again, made it clear that this would not happen. However, they did not prevent Dr. McCoul from teaching the class she wanted to teach. They didn't say, you can't teach that class.

Instead, the administration directed the college, Dr. Hansen -- Dr. Johansen and Dr. McCoul to move her class to an English 489 course, a course designed for, quote, special topics and, quote, to be taught by faculty based on their academic interest. That was the directive given to the college, Dr. Johansen and Dr. McCoul.

But, again, Dr. McCoul and Dr. Johansen refused to follow this directive. Instead, they reluctantly moved Dr. McCoul's English 361 class to an

Page 9

English 394 class, which was described as a studies in genre class, including the theory and practice of a same goal genre, including analysis of (unintelligible) and development. That's the description of 394. But that was not what was the directive.

When it was again discovered that Dr. Johansen and Dr. McCoul were flouting these directives, the administration had no choice but to take action. President Welsh removed Dr. Zoran as dean and Dr. Johansen as chair; and after an additional day of deliberation, President Welsh made the decision to terminate Dr. McCoul.

You will hear from Dr. Zoran that he takes responsibility for his role in failing to follow multiple directives in putting his trust in the wrong people to implement these decisions. I anticipate that you will hear a full defense of Dr. McCoul from her former chair, Dr. Johansen, who will claim that Dr. McCoul followed the -- the directions she was given.

But you will also hear from Dr. Tim Scott and Dr. Alan Sams that despite their ef- -- best efforts to protect Dr. McCoul, as well as to protect the students and the integrity of the curriculum of this university, Dr. McCoul repeatedly violated these directives, placing the university in an untenable

Page 10

position through her actions.

Accordingly, the predominant -- the preponderance of the evidence will show that good cause did exist to terminate Dr. McCoul's employment. Thank you.

CHAIR MCDONALD: Litigant Reichek, you going to take -- you ready?

MS. REICHEK: Ready.

CHAIR MCDONALD: Okay.

MS. REICHEK: Great. Good morning, everyone. I would also like to begin by thanking you all for being here and taking the time to consider what we believe to be a terrifying violation of Dr. McCoul's academic freedom. This case is a canary in a coal mine for higher education in the state of Texas and should be of grave concern to everyone in this room.

Thank you to Professor McDonald for facilitating this and to Kelly Drake for facil- -- facilitating this as well. My name is Amanda Reichek, I'm here with Sara Babineaux, and we are proud to represent Professor Melissa McCoul.

This case not only raises significant First Amendment and academic freedom concerns, but it raises due process concerns as well. What you won't see reflected in the charge is the fact that they fired her

Page 11

CHAIR MCDONALD:  No, I -- I -- I get that, but, no.

MR. GIBSON:  (Inaudible.)

CHAIR MCDONALD:  We're -- we're kind of set here on this, and we're kind of -- and on time.  Yes, sir.

Dr. Scott, I'm going to swear you in.  Do you swear to tell the truth, the whole truth and nothing but the truth?

DR. SCOTT:  Yes, sir.

CHAIR MCDONALD:  Okay.  It's your witness.  I'm going to a- -- I'm going to keep track of time here again.  (Inaudible.)

MR. GIBSON:  I've been given 18 minutes?

CHAIR MCDONALD:  You have 18 minutes, in essence.  And I will watch it and I'm going to show both sides.  Okay?

MR. GIBSON:  Thank you very much.

CHAIR MCDONALD:  Yeah.

MR. GIBSON:  Appreciate it.

CHAIR MCDONALD:  You ready?

MR. GIBSON:  Yeah.

CHAIR MCDONALD:  Okay.

MR. GIBSON:  In light of that, we're going to go quickly, okay?

Page 20

DR. SCOTT:  Okay.

CHAIR MCDONALD:  Introduce yourself real -- real quick.  And I'm not charging you for that time.

DR. SCOTT:  My name's Tim Scott.  I am a professor of biology.  I am almost to 37 years at A&M.  My most recent job has been Chief of Staff.

CHAIR MCDONALD:  I got 46.

DR. SCOTT:  Well, then I don't -- yeah, I need to talk to you.

CHAIR MCDONALD:  Are you ready?  Okay.  Now we're ready.  Okay.

MR. GIBSON:  Thank you.

CHAIR MCDONALD:  Yes, sir.

DR. TIM SCOTT,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GIBSON:

Q.  Let's jump right in.  When did you hear about Dr. McCoul's English 360 course over the summer?

A.  July 10th.

Q.  And what happened on July 10th?

A.  Representative Harrison released an X calling attention to it.  The president and a small group, including his comm person, Matt, and tried to sort out what to do.  Pulled --

Page 21

MS. BABINEAUX:  Ready.

CHAIR MCDONALD:  Okay.

MS. BABINEAUX:  Hi, Dr. Scott.

CHAIR MCDONALD:  Hold on.  Okay.  Thank you.

EXAMINATION

BY MS. BABINEAUX:

Q.  Hi, Dr. Scott.  I'm Sara Babineaux and I represent Dr. McCoul.

A.  Okay.

Q.  So I want to spend a little bit of time talking about the directives that you just went through as part of your direct examination.  I count three or, maybe, possibly four.  So the first directive that we heard about was a July 10th one where there were two things.  Dr. Johansen was asked -- Dr. Johnson was asked to call the dean and convey concerns regarding course alignment.  Did I get that right?

A.  And which he did on the 11th.

Q.  Okay.  Perfect.  And then Faculty Affairs was also asked to reach out to Dr. McCoul to check in?

A.  Correct.

Q.  Now, do you know if any specific directive was supposed to be given to Dr. McCoul as part of that call from Faculty Affairs?

Page 39

A.    Not from Faculty Affairs.

Q.    Okay.

A.    Faculty Affairs is more of a well -- well --

Q.    Oh, kind of, a check-in?

A.    Yeah.  Yeah.

Q.    Okay.  So at that --

A.    When a faculty member is mentioned by X.

Q.    Got it.  That makes sense.

A.    Okay.

Q.    But -- so as of July 10th or 11th, there wasn't actually a directive from the university conveyed to Dr. McCoul herself, right?

A.    On July 11th, the vice provost called the dean of Arts and Sciences and suggested -- or asked if the content aligned to the catalog description.

Q.    Okay.  But you --

A.    I don't know what was conveyed to her.

Q.    Perfect.  The second directive I heard about was on July 17th, and you said something to the effect of, you know, what's being done after receiving some parent complaints --

A.    Correct.

Q.    -- and student complaints?

A.    Correct.

Q.    And so in terms of that being a directive,

what's being done, who was that said to?

A. I -- so I reached out to an AOC dean --

Q. Uh-huh.

A. -- which is the undergraduate dean, who said he's not involved in this, it -- it was handled above, and he would find out. And they were supposed to meet with the department head on Friday. I'm assuming that's the executive associate dean, if I had to guess. But I think Dr. Johansen may have been ill that day. But it was -- we're continuing to get pummeled by these calls --

Q. Uh-huh.

A. -- can you align the course to why -- what -- how it is described in the catalog.

Q. Okay. And so in terms of "can you get that alignment," you have no idea if that was conveyed directly to Dr. McCoul. It -- your understanding is that a dean was supposed to meet with Dr. Johansen, and she might have been out sick?

A. Correct.

Q. Okay. The third directive that I heard about was from the August 4th meeting. And correct me if I'm wrong. I heard it as what happened over the summer in 360 can't happen in the fall in 361, right?

A. Yeah. There -- there was actually -- the

Page 41

department head, I think, met twice on the July 28th.

Q. With who?

A. I think with Dr. McCoul.

Q. Okay. But as of August 4th, though, the directive that I heard was that the university told the department head and the dean at an over two-hour meeting that what happened over the summer can't happen in the fall?

A. That's correct.

Q. Okay. And Dr. McCoul wasn't at that meeting, right?

A. That's correct.

Q. And then the fourth possible -- I think this might have been a directive around August 20th, that the dean was working out a transfer of the course load. The caveat that -- being that Dr. McCoul would have to teach the course as a 489, right?

A. Correct.

Q. Okay.

A. Could teach the course as --

Q. Could teach it --

A. And we understood that she wanted to teach it and she felt like there were students who wanted to take it.

Q. Okay. But if she taught it, it had to be as a

Page 42

489?

A. Correct.

Q. Okay. Now, at that point, though, the dean was asked to work that out. You don't know that Dr. McCoul was actually told to do the 489?

A. That's correct.

Q. And as we can see, I think we saw -- if you go back in your binder to 37, this is TAMU 37.

CHAIR MCDONALD: TAMU 37?

MS. BABINEAUX: Yes.

CHAIR MCDONALD: 37. (Inaudible.)

Q. (BY MR. BABINEAUX) And it's that second -- I think this is the second or third page where we had Dr. McCoul talking about, kind of, her three options. They stressed that my safety and comfort in the classroom, three choices. At this point, she doesn't say anything about how she needs to teach a 489, right?

A. I don't see it in here.

Q. So at this point, we have no idea if Dr. McCoul was actually told that she had to teach this course as a 489, based on her words here?

A. Correct. But this was August 18th, and we didn't do the outreach till the 21st.

Q. Got it. Okay. But -- so at least at this point, on the 18th, it's not clear that that directive

had ever been given?

A. Correct.

Q. Okay. So now let's go to Exhibit 2, and this is actually going to be in the --

A. Okay.

Q. -- other binder, if you flip to the front. So this is going to be McCoul Exhibit 2. Yes, you're there. Perfect.

So do you recognize this as the termination letter that was sent to Dr. McCoul?

A. I do.

Q. Did you have a part in drafting this at all?

A. I did not.

Q. Did you have -- were you involved in the decision to terminate Dr. McCoul?

A. I was not.

Q. Okay. Are -- but you're at least familiar with this document?

A. Yes.

Q. Okay. So if you look here, it says, "Your behavior constitutes good cause based on the following criteria." Do you see that?

A. I'm trying to figure out...

Q. "Your behavior" -- it's right before the provisions start.

Page 44

again, how did Dr. McCoul actually violate 6.3.5?

A.  With hesitation that I'm going to go down a rabbit trail, and I hope not, is that with academic freedom comes academic responsibility.  And that is alignment, that is you're teaching what you say is going to be taught.  If it's a survey class, it's a survey class.  So I think in a -- in a broad swipe, that's probably what they're referring to.

Q.  Okay.  So, again, going -- what you feel it is is a disconnect between the course description, the course type even, and the -- what was being taught?

A.  Correct.

Q.  Okay.  And then let's do the same thing for 6.3.7.  "Unprofessional conduct adversely affecting, to a material and substantial degree, the performance of duties or the meeting of responsibilities to the institution or to students or associates, including research misconduct or professional misconduct."

So what is the misconduct and the violation of 6.3.7?

A.  I don't think this case rises to that level.

Q.  Okay.  Okay.  Let's go to 4.  This is McCoul Exhibit 4, so you'll stay --

A.  Okay.

Q.  -- in the same binder.  Do you recognize this

Page 46

UNIDENTIFIED SPEAKER:  If other committee members have other questions, I don't want to pause the discussion.  Go ahead.

UNIDENTIFIED SPEAKER:  I have a question. If I heard correctly, so you weren't aware that the -- when President Welsh released the dismissal letter to the university, so you weren't aware prior to his letter release?

DR. SCOTT:  Her release?

UNIDENTIFIED SPEAKER:  I mean, like, yeah, so dismissal letters of her release --

DR. SCOTT:  Yeah.

UNIDENTIFIED SPEAKER:  So --

DR. SCOTT:  Correct.  Correct.

UNIDENTIFIED SPEAKER:  And then if that's the case, are you aware that -- if the president was following the due diligent processes of dismissal APT of the faculty on campus?  Because -- because there is a set of procedures to follow.

DR. SCOTT:  Yeah.  I don't think we followed -- I don't think process was followed.

UNIDENTIFIED SPEAKER:  Okay.  Thank you.

DR. SCOTT:  If you're asking me -- you bet.

UNIDENTIFIED SPEAKER:  One other policy question --

Page 55

UNIDENTIFIED SPEAKER:  Okay.

CHAIR MCDONALD:  (Unintelligible) start.

MR. GIBSON:  Ready.

DR. MELISSA MCCOUL,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GIBSON:

Q.  Can you turn to McCoul Exhibit 11?

UNIDENTIFIED SPEAKER:  What number?

MR. GIBSON:  11.  McCoul 11.

A.  I'm not sure I have an 11, actually.  It goes from 6 to 12.

UNIDENTIFIED SPEAKER:  I don't have an 11. Oh, I see.  Didn't include anything that was struck. It's --

MR. GIBSON:  McCoul 11 is (unintelligible) CV (unintelligible).

MS. BABINEAUX:  Well, apologies.  Could we share it on the screen?

UNIDENTIFIED SPEAKER:  Yeah.

UNIDENTIFIED SPEAKER:  Yes.

MR. GIBSON:  So it's your CV.

DR. MCCOUL:  Oh, okay.

MR. GIBSON:  Okay.  I'll just ask you --

UNIDENTIFIED SPEAKER:  Yeah, your CV.

Page 68

Q. Do you also speak with Cynthia Werner about these directives?

A. Again, I'm not sure which directives you're referring to.

Q. The directive to, let's say, teach your 361 classes in a different form.

A. No.

Q. You never spoke to Cynthia Werner about that?

A. No.

Q. You only spoke to Dr. Johansen?

A. I never received any directives to change my course material at all. I only spoke to Dr. Emily Johansen about changing the course code from a 361 to a 394.

Q. And you didn't want to do that, did you?

A. No, I would prefer to teach the 361, but the 394 seemed like a reasonable alternative.

Q. And you -- you had said that if only three students transferred to your course to 394, that you would rather not teach it, and you would rather just not get paid, correct?

A. I did consider that option. It seemed like a lot of administrative effort for just a few students, but it turned out to not be an issue because a number of students did want to take the class.

Veritext Legal Solutions
800-336-4000

three institutions as instructor of record in writing and rhetoric courses, in 19th Century courses, gender studies courses, children's literature, and young adult lit.

Q. All right. I'd like to talk about the kinds of feedback that you've gotten for your teaching over the years. Turn to Exhibit 18 in McCoul exhibits.

(Conversation outside of the hearing of the reporter.)

MS. REICHEK: Exhibit 18. All right. Exhibit 18.

CHAIR MCDONALD: McCoul?

MS. REICHEK: McCoul.

CHAIR MCDONALD: McCoul Exhibit 18. Okay. You're back on.

Q. (BY MS. REICHEK) And this looks like your most recent annual review; is that accurate?

A. That's correct.

Q. Okay. And this was given to you by the department head, Emily Johansen; is that accurate?

A. That's also correct.

Q. Okay. In that second paragraph, the second full paragraph, that says, In the category of teaching, the EAC, which is the Evaluation Advisory Committee, determined that your performance exceeded expectations.

Page 94

You provide high quality in- -- quality instruction for all your courses.  EAC members particularly emphasize your commitment to accessibility and equity, drawing attention to clar- -- the clarity of your syllabi and their alignment with UDL principles; is that accurate?

A.  Yes, that's correct.

Q.  And in the interest of time, I won't go through your other evaluations, but is this -- is this similar to feedback that you've received in the past?

A.  Yes, very much so.  All of my previous reviews have either met or exceeded expectations.  The last several exceeded, which I was very excited about.  And I usually receive specific positive (unintelligible) as well.

Q.  What is a PICA score?

A.  Both PICA and AFIs are acronyms that refer to different ways we collect evidence about student evaluations.  There were two different programs, so there was a time when the university used both, so they overlapped.  But they're how students give anatomized information about how they experienced a course, and then later that information is presented to the faculty members and also to their department heads and deans.

Q.  What kind of PICA scores have you gotten in the past?

A.   I usually range around a 4.  It varies a little from class to class, but definitely between a 3 and a half and a 5.

Q.   And what is your understanding of the significance a 4?

A.   A 4 is a very strong score.  5s are the best, and they're fairly rare.

Q.   Okay.  Turn to Exhibit 56 in McCoul.  McCoul Exhibit 56.

A.   Yes.

Q.   It looks like this is the notice -- this is a request for salary adjustment for you.  And it's from -- let's see -- Maura Ives, the former head of the department of English.  And it's to Carol Fierke, the -- the provost and executive vice president.  In that first paragraph, she proposes a salary increase for -- for you.  And she lists English 360 as a high-demand course?

A.   Yes.

Q.   Is that consistent with your understanding of this course?

A.   Yes.  English 360 is one of the most pop ular courses the department runs.  My sections fill within minutes of them going live on registration day, and I usually have a substantial list of students requesting access after the course is full.

Page 96

Q. Okay. And it also says her PICA scores are exceptionally high. Do you see that?

A. Yes.

Q. Okay. Do you have any reason to disagree with that?

A. No.

Q. And that --

A. The feedback I receive from students aligns with that.

Q. Turn to Exhibit 14, if you would, in McCoul. McCoul Exhibit 14. This is your 2022 annual review. And in that third paragraph, the one at the bottom, there's information about your syllabi. It states, "Your course syllabi continued to be well designed with information clearly presented in engaging course descriptions that help students connect to the course's focus and goals." Do you see that?

A. Yes.

Q. Is that consistent with verbal feedback and -- and written feedback that you've gotten throughout the years at A&M?

A. Yes, absolutely.

Q. And you were promoted as senior lecturer in 2023; is that right?

A. That's correct.

Page 97

Q. Describe your background in children's literature.

A. I taught children's literature at Notre Dame. I then taught both 19th Century and contemporary children's literature. Since I've been here at A&M, I've taught children's literature or young adult literature almost every semester, with the exception of my first semester here. So I usually teach three writing classes and either children's lit or young adult literature.

And those syllabi have been, after the first one, mostly contemporary literature to focus more on my areas of expertise and areas of departmental need.

Q. And how many times have you taught children's literature?

A. 13 in total.

Q. Have you ever received any kind of reprimand about the way you taught your course?

A. Never.

Q. Any kind of directive to change the way you taught your course?

A. No.

Q. Is it your understanding that the English 360 course is part of the core curriculum and the foundational component area of language philosophy and culture?

Page 98

A.   Yes, that's correct.

Q.   Turn to Exhibit 54 in McCoul, if you would. Again, this is McCoul 54.  You can go ahead and turn to the third page.  At the top, it says Foundational Component Area, Language Philosophy and Culture.  Do you see that?

A.   Yes.

Q.   Okay.  All right.  Now, it states in that first paragraph, that last sentence, "Courses involve the exploration of ideas that foster aesthetic and intellectual creation in order to understand the human condition across cultures."  Is that accurate?

A.   Yes.

Q.   Do you think that your English 360 course fits that description?

A.   Yes, I designed it to do so.

Q.   And under Recertification for Foundational Component Area Language Philosophy and Culture, it says, "Courses in this category focus on how ideas, value, beliefs and other aspects of culture express and affect human experience.  Courses involve the exploration of ideas that foster aesthetic and intellectual creation in order to understand the human condition across cultures"; is that right?

A.   Yes.

Q.   Further down, it says, "The student will not only become familiar with these genres, but explore various ideas conveyed in the texts.  The historical development, social and cultural context of children's fiction, how novels for young readers have changed and/or stayed the same in the intersections among gender, politics, and children's fiction."

Do you see that?

A.   Yes.

Q.   And -- and have you designed your course content to reflect that core val- -- that core curriculum?

A.   Yes, my course does all of those things in different ways.

Q.   It states, "This course will ultimately reveal how wider social forces shape the philosophical outlooks and aesthetic sensibilities of writers of literature for children, and how writers of different racial, ethnic, gender, regional backgrounds and sexual orientation may approach and interpret the world differently for readers of children's literature"; is that right?

A.   That's correct.

Q.   So is this -- is your syllabus in any way insistent with the -- the core component of -- the core LPC component?

Page 100

A.   I don't believe so.

Q.   Okay.  Now, turn to 54A.  And this is Professor Robinson's children's literature syllabus.

A.   Yes.

Q.   You agree that your syllabus does not look the same way as her syllabus?

A.   It does not.

Q.   Okay.  Have you ever told -- been told that you needed to make your syllabus look like her syllabus?

A.   No, I have not.

Q.   Would that directive make any sense at all?

A.   No, it would be counterintuitive since the department wants to have different classes to fit different student needs and different professor expertise areas.

Q.   Okay.  Now, you'll agree, Professor Robinson focus on -- focuses on a different era, if you would --

A.   Yes.

Q.   -- of literature.  And why is that -- and explain that in relation to your class.

MR. GIBSON:  Object.  She's asking why Professor Robinson does something.  She -- this -- Dr. McCoul can't testify for Professor Robinson.

MS. REICHEK:  I can rephrase.

CHAIR MCDONALD:  Yeah, please.

Page 101

Q.    (BY MS. REICHEK)    Why don't you just explain why your syllabus covers a different type of children's literature than Dr. Robinson's.

A.    Yeah.    So I, like Dr. Robinson, actually, I'm a specialist in 19th Century children's literature. However, it's impossible to teach all children's literature in any class, so you have to choose an angle of the focus.    Dr. Robinson already teaches an amazing and very popular class on Golden Age children's literature classics, and so my repeating her syllabus would be redundant.

Instead, I focused on my specialties and on an area that the department needed, which is a focus on contemporary children's publishing and contemporary children's literature scholarship.    And so the catalog description that Dr. Robinson and I both adhere to is the same, but our course descriptions will be different.

Q.    Now, has your syllabus ever been the one submitted for recertification in this core curriculum?

A.    Yes.

Q.    And you didn't get any feedback?

MR. GIBSON:    Objection.    There's no evidence -- you guys haven't presented any such documents.

MS. REICHEK:    Well, she's entitled to

Page 102

testify from her memory.

UNIDENTIFIED SPEAKER:  Okay.

A.  Yes.  Recertification happens for different classes on different years.  It's a cyclical process, so not every course is recertified every year.  The last time mine was on the recertification list, it was recertified.  And that syllabus is very similar to the one I taught in the summer.

UNIDENTIFIED SPEAKER:  It's not running.

Q.  (BY MS. REICHEK)  My understanding is that the children's literature summer course began July 2nd.  Before I get into that, actually, you taught this course in the spring as well; is that right?

A.  I did.

Q.  Did anything unusual happen in that course?

A.  No.  It was a wonderful class, full of great discussions, really engaged students.

Q.  All right.  Explain -- explain how the semester was going in the summer.

A.  I think generally going pretty well.  It's a summer course, so it's very fast, very fast-paced.  And students have other things going on in the summer, so it's to be expected that students might not attend as many sections or might just be a little more distracted.  I saw some of that, but otherwise, I think things were

Page 103

going pretty normally.

Q.    Turn to Exhibit 26 in McCoul.  Again, this is McCoul Exhibit 26.  And this is an e-mail exchange with Dr. Johansen and in this e-mail she's letting you know that a slide from your course made its way onto -- to Twitter or X.  And she's giving you a heads-up and she says, I wanted to reach out to affirm that the department, college, and university strongly support and take incredibly serious leader academic freedom to teach this course in the manner you see fit based on your expertise.  Do you see that?

A.    Yes.

Q.    Okay.  And further down, you respond and -- and you tell her that you've had variations on that slide as well as many other materials related to gender identity, sexuality, race and disability in your 360 class for as long as you've been teaching it.  Do you see that?

A.    (No audible answer.)

Q.    Now, why do you have these themes in your class?

A.    Largely because I teach contemporary children's literature and those are necessary themes that are increasingly common in the literature published for children, and then the scholarship about that literature focuses on diversity in general and on gender and

sexuality in particular. Just also, children's literature is grounded in the idea of Windows, Mirrors, and Sliding Glass Doors, a foundational article by Rudine Bishop Sims back in 1990, the idea that all students of all ages need to have both representation of themselves, mirrors, and also representation of those unlike them, windows, to see into the lives of others.

Q. And Dr. Johansen affirms that -- that they support you and that they take your right to academic freedom seriously; is that accurate?

A. Yes.

Q. All right. Based on this, did you have any reason to think that the university had any kind of problem with your curriculum?

A. I did not.

Q. In the weeks and days that followed, did you hear -- yourself hear about any sort of complaints or concerns on the university's behalf?

A. I did not, no.

Q. Okay. And you weren't -- you weren't approached about changing your curriculum at [sic] any way at that point?

A. No.

Q. Okay. Any other repercu- -- repercussions from this Twitter post from --

Page 105

A.   None that I was aware of.

Q.   So as far as you were concerned, it was over and done with and -- and that was it; is that accurate?

A.   Yeah.   I was under the impression that I simply needed to know it had happened and to continue on how I've been doing.

Q.   And Professor Scott alluded to this, but they reached out -- Faculty Affairs reached out to you just to support you; is that accurate?

A.   Yes.

Q.   Because you had been identified on Twitter and your class materials had made it to that platform?

A.   That's correct.

Q.   And we've also heard that there were parents and students -- a few parents and students that were reaching out to the president.   And -- and were you aware of any of that?

A.   Only secondhand.   (Unintelligible) Johansen briefly mentioned that that had happened, but I was not involved in any conversations with the president or with anyone else about these complaints.

Q.   Okay.   And she let you know about that around July 25th; is that accurate?

A.   That's correct.

Q.   Okay.   And -- and my understanding is that --

Page 106

is -- and it was determined that a faculty -- or a member of administration would absorb your -- observe your class?

A. That's right.

Q. Okay. And who was that?

A. That was Joanna Goodey-Pellois on July 28th.

Q. Okay. If you would, turn to Exhibit 64 in McCoul exhibits. Again, that's Exhibit 64 in McCoul.

A. Okay.

Q. You just recently saw this document for the first time; is that correct?

A. That's correct.

Q. Okay. This wasn't a document that was sent to you?

A. No, it was not.

Q. She -- she attended your class. Dr. Joanny -- Joanna Goodey-Pellois attended your class and observed. And this was, just for context, the day before the disruption with the student that videotaped?

A. That's correct. This would have been the first day we were discussing Jude Saves the World.

Q. Okay. And she writes up her observations and sends those to Dean Zoran and Dr. -- yeah, Dr. -- just Zoran, and she copies Cynthia Werner; is that accurate?

A. That seems to be correct, yes.

Page 107

Q. Okay. All right. And on the second page, she states, "At no point did I observe Dr. McCoul advancing a personal or political agenda. Rather, she facilitated a respectful environment in which students were free to express a range of views. All perspectives were treated as valid, and no student was criticized for their opinion"; is that accurate?

A. I would say so. Certainly what I strive for every day.

Q. Okay. She states further down, "The treatment of gender in this lecture was consistent with that broader pedagogical framework"; is that right?

A. Yes.

Q. And in conclusion, she states that your lecture was fully aligned with the course's stated learning objectives. Your approach was "scholarly, pedagogically sound, and appropriately sensitive to a range of student experiences. I found the class to be intellectually engaging, relevant, and thoughtfully delivered." Right?

A. Yeah. I'm -- I'm glad to hear that and it aligns with my experience of the class.

Q. All right. And she had a -- did she have any kind of verbal feedback for you that day?

A. Much to the same, that she thought I had done a good job, that she had heard lots of other students

Page 108

conversing about the text, and that she was impressed with the kind of discussion that they were having.

Q.  Okay.  Now, the next day is when the -- the student videotaped you?

CHAIR MCDONALD:  You're out of time.

MS. REICHEK:  I'm out of time?  Oh, okay. Well, I pass the witness then.

CHAIR MCDONALD:  Okay.  Does -- hold on, everybody.  Are there questions from the panel for Dr. McCoul?

UNIDENTIFIED SPEAKER:  A couple.  Twice, Dr. McCoul, you -- you -- you indicated in -- in your comments that you were discussing current trends in children's literature and children's literature scholarship?

DR. MCCOUL:  That's correct.

UNIDENTIFIED SPEAKER:  And then you had a focus on contemporary children's literature in -- in your -- your discussions.  How do you square that with what the university says it -- historical children's literature, especially in light of the -- the recency of -- of all those texts that you're having and the -- the topical alignment of those books with the breadth of children's literature.

DR. MCCOUL:  So I do my best to choose

Veritext Legal Solutions
800-336-4000

contemporary novels that do touch of the breadth of contemporary children's literature, a variety of different races, genders, sexualities, disabilities, living situations, and also different kinds of texts. So prose novels, novels in verse, graphic novels, and picture books. Most of them are contemporary, and that's by design.

The course description is quite vague and meant to be so that multiple different instructors can fit within that umbrella. And so I have chosen to do something different from Dr. Robinson's course, but her course is just one of many possible choices.

UNIDENTIFIED SPEAKER: So you -- you're -- not just you, but each of the instructors of this class are not necessarily bound by taking this historical approach --

DR. MCCOUL: Correct.

UNIDENTIFIED SPEAKER: -- that -- that's listed? And we all -- we're familiar with the -- the vagueness of some course descriptions --

DR. MCCOUL: Yeah. That's correct. Each --

UNIDENTIFIED SPEAKER: Okay.

DR. MCCOUL: -- person has the right to choose their own perspective. And I do also discuss

Page 110

historical trends. Just, I can't include all texts in the syllabus. And so we focus on contemporary ones with discussion of what came before.

UNIDENTIFIED SPEAKER: Okay. And if I -- if you don't mind one more question. I -- I'm -- you know, we're -- we're all kind of curious about the incident in the classroom that day. I love passionate debate. You know, I think when they debate with me, they debate with each other, I think that's the best learning environment.

So how are -- how did you or are you differentiating harassment versus passionate disagreement --

DR. MCCOUL: Yeah.

UNIDENTIFIED SPEAKER: -- and -- and -- and your decision to -- to ask this student to leave?

DR. MCCOUL: So I'm going to agree with you. Passionate debate is a cornerstone of my discipline and some of the most fun classes --

UNIDENTIFIED SPEAKER: Uh-huh.

DR. MCCOUL: -- to be a part of and something I definitely encourage. And there's actually a part in my syllabus that specifically says, I, as the instructor, do not require my students to agree with me, with the texts, or with one another, but they must

Page 111

respect the conversation. And so if they do disagree with someone, they need to disagree with the idea, not the person, and to use respectful language, and not to allow it to escalate beyond a point of reasonable debate.

And this is the only time I've ever had to ask a student to leave because they did escalate beyond a point of debate, into a point where they were no longer allowing other people to speak or to have ideas or allowing me to continue teaching. But they were making claims that certain kinds of people were illegal, and that language feels very harmful to me. So that's why I asked that student to leave. That's the first time in my career.

UNIDENTIFIED SPEAKER: So I have some questions. It's perfectly okay if you don't want to answer it. So there is this -- the first part is regarding this, you know, perceived violation of FERPA. So I'm, kind of, wondering about the timeline of when you shared this information with your lawyers. Was it after your termination agreement or before your termination agreement?

DR. MCCOUL: I'm not sure, honestly.

UNIDENTIFIED SPEAKER: Okay. All right. And then the second question is, I -- I, kind of, missed

Veritext Legal Solutions
800-336-4000

of harassment? Because I think we know that when we have ADA compliancy students or a student that asks to record, there's usually not a verbal piece that accompanies those in our classrooms, right?

But did you feel like that piece of the video-recording with the speech or whatever was happening started to elevate the situation? And do you think it violated the other students' privacy in the room?

DR. MCCOUL: I do, definitely, think it violated the other students' privacy. There is a student rule, Rule 21, against unauthorized vi- -- recordings. This student did not have any kind of permission from anyone to be recording the class. So, yes, I do think it violated other students' privacy.

I didn't realize she was recording until shortly after I asked her to leave when another student mentioned that that was the case, and then I clearly realized that when I saw the video myself. So at the moment I asked her to leave, I was asking her to leave based on hurtful and I believe harassing things she had said about other people in the classroom.

The fact that she was recording, I was also very concerned about, and they were (unintelligible) at the time.

Page 114

UNIDENTIFIED SPEAKER:  So one thing is, Dr. Robinson's name comes up pretty freq- -- frequently, but I don't see her on the witness list from either side.  That -- that intrigues me.

UNIDENTIFIED SPEAKER:  Do you want me to answer that?

UNIDENTIFIED SPEAKER:  That -- that -- no.  No.  That -- you made a statement.

UNIDENTIFIED SPEAKER:  That's for the lawyers.

UNIDENTIFIED SPEAKER:  Yeah.  No.  You made a statement.  That's -- that's not up to us on who's called.

DR. KANG:  Hi, I have a quick question.  I have a quick question.

So Dr. McCoul, I think you and your attorney already alluded to this, but I just want to hear very clearly from yourself again, if you will, it is this.  I understand, according to both you and your attorney, that you have taught this course, English Lit 360, in total, 13 times, correct?  13 times?

DR. MCCOUL:  That's correct.

DR. KANG:  So my question -- first question is, the -- you know, during the summer when everything erupted, did you teach the course in a manner or in a

Page 119

tilt in terms of gender, sexual orientation, et cetera? Did you teach the summer course in a way that is substantially different from how you taught the previous 12 times?

DR. MCCOUL:  No, not at all.  My spring 2024 course, the one that I taught immediately before, the syllabus was nearly identical with a few changes to secondary articles and one assignment being removed. But all of the materials and the basic purpose behind the syllabus has been the same.

DR. KANG:  And so previously, when you taught, let's say in the previous three years, when you taught in a similar way, did you get this resistance or this uproar from the students and the parents and the admin?

DR. MCCOUL:  I did not, no.

DR. KANG:  Okay.  And also, one more thing, so I -- I'm looking at the catalog description for this English Lit 360, Literature for Children.  I'm a math faculty, and I -- I find this extraordinarily terse, this description.  It states -- and I -- and let me read it for everyone.  It just states, English 360 Literature for Children.  It says, "Representative writers, genres, texts, and movements.  Prerequisite, junior or senior classification."  And that seems to be the entirety of

Page 120

the catalog description; is this correct?

DR. MCCOUL:  That is correct.  That's why each professor writes their own course descriptions on the syllabus that align with both that catalog description and with the core curriculum goals.

DR. KANG:  So -- so therefore -- and let me just understand this for all the faculty who are not in the humanities.  For example, I'm a mathematician and I -- I know there's an engineer there on the panel.  When we teach, for example, a course, like, if I were to teach a course in Calculus 1, the content is more or less fixed.  No matter who's teaching the Calculus 1, it's pretty much the same.  The details vary.  The exact coverage varies.  But essentially, it is Newton's Calculus 1 that we find over almost three -- whatever -- three centuries or more.

So are you saying that, however, in humanities, even though you are -- you and Dr. Robinson, who's being referred or referenced, even though you're teaching the same course, the -- the content -- the actual content can be very different; is that what you're saying?

DR. MCCOUL:  That's correct.  That is an expectation in my field.

DR. KANG:  Okay.  One -- one more thing.

Veritext Legal Solutions
800-336-4000

like, a very -- like, a normal statistical sampling of the literature for children in its entirety?  It does not have to be like that?

DR. MCCOUL:  That's correct.  I'm not sure such a statistical sampling could even exist.

DR. KANG:  Okay.  Thank you.

CHAIR MCDONALD:  Thank you.  Any other questions?

MR. ALI:  Yes, I have a question.

CHAIR MCDONALD:  Go -- whoever's online, go ahead.

MR. ALI:  Yes.  Dr. McCoul, regarding -- there is some record indicate that you have multiple student complaints regarding your classroom management. I am asking you about your attitude when you go to kick out many students from the cla- -- your classes when they challenge you in some point.

Can you just describe your action, if it is aligned with any stru- -- your instructional approach and also university faculty/student interaction?  Can you explain this trend when you have any negative feedback, when -- how you address it also from year to year if you have any problem.

DR. MCCOUL:  Yeah.  So each year, I get some students who have questions or who are

Page 123

uncomfortable for any number of reasons. The first step is usually, I have a conversation with them. And often, that can resolve their discomfort all together. If not, we then talk about how they might approach the class, and this might mean skipping certain classes, not reading a specific book, and instead writing their papers about the other books on the syllabus, or otherwise doing some alternative assignments.

And if that still doesn't solve their discomfort, I might refer them to the department head or the director of undergraduate studies so that they can talk about what other options might exist, including possibly switching to a different class.

I've actually never had it happen that a student wasn't able to have their problems solved by talking to me and possibly other administrators and needed to leave the class. This is the only time in my career that I've had to ask a student to leave.

MR. ALI: Did you apply the same approach you describe now with the case in which you already spread in viral on media? Did you apply the same approach?

DR. MCCOUL: In this case? The student never --

DR. ALI: Yes, in this case, yes.

Page 124

DR. MCCOUL: Yeah. The student never requested to interact with me, and I didn't know that she had any difficulties until she began speaking up and disrupting the class.

DR. ALI: Okay. Thank you so much.

CHAIR MCDONALD: Anything else? Very quickly.

UNIDENTIFIED SPEAKER: Sure. Yeah. So -- so when this student records the video and then did she get your consent before she posts it on social media. So I think a recording of the lecture and instruction materials could violate some university codes. I was wondering if you get any, you know, sense of help from the university or support that protect not only the student, but protect you as the instructor?

DR. MCCOUL: I was informed that recording without permission is against student rules, and that someone would talk to this student about that breaking of the rule. I don't know if that ever happened or if the student ever received any kind of penalty for doing so.

CHAIR MCDONALD: Okay. Thanks. All right. We're late. We're at a break now. We'll come back in about 10 minutes. (Unintelligible.) So let's start at -- let's start at about 11:30. I let your testimony

Page 125

recording.)

DR. EMILY JOHANSEN,

testified as follows:

EXAMINATION

BY MR. SMITH:

Q. Good morning.

A. Hi.

Q. So is it fair to characterize you as being the direct supervisor to Dr. McCoul?

A. Yes.

Q. Okay. So looking at the chain of approval for a core curriculum class --

A. Uh-huh.

Q. -- and that would be on Exhibit 54 from the McCoul stack. And you don't have to look at it because we have two different ones.

A. Okay.

Q. So you are the first person in that chain of approval that approves the syllabus for English 360; is that correct?

A. Yes. Wait. I -- I -- wait, I'm -- I just want to make sure I'm understanding what you're saying. So when -- when a course gets submitted for the core curriculum --

Q. For the core curriculum --

Page 127

A.    Then, yes.  Then, yes, I am the first --

Q.    Okay.  So --

A.    -- under it's -- it goes through the undergraduate director, and then I --

Q.    Understood.  But you put your signature --

A.    Yes.  Yeah.

Q.    -- on that for the first line to approve?

A.    Yeah.

Q.    And you look at the representative course syllabus?

A.    Yep.

Q.    Okay.  Could I ask you to take a look at TAMU 4?  And if you could thumb forward to the English 360 start of Dr. Elizabeth Robinson's syllabus.

A.    Yep.

Q.    Do you see the course description?

A.    Yes.  The survey, Early Fairy Tales, that's correct, yeah.

Q.    Yes.  "In this course, we will survey children's literature from early fairy tale texts through very recently published texts"?

A.    Correct.

Q.    You still stand by that, I'm assuming?

A.    Like, as a course description?

Q.    You approved it?

Page 128

A.   You know, letting her know that, you know, there was a slide from her course circulating on Twitter and, you know, that we were sort of paying attention to it.   There's a process for -- university process for when faculty members are in the media in whatever capacity, and so I just wanted her to let -- let her know that that might happen.

We didn't know if it was going to -- we didn't know if it was just, like, this was on Twitter, it will disappear, or if this is a thing that will happen.

Q.   Were there student complaints?

A.   It was just a tweet of the -- a slide.

Q.   Did you receive student complaint?

A.   Oh, no.

Q.   You never received a student complaint?

A.   No, never.

Q.   Okay.   Okay.   Let's move on to the English 360 course when you sat in on the course.

A.   Uh-huh.

Q.   And around that time period, the 28th, I believe you sat in on the 30th; is that correct?

A.   The Wednesday, yes.

Q.   Okay.   So you said that there was a conversation prior to the 28th with Dr. McCoul?

Page 132

A.    (Inaudible) -- at the -- at the August 4th meeting?

Q.    Yeah, the meeting -- the August 4th meeting or the meeting you just discussed with Dr. Zoran.

A.    Okay.  So not at the August 4th meeting, we weren't talking about the fall.  We were talking about the, kind of, process --

Q.    You did not talk about the fall at all in the August 4th meeting?

A.    In -- not in a, sort of, specific, "this needs to happen in advancement of the fall."  So, again, it was, sort of, reflecting on what had happened and how the conver- -- the -- the communication between the different levels needed to be quicker and more responsive.

Q.    Okay.

A.    This -- so on August 18th, I had a conversation with Mark Zoran, saying he had spoken to somebody from higher up.  It was -- it wasn't clear to me.  I think it was Alan Sams, saying that there were -- that they had heard from a student again.  They were concerned about the fall.  And there was no instructions about what that concern meant.  And so the concern was that it would re- -- it would have a, sort of, public social media presence, again, in the way that it had over the summer.

Page 143

And so in the conversation with Mark Zoran, he and I came up with these three options to offer to Dr. McCoul in response to -- with the knowledge that she would be on the front ends of this --

Q.   But one of the -- but one of the options that you had come up with and presented to Dr. McCoul is that, status quo, you can teach the same thing, because -- is that not what she selected with Option 1?

A.   Yes, but the same -- the -- the -- she could maintain the -- the sched- -- the syllabus for 361 that she had already --

Q.   And that came from you?

A.   Well, in conversation with Mark Zoran, yes.

Q.   Okay.  In terms of the course redesignation from 361 to a 394 --

A.   Uh-huh.

Q.   -- was the understanding that it would be changed to a 489?

A.   No.

Q.   Never?

A.   No.  To the extent that we had -- we had a conversation, we were floating a variety of course numbers as potential options.  And 489 might have come up, but it was not "this is the course it was going to be."  It was, "here are a handful of course numbers that

Page 144

would work." And so, yeah. So the 489, we talked about very briefly.

Q. Did you ever have a role in directing anyone to change that course, the designation, the redesignate?

A. The -- like a staff person to redesignate?

Q. Yes.

A. Yes. So I reached out -- once we decided that 394 made the most sense, it was the most straightforward, I reached out to Andrea Ramirez, who is our staff person in the undergraduate office who does all of the ARS stuff. So she re- -- re- -- was going to do it. It was at 5:00 p.m. on Thursday, one business day before the semester started. She was out for the day or le- -- either was out for the day or left early, so then Jason Henderson and the college ended up doing this.

Q. You never gave any directive to anyone to execute this directive to change to a 489 or a 394 --

A. No, I --

Q. You never used --

A. No.

Q. -- you never used the word "494"?

A. 494 is not a course. 489.

Q. 489, excuse me.

A. No, I never told her. I told her to change it

to 394.

Q. Okay. And you never told anyone else to make it a 489 or that we were told to make it a 489?

A. No.

MR. SMITH: Okay. No further questions.

CHAIR MCDONALD: One second here, ma'am, please. Okay.

MS. REICHEK: Great.

EXAMINATION

BY MS. REICHEK:

Q. Good afternoon.

A. Hi.

Q. Could you turn to Exhibit No. 35 in the TAMU exhibit.

A. Okay.

Q. These are the evaluations that you were questioned about earlier.

A. Yep.

Q. It says that there's a response rate of 12 out of 35?

A. Yes.

Q. What does that mean?

A. That means that of the 35 students who were registered in the class, only 12 responded to the course evaluation. Course evaluations are optional.

Page 146

Q.  Okay.  In your experience, do these evaluations sometimes skew negative?

A.  Course evaluations, I don't know that they would skew negative, but they -- they skew -- they -- they -- there's large bodies of social science evidence that suggests that course evaluations respond in -- in biased ways, whatever that might look like.

Q.  How would you describe Professor McCoul as a professor?

A.  She's an excellent professor.

Q.  She was promoted to senior lecturer in 2023; is that accurate?

A.  Yes.

Q.  That wouldn't have happened had she not been an excellent professor; is that right?

A.  That's correct.

Q.  Okay.  How would you describe her -- her student scores, her student evaluations prior to the summer of 2025?

A.  I don't remember them in much detail, which would suggest to me that they were typical.

Q.  Typical of?

A.  Sort of, the departmental average.  You know, so in -- in an -- in what I would expect would be the typical range for those -- those scores.

Page 147

Q.  All right.  Turn to Exhibit 32, if you would, in McCoul exhibit.

A.  Okay.  32?

Q.  32.  Is this your evaluation from -- or your observation notes from the 30th of July?

A.  It is, yes.

Q.  And you didn't identify any kind of problems with her -- her course content that day, did you?

A.  I did not, no.

Q.  And this is consistent with your observation that day?

A.  Yes.

Q.  Okay.  Turn to Exhibit 61, if you would.

A.  Of your -- the McCoul?

Q.  Yes, of McCoul.  At the bottom of that page, Page 1, there's an e-mail to Dr. McCoul from you.

A.  Uh-huh.

Q.  And this reflects that meeting from August 4th; is that correct?

A.  Yes.

Q.  Okay.  And -- and you say, I met yesterday with President Welsh, along with Dean Zoran, Heather Lench and Tim Scott.  President Welsh emphasized to me that he supports the work you do, and especially noted the thoughtfulness and care you extend to both your course

Page 148

design and your students; is that accurate?

A. Yes.

Q. Let's talk about syllabi for a moment. Is there a common syllabus for any courses in the English Department?

A. No. Yeah. No, there is no -- for our multisection writing classes, there is a -- a shared syllabus that students or -- or instructors can use, but they're -- it's not mandated.

Q. Okay. Turn to Exhibit 54A in McCoul. This is Dr. Robinson's syllabus.

A. Correct.

Q. And this was -- it's my understanding it was submitted for the recertification process for the core curriculum?

A. Correct.

Q. Is there any expectation that Dr. McCoul's syllabus looked like Dr. Robinson's syllabus?

A. No.

Q. Now, Dr. McCoul is -- just to reiterate your testimony from earlier, she was never told that she should or even could teach this content as an English 489 class, was she?

A. No.

Q. She was told only that it could be taught as a

English 394 class?

A. Yes.

Q. And she did that?

A. Yes.

Q. Did you ever analyze whether her 394 content aligned with the course catalog?

A. In the sense that that was why we suggested it, that it -- or why I proposed that to Mark Zoran and Cynthia Werner, was that we have this course number that aligned with the way that the course had been set up.

Q. And 394 is what?

A. Topics in a genre or special topics in a genre.

Q. Right. And the genre in this case would've been young adult literature?

A. Yeah.

Q. Okay. All right. Turn to McCoul's Exhibit 3, if you would. This is the university's Academic Freedom, Responsibility and Tenure Policy. And under Academic Freedom, it states, "Each faculty member must be free from the corrosive fear that others inside or outside the academic community, because their vision may differ, they threatened the faculty member's professional career, the material benefits accruing from that." Is that accurate?

A. (No audible response.)

Page 150

Q. And that -- that's consistent with your understanding about A&M's academic freedom policy, right?

A. Yes.

Q. If Dr. McCoul was terminated in response to complaints from students, parents, and elected officials who had a different view than Dr. McCoul, would that violate this policy?

A. That feels like I would be speculating a little bit here, but I would say probably not.

Q. You --

A. Stu- -- student complaints are different, but...

Q. Right. Now, you were not consulted on her termination, were you?

A. No, I was -- was removed from the department head position the night before.

Q. Okay. All right. Are you aware of her failing to follow any directives?

A. No.

Q. Okay. Are you aware of her violating any university policy?

A. No.

Q. Had you been -- had you been involved in the decision-making for her termination, would you have made

Page 151

so this -- and this is at the moment where the annual -- sorry -- the student evaluations are part of, though certainly not the -- the full extent of -- about the departmental evaluation of an individual professor's performance.

DR. ALI: Thank you.

CHAIR MCDONALD: Anything else? Okay. Yeah?

UNIDENTIFIED SPEAKER: So regarding that student evaluation comments and, I think, you know, based off on our conversation, we learned that she taught the same class multiple times throughout the years. And have you, like, compare and contrast those comments from the previous years to this?

DR. JOHANSEN: I think there's -- there's some occa- -- there's some overlap with previous comments. I would also say that one or two student comments out of 35 and just -- just the number of evaluations over the -- I don't know, five or six iterations she taught in most recent years, that also didn't seem, sort of, statistically overwhelming. So, you know, there's, inevitably on a student evaluation, one or two comments that are negative that, you know, in whatever way.

And so it's -- it -- looking for recurring

Page 154

patterns, but also looking for, kind of, overwhelming burden.  Is this one or two students who don't like the class or is this a real, sort of, solid percentage of the students.

UNIDENTIFIED SPEAKER:  Thanks.

UNIDENTIFIED SPEAKER:  So in the AEFIS feedback, one of those comments was about how the class just didn't align with this person's, like, own personal beliefs, and they felt that this was all false information.  So at that point, if the student would've asked, could y'all have removed her from the class and put her in a different class or accommodated her in a different way?

DR. JOHANSEN:  The -- the student?

UNIDENTIFIED SPEAKER:  Yeah.

DR. JOHANSEN:  Yes.  That -- so typically -- you know, students have opinions about material, and they can either, you know, have -- so the -- the first step is to have a conversation with the instructor, to see if they -- the instructor and the student can either clarify what the issue is and how to pre- -- how to respond to that, whether that's -- you know, whatever that might look like, depending on the scale of the student issue.

We could also remove them -- or move --

Page 155

CHAIR MCDONALD:  We have 16 minutes to --

MR. GIBSON:  Perfect.

CHAIR MCDONALD:  -- do what you need to do.

And I'm sorry online, I cannot -- I don't have the start time.

(Lunch break was taken.)

CHAIR MCDONALD:  So I'm going to swear you in.  Do you swear to tell the truth, the whole truth and nothing but the truth?

DR. ZORAN:  I do.

UNIDENTIFIED SPEAKER:  Oh, there's Carla.

CHAIR MCDONALD:  There's Carla.  No, we haven't started.

I'm going to ask you to introduce yourself (unintelligible).

THE WITNESS:  I'm Mark Zoran, professor of biology, former dean of the College of Arts and Sciences.  Is that what -- is that enough?

CHAIR MCDONALD:  I think so.  Okay. Darren, you ready?

MR. GIBSON:  Yeah.

CHAIR MCDONALD:  Okay.  You ready?  Okay.

MR. GIBSON:  Thank you.

DR. MARK ZORAN,
having been first duly sworn, testified as follows:

Page 158

Q. And did you discuss that someone needed to observe her class?

A. Yes.

Q. But prior to that happening, did you get further calls from the president and the provost regarding additional complaints about the class?

A. Prior -- before the 21st?

Q. No, before the 29th.

A. Yes.

Q. Yeah. And were they concerned that it didn't seem that this class was being addressed, the concerns about this class?

A. That -- that was their impression, yes.

Q. Did you have a further call with Emily Johansen on the evening of July 27th?

A. I -- a further phone call with her?

Q. Uh-huh.

A. I don't recall that, no.

Q. Do you recall discussing that Dr. Johansen would actually go observe the class as well as Dr. Goodey?

A. Yes.

Q. At some point, it became clear that a student had been removed from the class and was meeting with the president, correct?

Page 160

A.   That's correct.

Q.   And you thought it best for all to cancel the rest of the class, given what had occurred?

A.   That's correct.

Q.   Who made that decision?

A.   I think it was a -- it was a joint decision within the college.  So myself, Executive Associate Dean Werner, and I believe Dr. Johansen was involved in that.  Was -- it was more of an outcome of a discussion of how do we -- how do we check with all the students in the course, the students that are happy in the course, the students that are not happy in the course and the professor herself.

Q.   And then there was a meeting on August 4th with the president, including yourself, provost, chief of staff, Dr. McCoul, and some additional individuals from mark comm; is that correct?

A.   That's correct.

Q.   Okay.  And was the president surprised by the content of the course that McCoul was teaching in light of the course description and core curriculum documentation?

A.   I think that's fair to say.

Q.   Was he significantly concerned about the misalignment of those two things, a core course relative

Page 161

explicitly say she agrees with the -- with the options presented, but basically reiterates her support for Dr. McCoul, correct?

A.   Her -- her support for Dr. McCoul and her support -- and her support for the content that she was teaching, yes.

Q.   Uh-huh.  And did Dr. Johansen repeatedly push back on your efforts to change the ways that Dr. McCoul taught her classes?

A.   I -- I wouldn't -- I wouldn't define it as "push back."  She certainly feels strongly that the content of the course and the way Dr. McCoul taught it was appropriate.

Q.   And the -- it was clear that that was not the directive that was coming from university, which is she was not to teach 361 in the same manner as she had previously taught it?

Let me say that Dr. McCoul thought it was perfectly appropriate for Dr. -- Dr. Johansen thought it was perfectly appropriate for Dr. McCoul to teach 361 in the manner she had previously taught it?

A.   I -- I -- yeah, I would -- I would assume so.

Q.   And that was not --

A.   She'd taught it for many years in that -- in that format, so...

Page 170

Q. And that was not an option, according to you, that was on the table after --

A. I did not think it was in her best interest to teach it in that -- in that way so close after this incident happened.

Q. And did you, at some point, indicate to the provost that the class was going to be taught as a 489 course?

A. I don't know if I ever explicitly said that. That would -- I would -- I would think I wouldn't have, because it was never cemented in that way. But I certainly related to him that that was my preference, that it be taught as a 489, and that that would be the best for all because it's a de- -- that is a developmental course --

Q. Uh-huh.

A. -- and we could be developing the co- -- a course and Dr. McCoul's content in a way that reflected a course that was, in my mind, more appropriate than in -- in the core curriculum. And as we've spoken before, it was my understanding that 361 was part of the core curriculum, but it turns out it was not.

Q. It was not taught as a 489 course, correct?

A. That's right.

Q. It was taught as a 394 course.

Page 171

CHAIR MCDONALD:  Okay.  Ms. Babineaux.

(Unintelligible.)  Ready?

EXAMINATION

BY MS. BABINEAUX:

Q.  Hi, Dr. Zoran.  I'm Sara Babineaux.  I'm one of the attorneys representing Dr. McCoul.  Quick point of clarification, I think this was a mistake in your direct.  At that August 4th meeting, Dr. McCoul was not an attendee at that, correct?

A.  She was not an attendee.

Q.  Okay.  I just wanted to clarify that.  No, all good.

And if you could go to your McCoul exhibit binder and go to Exhibit 16, please.  Do you recognize this as a promotion recommendation on behalf of Dr. McCoul as a senior lecturer?

A.  Yes.

Q.  You're listed as, you know, on the "from" line, correct?

A.  Yes.

Q.  So you were part of the decision to promote Dr. McCoul to senior lecturer?

A.  Yes.

Q.  Okay.  Did you oppose her promotion at all?  No?

Page 173

A. No.

Q. What was considered as part of this decision?

A. For folks on the -- on the lecturer track at Texas A&M, basically, 90 percent of what is taken into consideration is the excellence of one's teaching, with the other 10 percent on, kind of, service; although service is, kind of, just expected --

Q. Yeah.

A. -- of faculty.

Q. How is the excellence determined? It is it through student feedback, professor feedback, course observation? What goes into that?

A. All -- all of the above. It's -- it's a holistic review of the faculty member's engagement in teaching from pedagogy to course evaluations to peer -- peer evaluations, et cetera.

Q. So, kind of, considering all of those different factors, you and others made the decision that Dr. McCoul should be promoted?

A. Yes.

Q. Okay. Now could you please go to McCoul Exhibit 4. And do you recognize this documents as University Rule 12.01.99.M1?

A. Yes.

Q. Okay. Could you please flip to Page 21. And

Page 174

personal conference that dismissal is being considered, and that the faculty member may request a conference with the dean.  The dean would be you, correct?

A.  That's correct.

Q.  To your knowledge, was such a personal conference held and then referred to you?

A.  Absolutely not.

Q.  Okay.  And it also --

A.  I don't even think I was dean anymore when she was dismissed.

Q.  It also talks about how the faculty member has the right to an advisor during this process.  Do you know if Dr. McCoul was provided an advisor?

A.  I do not know that.

Q.  To your knowledge, she was not provided an advisor?

MR. GIBSON:  Objection; he just said he doesn't know.

Q.  (BY MS. BABINEAUX)  It also says, "The opportunity to be heard shall be completed within 15 business days from the time of the request."  Again, you don't believe that the opportunity to be heard even happened, correct?

A.  Correct.

Q.  Okay.  Jumping down to 9.2.1, we're still on

Page 176

says, "at the conclusion of an investigation process." To your knowledge, no investigation process was actually undertaken by the university?

A.   (No audible answer.)

Q.   Okay.  If you could please flip the page and look at Section 9.2.2.  It says, "Prior to issuing the notice of intent to summarily dismiss, the apartment" -- "the department head shall seek approval from the college/school dean."  Now, to your knowledge, was Dr. McCoul given notice of intent to summarily dismiss her?

A.   I have no knowledge of that.

Q.   Okay.  So the department head, which in this case would've been Dr. Johansen, correct?

A.   I -- I don't know who was department head at the moment.  I was --

Q.   Uh-huh.  Oh, I understand.  Because of the removal from the positions?  Prior to the removal from the positions, would you --

A.   Prior to the -- my and Dr. Johansen's removal, no, I don't believe anything like that happened.

Q.   Okay.  To your knowledge, Dr. McCoul was not provided any written charges as is required under Section 9.2.2?

A.   My knowledge.

Page 178

A. To my knowledge.

Q. Do you agree with the decision to terminate Dr. McCoul?

A. Well, I -- I would say no.

Q. Why?

A. As you -- as you indicated --

UNIDENTIFIED SPEAKER: No, no --

Q. (BY MS. BABINEAUX) No.

UNIDENTIFIED SPEAKER: -- no, no, no.

A. As you indicated, we -- you know, she was promoted; she was respected by her faculty and her department. So to my knowledge, she was fulfilling her -- her job as a -- as a senior lecturer in the college. As I -- I don't know the circumstances or the causes by which she was dismissed, so it's -- it's hard for me to make a decision on whether or not that was legitimate, I would say. Knowing what I know, no, I would not have dismissed her.

MS. BABINEAUX: Thank you for your time. Pass the witness.

CHAIR MCDONALD: Okay. Faculty members, do you have any questions for Dr. Zoran?

UNIDENTIFIED SPEAKER: Yes.

CHAIR MCDONALD: (Inaudible.)

UNIDENTIFIED SPEAKER: Looking at the

Page 180

MS. BUDZISE-WEAVER: Okay. Do you know if Dr. McCoul was ever explicitly told not to teach the content in question in a fall course?

DR. ZORAN: I do not know that.

MS. BUDZISE-WEAVER: Can I get a follow-up? Did the provost ever pass along directly to Dr. McCoul about teaching the course as a 489?

DR. ZORAN: I don't -- I don't know.

CHAIR MCDONALD: Provost coming up next, Tina.

MS. BUDZISE-WEAVER: (Indiscernible) coming?

CHAIR MCDONALD: Yeah. (Indiscernible) will be here next, so that's probably -- and Dr. Zoran, that's -- just would be --

MS. BUDZISE-WEAVER: He lost the schedule of events today.

UNIDENTIFIED SPEAKER: That's okay.

MS. BUDZISE-WEAVER: It's buried somewhere.

CHAIR MCDONALD: I want to mutter overrule because that's what Judge (indiscernible) --

UNIDENTIFIED SPEAKER: Overruled.

CHAIR MCDONALD: Sorry.

MS. BUDZISE-WEAVER: Okay.

CHAIR MCDONALD: Jay, go ahead.

Page 182

original designator.

And I said, Well, that's the first I've heard of any of that. And I said, Let me call Mark Zoran and get back with you. So that's -- that's when I'm hearing about it. It was late that afternoon.

Q. What was your reaction?

A. I just said it wasn't what we had agreed to, so this doesn't make any sense. I -- Mark would have told me had they changed course on it.

So I -- I called him immediately and he said, Yeah. He said, They didn't create the 489 because it would -- it was going to take too much time. And they -- they moved the course into -- instead of young adult literature, moved into genres. Right? So put it into another course. Again, it wasn't the 489. It was in another -- one of the problems with this all along had been that it was in a general nondescript course that has lots of different things you could teach in it, right?

And so it -- again, it was put into that. One of the -- all the way back to the -- to the -- the -- the president's office conference room meeting was that it needed to have a name of a course that represented what the content of the course was. That was the original directive. And even here, we're all

Page 197

A.   Correct.

Q.   -- you would agree with that?

And -- and Dr. Johansen affirmed her understanding?

A.   Correct.

Q.   Okay.

A.   But it's -- I wasn't there when -- when Dr. McCoul was -- got this -- this impression from the president or from whomever she got it from.  And so it's hard for me to say that this -- I -- you're asking me is this her understanding?  I don't know what her understanding is.  This is what the e-mail says.

Q.   Okay.

A.   And this is what this e-mail says that refers to that.  So...

Q.   Okay.

A.   But I -- I -- I understand the connection between this and this and that Dr. Johansen felt like this was accurate.

Q.   Okay.  Thank you.

Was there any discussion about Governor Abbott's office calling out to -- reaching out to the president about this course?

A.   (No audible response.)

Q.   Turn to, in the other binder, Exhibit 2.  That

Page 204

would be McCoul Exhibit 2.  Have you ever seen this document before?  You're, in fact, copied on it; is that accurate?

A.  Uh-huh.

Q.  Did you review this letter before it was sent out to Dr. McCoul?

A.  Yes, I did.

Q.  All right.  In that first full -- that second paragraph in the first page states, "On July 10th, 2025, the office of the president was made aware of material being introduced into her English 360 Literature for Children curriculum that did not align with the course catalog.  You were instructed on multiple occasions to change the course content to align with the catalog description and the course description that was originally submitted and approved; however, you chose not to follow that directive."

Do you see that?

A.  Uh-huh.

Q.  Do you have firsthand knowledge of what directives Dr. McCoul was ever given about that?

A.  No.

Q.  Okay.  What is your understanding based on? Well, sitting here today, do you still have the understanding that she was given directives to change

Page 205

her course content and she failed to do so?

A. President Welsh mentioned that he had communication of some form with Dr. McCoul, and in the meeting on the 4th with -- in -- it was in the president's conference room, Dr. Johansen had said that she had talked to her about changing the course -- well, I think what she said was she -- she -- she didn't think that Dr. McCoul would want to do that, change the course.

Q. So she didn't -- she wasn't referencing a directive?

A. Correct.

Q. Okay.

A. Correct.

Q. All right. And is it your testimony under oath that Welsh said that he had talked directly to Dr. McCoul?

A. It was -- it was my impression that there had been conversation or communication of some form with Dr. McCoul.

Q. What was that based on?

A. Oh, I don't know. I have ha- -- I have -- I had lots of conversations with him.

Q. Okay.

A. And my impression was that there had been some

Page 206

kind of communication about the course back earlier in the summer.

Q. Any other directives that you believe were given directly to Dr. McCoul that --

A. No. No. Like, I -- this -- and this is my first communication with Dr. McCoul, and I hadn't met her before.

Q. Okay. Now, reading this letter, is it your understanding that these policy violations that are listed relate to her failure to follow directives?

A. Yes, I -- yes.

Q. Okay. So those policy violations are based on her failure to follow directives with -- with respect to the course -- the curriculum content and nothing else?

A. It's been a while since I've read this, so...

Q. So Policy 6.3.2, Continuing or Repeated Failure to Perform Duties or Meet Responsibilities to the Institution or to Students or Associates, that's referring to that paragraph about failure to follow directives; is that accurate?

A. Yes.

Q. All right. And 6.3.5, Violation of System Policies, System Regulations, System Academic Institution Rules or Laws Substantially Related to the Performance of Faculty Duties, what system policy,

system regulations, system academic institution rules or laws are implicated by that paragraph?

A. I think I -- I couldn't quote you a policy number. I think it relates to the -- to not doing what your superiors have told you to do.

Q. And sitting here today, you don't have firsthand knowledge of anything that her superiors told her to do; would that be accurate?

A. Correct. They -- they -- other than what I've just said about the -- the 489 exchange and the comments that -- that Dr. Johansen made in the president's conference room, it's -- if that's secondhand.

Q. Okay. It's -- it's a big deal to be promoted from lecturer to senior lecturer; would you agree with that?

A. (No audible answer.)

Q. Turn to Exhibit 17 in McCoul exhibits. Do you recognize this document?

A. I do.

Q. Okay. This appears to be a -- a notification to Dr. McCoul that -- that she's been proposed for a promotion to senior lecturer.

A. Uh-huh.

Q. And it states that she concurs with Vice President for Faculty Affairs, Dr. N.K. Anand and

Page 208

Interim Provost Alan Sams in making a positive recommendation regarding your promotion to senior lecturer. Do you recall passing on Dr. McCoul's promotion during this time frame?

A. No, I don't call -- I don't recall this specific one, no.

Q. Okay. What would -- what would --

A. I do about a hundred a year, so...

Q. Sure. I understand. What would be the typical materials that you would review in -- in deciding whether to approve a -- a promotion?

A. It usually involves a faculty member's statement about their work and their philosophy about whatever their responsibilities are, teaching or ser- -- service and things like that. A record of accomplishments for somebody that's got primarily instructional duties assigned to them, it usually involves some aspect of how they've either developed their course or further developed or modified it or innovated it. And in some of that kind of stuff, is we look for somebody that's keeping up with the profession and -- and they're trying to advance their course. So those kinds of things.

Q. Student evaluations?

A. Uh-huh. Yeah. Those are -- and peer

Page 209

evaluations by other faculty.

Q. Okay. Now, do you un- -- do you agree with me that the decision to remove Dean Zoran and Department Head Johansen, those decisions were made on September the 8th?

A. I'd have to look back at my calendar to know for sure, but probably. It was -- it was the same -- it was the night that I made the initial -- that I call- -- got a call from the president in the afternoon and -- and immediately called Dean Zoran, and then I called them later on that evening --

Q. Okay.

A. -- and asked them to step down.

Q. All right. Turn to Exhibit 40 in McCoul, in McCoul Exhibit 40. Do you recognize this document?

A. Yes, it looks like the social media post from -- from the president.

Q. And does this reflesh [sic] -- refresh your memory as to when the decision was made to remove the dean and the department head?

A. Yes, because this was sent out shortly after I called him and told him I had talked to both the dean and the department head.

Q. Okay. And turn to the next one, is Exhibit 41 in that same binder. And this is a -- a follow-up

Page 210

action until we can think more about that and look more at what happened and make a decision about that later. So we -- we paused that one. And then on the next day is when that decision had been made.

Q. Okay. My understanding is that -- my understanding is that as of the morning of September 9th, there was no decision yet made with respect to terminating Dr. McCoul; is that accurate?

A. Uh-huh.

Q. Okay. What time of day was the decision made to terminate Dr. McCoul?

A. In the afternoon.

Q. After 12:29 p.m.?

A. After 12:29 p.m.

Q. Turn to Exhibit 38 in that same binder. And this is McCoul Exhibit 38. This is a post on Twitter by Greg Abbott at 12:29, September 9th. And he's saying, "Good. Now fire the professor who acted contrary to Texas law." Do you see that?

A. Uh-huh.

Q. Okay. So in the morning, as of around 9:00, no decision to terminate Dr. McCoul had been made. 12:29, this tweet is issued, and she's fired a few hours later; is that accurate?

A. Uh-huh.

Page 212

committee generally come from a dean and -- and not the provost's office.

So can -- can you, maybe, help me understand both of those issues?

A. Yes, I -- I think by going straight to the dismissal, it would not follow the policy.

Q. Okay.

A. And the reason the dean was not the one that exhibited -- because we had no dean at the moment.

Q. Good point. Okay.

A. Okay? And the next person up the ladder is the vice provost for Faculty Affairs, and that's why Blanca Lupiani was one that signed --

Q. Okay.

A. -- that.

UNIDENTIFIED SPEAKER: And so I -- I have a follow-up question. So when the -- per university policy, like, those, like, the person who's affected, being dismissed, the -- per policy, they have a right to appeal or heard about the processes. And I was wondering if any, like, leadership team discussed about the potential, like, you know, the hearing session for the -- Dr. McCoul?

Because those should be made at -- in the conclusion of the investigation, but we don't see that

Page 217

BY MR. SMITH:

Q.  Can I have you take a look at TAMU 47.  Were you aware that DOJ said that they were going to look into this matter?

MS. REICHEK:  I'm sorry.  Objection to "this matter."  Are you referring to what's in this letter or what we're talking about today?  Okay.

MR. SMITH:  Dr. McCoul's teaching.

A.  Yes, I was.

Q.  (BY MR. SMITH)  That's a pretty exceptional circumstance, is it not?

A.  Yeah.

Q.  I mean, one might say serious?

A.  Uh-huh.

MR. SMITH:  All right.  Pass the witness.

MS. REICHEK:  I only get one?  Or do I get one and a follow-up?  I think that was three.  I'll be quick, I promise.

FURTHER EXAMINATION

BY MS. REICHEK:

Q.  You said earlier that your supervisor told you not to investigate?

A.  That's not what they said.  They said -- that they -- they said, We're going to go straight to termination.

Page  222

Q.   And who is "they" said this?

A.   My superiors.

Q.   Being?

MS. REICHEK:  It's a fair question?

MR. SMITH:  If it includes any attorney-client privileged communication, you can't include that.

DR. SAMS:  Yeah, it is -- it is attorney-client.

MR. SMITH:  Then you can't -- it's --

DR. SAMS:  That's why I'm pausing about it. I don't know what I'm supposed to say with that.

MR. SMITH:  And if it includes attorney-client pri- -- you -- with that, you can't disclose attorney-client privileged communications.

CHAIR MCDONALD:  (Unintelligible) answer that because -- yeah, I -- we can leave it at "superiors."

MS. REICHEK:  Can I ask a question about their Exhibit 47 that they just asked about?

MR. SMITH:  I think you've had three questions.

MS. REICHEK:  He didn't get to answer one of them.

MR. SMITH:  Oh, you got one more.

Page 223

CHAIR MCDONALD:  You've met, okay.

UNIDENTIFIED SPEAKER:  Yeah, probably in person at some point, but...

CHAIR MCDONALD:  Okay.  You ready?

MS. REICHEK:  I'm ready.

CHAIR MCDONALD:  Okay.

DR. CYNTHIA WERNER, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. REICHEK:

Q.  Good afternoon.  What is your position with the university?

A.  Yeah, as I just mentioned, I'm senior executive associate dean in the College of Arts and Sciences.

Q.  And what does that job entail?

A.  I work in the, you know, the core leadership team of the dean, and I have oversight for two different areas; one is Faculty Affairs and the other one is Undergraduate Education.

Q.  Thank you.  In that binder in front of you --

A.  Uh-huh.

Q.  -- that one that Professor McDonald has --

CHAIR MCDONALD:  Dr. McCoul -- Dr. McCoul's?

MS. REICHEK:  Yes.  Let's trade.  I'm not

Page 227

page in that document, which is -- they're front/back, so...

A. Uh-huh.

Q. You'll agree with me that children's literature is part of the LPC, or Language, Philosophy and Culture --

A. Yes.

Q. -- core curriculum?

A. It is.

Q. And for that reason, it includes themes, many of which are reflected in Dr. McCoul's course content; would you agree with that?

A. Yes.

Q. Okay. And why is it important to have things like gender, race, regional backgrounds, things like sexual orientation in a children's literature course that's certified in LPC?

A. Yeah, as I understand the purpose of this foundational component area, I just call them "categories of the core curriculum," is to give students an ex- -- an opportunity to learn about the human experience, broadly defined. And this would include experiences over time and over space and subcultural differences.

Q. My understanding is that in mid July, there was

Page 229

you and a Wayne Versaw?

A. Yes.

Q. Who is he?

A. Wayne is a member of my team. He's on the Undergraduate Education team. He's the associate dean for -- all the titles, I'm confused -- I think strategic initiatives or faculty-student initiatives.

Q. And on the third page of that document, there's an e-mail from him to you. And he said, I asked Tim, presumably Tim Scott, to itemize the unique complaints and to share what the outcome that the president expects. He shared the first, but not the second.

A. Uh-huh.

Q. And then he goes through and describes, At issue is: Instructor teaching LGBTQ content in a children's lit class, not part of course description or syllabus in other semesters. It's a core class and we have had numerous complaints, et cetera. Feel like it is a bait and switch. Came up last week. We thought between Faculty Affairs and Mark, it had been dealt with, but continue to have complaints to the president.

A. Uh-huh.

Q. And he says that Mark's conversation with Michael Johnson suggested that a core course should have similar syllabus and content regardless of who teaches

Page 231

it?

A.   Yes.

Q.   Do you see that?

A.   Yes, I do.

Q.   Okay.  Do you agree with that idea?

A.   I do not.

Q.   Okay.  And -- and --

A.   As you can see in my long discussion on --

Q.   Right.

A.   -- response of why I don't agree with that.

Q.   Right.  You responded and described why that is not the case --

A.   Uh-huh.

Q.   -- in the humanities; would that be accurate?

A.   That is true.

Q.   And then you propose at the end that they look into it, right?

A.   Uh-huh.

Q.   That a meet with the department head is planned; however, she should have discussion with faculty member --

A.   Uh-huh.

Q.   -- et cetera.  And -- and he said -- he generally agreed with you, "fact finding is prudent," right?

Veritext Legal Solutions
800-336-4000

A. That is true.

Q. Okay. So tell us more about this alignment idea between Dr. McCoul's syllabus and the one that was submitted to recertify this course. I believe Dr. Robinson's syllabus was the one.

A. Uh-huh.

Q. What is your view on that?

A. This is a subject that started to come up around this time about this class, and it was this idea that the course syllabus that she's teaching should be identical to the course syllabus that a previous instructor had been teaching, and that was unfamiliar to me that that was an expectation.

Q. Okay. And why is that?

A. Because different instructors teach classes in different ways. A class is approved into the core curriculum. There are certain aspects of the class that should be the same, like the learning outcomes, especially for a core curriculum class. The different instructors are going to tailor the class, they're going to select their own readings.

If you think about classes in English and literature, there's so many different reading materials that someone can choose, so it's up to the instructor to choose the readings that they want to use.

Page 233

Q.  Okay.

A.  You wouldn't just focus on eight novels and use those for 50 years in a row.  Materials change over time, scholarship evolves over time.

Q.  Now, there was some discussion about recasting this course content as a diff- -- under a different number.  And my understanding is that there was a 489 number proposed and a 390.

A.  That was later.  That was whenever we were talking about the fall semester.

Q.  Yeah, I'm paraphrasing a little bit --

A.  Yeah, okay.

Q.  -- to save time.  Sorry.  It's like whiplash.

A.  Yeah.

Q.  Are you aware of Dr. McCoul ever being told that she needed to teach her young adult classes as a 489 course?

A.  Not that I know of, that it was directly said that she must teach that class as a 489, no.

Q.  Okay.  And there was -- there was some discussion among you and some other administrators about different options, and it was decided that she would teach this 49- -- a 394 class; is that accurate?

A.  That is true.

Q.  And Dr. McCoul wasn't involved in those

Page 234

discussions, right?

A.   I don't think she was.

Q.   Okay.  Are you aware of any directive that was directly given to Dr. McCoul that she failed to follow?

A.   No.

Q.   Okay.  Now, I'm sure that it's not uncommon for you to get complaints or hear of complaints routed to you from the provost or the president --

A.   Uh-huh.

Q.   -- is that accurate?

A.   That is true.

Q.   Okay.  Was anything different about this time?

A.   It was different this time.  There seemed to be a preconceived idea that she was doing something wrong. Usually in the dean's office, we're asked to look into something, and we work with the department head to look into the situation.  In this case, in this very paragraph that's in No. 60, it just seems like there was already an idea of what was happening in the class, and that was quite different.

Usually we look into something, we report back and discuss this with other administrators.  And we seemed to be brought into the loop later than usual.

Q.   When did you first hear that any sort of administrative action was being proposed with respect to

Page 235

Dr. McCoul?

A. I believe it was Tuesday. I'll try to get the date right this time. September 9th.

Q. Yes. Okay. So what did you hear?

A. It was -- I was in a meeting with our department heads. This was the day after our dean was removed from his administrative position. We were all kind of struggling to come to terms with that. We had a scheduled meeting with our department heads. We decided to continue that meeting.

And during the course of that meeting, I got a phone call from Blanca Lupiani, who's the vice provost for Faculty Affairs, and she mentioned that they were going to provide Dr. McCoul with a letter to -- intent to dismiss with -- they were going to put her on administrative leave with pay, and there was going to be an investigation that was going to take place. And that was around 2:30 that day.

Q. Okay. And did she ask you to do anything with respect to this?

A. She did. Since I was, at that time, the senior administrative member of the college, since our dean was removed from his position, I was asked to sign the letter.

Q. And what did you say in response to that?

Page 236

A.   I asked a number of questions about what that investigation would be and why this was happening.  It was an awkward conversation, and I reluctantly agreed to sign that letter because there was going to be an investigation.

Q.   Okay.  What did you hear next?

A.   About two and a half hours later, I got a second call from Blanca Lupiani, and she said that there'd been a change of plans and that they were going to summarily dismiss her from her faculty position.

Q.   Did she ask you to do anything?

A.   She also asked me to sign that letter, and I said I cannot -- I can't sign it.

Q.   Why didn't you want to sign that letter?

A.   Because I have a conscience, and I knew that she had done nothing wrong and I -- it's my own assessment that she'd done nothing wrong, and I shared that assessment with (inaudible), shared that with --

DR. WERNER:  Thanks.

CHAIR MCDONALD:  Yes.

A.   -- with my team, I'd shared it with other administrators.  I just felt like it wasn't appropriate.

MS. REICHEK:  All right.  Thank you very much for your testimony today, and I don't have anything further for you.

Page 237

for making you switch.

MS. BABINEAUX:  Oh, here you go.

MS. REICHEK:  (Unintelligible) cumbersome binders on both sides.

MR. GIBSON:  Yeah.  So I don't...

A.  49?

Q.  (BY MR. GIBSON)  41.

A.  Okay.

MS. BABINEAUX:  Back on?

MR. GIBSON:  Yes, please.  Thank you.

Q.  (BY MR. GIBSON)  So basically, the same -- similar concerns were raised in August -- around August 20th regarding the 361 course; is that correct?

A.  Yes.

Q.  And here, the beginning e-mail, starting on the third page of this e-mail chain -- they're in reverse chronological order.  You e-mail Christian Brannstrom and Wayne Versaw saying, is it possible for a 489 course to be approved this late?  Are 489 sections approved at department level -- level only?  This is in regards to one section of English 361 being converted to a non-core curriculum course at the last minute.

A.  Yes.

Q.  So you propo- -- you were to- -- it was very clear to you that 489 was the approach that was

Page 243

initially considered?

A. Yes, it was.

Q. And then they -- they say, "Yes, it's possible." And then you confirm, "Confirming that a 489 would work," correct?

A. Yes.

Q. "Thanks for confirming." And then Emily Johansen writes, Kalani will take the 361 as an overload. Who's Kalani?

A. Kalani Pattison is another instructor.

Q. She was al- -- she was teaching -- she teaches 361 as well?

A. She also teaches -- yeah.

Q. And then it says, "Melissa will teach a 394 course."

A. Uh-huh.

Q. That was not in- -- that was inconsistent with what you had been discussing previous, correct?

A. It is. There was a discussion that's not captured in these e-mails.

Q. And the decision was made to have it as a 394, not a 489?

A. That is correct.

Q. And who made that decision?

A. Emily Johansen proposed it, and then Mark Zoran

Page 244

and I discussed it with her.  She gave a reason for why a 394 would be a better approach, and we agreed that that would be okay 'cause there's not a significant difference between offering the class at 394 versus 489. And in fact, 394 would be more likely to be appealing to students because it has a title in the transcript versus 489 will just say "special topics in."  In both classes, it's possible to teach different subject matter using both titles.

Q.  Is it the title for -- does the description in the course of 394 correspond to what she was teaching?

A.  Yes, it does.  Genres in Literature, it's a class that you can -- students can take multiple times for (inaudible) and it can be used for different sources.

Q.  So the descrip- -- you're saying that the description in the -- it was -- mattered to put it as a 394 'cause that more aligned with the course description?

A.  No, that it was acceptable to use as -- for this course.

Q.  I -- I thought you just --

A.  Genres in Literature.

Q.  I thought you just said that it was important because the students would be able to see in the course

description what it meant -- what it meant.

A. No, it did not say that. I said, on their transcript, they would have a title that said Genres in Literature. Genres in Literature would be more preferable than Special Topics, which is -- doesn't mean anything.

Q. Got it.

A. So that's why the students would prefer to take a 394. We often have problems having students sign up for 489s because it doesn't -- it doesn't say anything. Genres in Literature at least gives some idea of -- that it's genre in literature, and young adult literature is, in fact, a genre in literature.

Q. Got it. Could you turn --

A. It seemed like an acceptable solution.

Q. I understand. Could you turn to 53 --

MR. GIBSON: Is it our 53?

UNIDENTIFIED SPEAKER: Yeah.

Q. (BY MR. GIBSON) The same binder you have in front of you, 53, please.

CHAIR MCDONALD: One that (unintelligible).

MR. GIBSON: Yeah, but it was our (unintelligible).

CHAIR MCDONALD: You there, Cynthia?

DR. WERNER: Am I here?

Page 246

be updated to include the production --

UNIDENTIFIED SPEAKER:  I think -- oh, I think it just got --

UNIDENTIFIED SPEAKER:  (Inaudible) they added an hour ago on the Teams drive.

MR. GIBSON:  Oh, it got added an hour ago.

(Multiple people speaking simultaneously.)

MR. GIBSON:  Sorry.

MS. BABINEAUX:  Sorry, Kelly.  Thank you.

MR. GIBSON:  I think they needed to update their Teams from an hour ago.

MS. BABINEAUX:  They will.  Okay.

UNIDENTIFIED SPEAKER:  I had a question.

MS. BABINEAUX:  Okay.

UNIDENTIFIED SPEAKER:  Would you ever expect another English professor to teach someone else's syllabus?  Is that common practice in, like, the discipline, or is it expected for a professor to come and take the class and tailor it?

DR. WERNER:  Yeah, that's a great question. Every professor typically tailors their own class, and this is something that professors are taught to do when they're in graduate school.  And if it's something that if they go to CTE workshops, which we want all of our faculty to do, they are given lots of ideas of how to

Veritext Legal Solutions
800-336-4000

get students engaged.  And each class is going to be different, both the selection of readings, the topics, the course outline, they're going to follow certain things, especially if it's a core curriculum class.

And they're going to be prepared to do the recertification if it's their turn to be doing the recertification, which faculty will know about at the beginning of the semester that it's your -- if this is due this semester, and you're going to have to have all these artifacts to submit, so...

CHAIR MCDONALD:  Any...

UNIDENTIFIED SPEAKER:  With the core curriculum, I understand some flexibility, but I'm a -- a bit lost on this.  Okay.  I go to --

DR. WERNER:  Uh-huh.

UNIDENTIFIED SPEAKER:  -- wherever I come out -- I'm at -- I study Chaucer.

DR. WERNER:  Uh-huh.

UNIDENTIFIED SPEAKER:  I get assigned core curriculum.

DR. WERNER:  Uh-huh.

UNIDENTIFIED SPEAKER:  Because that's what I study, I teach Chaucer in the core curriculum?

DR. WERNER:  No.  If you're teaching literature and children, you would teach children's

Page 251

literature, but there are many different authors that have written children's literature books. So exactly which ones you pick, this sort of course is meant to be a survey course, so it's going to cover several different topics, which Melissa McCoul did have several different topics covered.

The exact topics that are covered might vary from one instructor to the next. The books that are selected are definitely going to vary. And this is common throughout the humanities and social sciences. I'm a member of the anthropology department, and I've taught curriculum classes, and my syllabus does not look like the other faculty in my department, in very similar ways to her literature for children.

CHAIR MCDONALD: Time for one more and then we've got to move on. We good? Okay. Thank you very much.

DR. WERNER: Okay. Thank you.

CHAIR MCDONALD: All righty.

DR. WERNER: Thank you.

MS. BABINEAUX: So our next witness is going to be on Zoom, Kelly.

MS. DRAKE: Yes. And I'm ready to admit whenever you are ready.

DR. PATTISON: Hello.

Page 252

MS. DRAKE:  Dr. McDonald, can you hear?

(Multiple people speaking simultaneously.)

CHAIR MCDONALD:  Okay.  Dr. Pattison, can you hear me now?

DR. PATTISON:  Yes.

CHAIR MCDONALD:  Okay.  Thank you.  I'm going to swear you in.  Do you swear to tell the truth, the whole truth and nothing but the truth?

DR. PATTISON:  Yes.

CHAIR MCDONALD:  Thank you very much.  We have about 20 minutes.  It's --

MS. BABINEAUX:  It'll be me.

CHAIR MCDONALD:  Oh, there you go.  If you would -- Dr. Pattison, if you could quickly introduce yourself to the panel, please, ma'am.

DR. PATTISON:  All right.  Hello.  I'm Dr. Kalani Pattison.  I work in the English Department. I am an instructional associate professor and the 104 coordinator currently.  And I've been teaching at A&M since the fall of 2016.

CHAIR MCDONALD:  Okay.  All yours.

DR. KALANI PATTISON, having been first duly sworn, testified as follows:

Page 253

EXAMINATION

BY MS. BABINEAUX:

Q. Hi, Dr. Pattison. It's Sara Babineaux here.

A. Hello.

Q. So let's start by talking about your familiarity with Dr. McCoul. Do you know Dr. McCoul?

A. Yeah, we're friendly colleagues. We've worked on some projects together. We've met for, like, coffee off campus once or twice. We've -- I've observed her classes at some point.

Q. Now, you mentioned you observed her classes. What were you observations or impressions of her as a professor?

A. She was a really good instructor. The classes I observed were 203, which is Introduction to Writing About Literature. She had some really good projects that she was working with students. One of the days that I observed, she was work stopping and students were really comfortable asking her questions. They had, actually, really great project topics. She was able to get them in their research and arguments related to literature.

Another course that I observed, she was leading class discussion on a text, and all the students were engaged and interested and relating it to other

Page 254

texts that they'd already read, and both classes went really well.

Q. Okay. You've had a chance to review the English 360 syllabus and course description, right?

A. Yeah.

Q. Did you feel that there was a mismatch between the course description and the syllabus?

A. Not at all.

Q. Do you think that the syllabus reflects a focus on gender and identity?

A. Yes, but that's, kind of, not gender and identity specifically, but finding some way to narrow down the text that you choose to teach in a course, to have them all be about a similar theme is pretty standard for most English classes. So I teach 361, which is young adult literature; and one semester, I might pick texts that all deal with language somehow; another semester --

Q. Right.

A. -- I pick -- might pick something that deals with the concept of what is a hero.

Q. Okay. Yeah --

A. Just because there's so many texts for children's and young adult literature, that you've got to narrow it down somewhere. So picking a theme that

Page 255

she was particularly interested in to narrow down those texts would be completely normal.

Q. Right. Aside from that, though, to sum it up, a student could read the syllabus and pick up on that theme, right?

A. I believe so. They might have to look up some of the individual books just by Googling them, but I'm pretty sure she has a clear statement in her syllabus about what kind of material they'll be covering, content and stuff. So, yeah, they should know.

Q. So if a student reviewed that syllabus, picked up on those themes and disagreed with it, they could drop the course; correct?

A. They could. They could take a different section of 360. There's more than one.

Q. And there's no penalty for dropping that course, correct?

A. No.

Q. Are the books in the syllabus unusual for this kind of course?

A. Not when I looked at them. They seemed to be a wide range of children's ages that they were intended for, picture books, chapter books, kind of, falling within the definition of literature published for children.

Page 256

Q. Are you aware of something called the Children's Literature Comprehensive Database?

A. I am.

Q. Can you explain what that is for the panel, please?

A. It's one of the library database bases that A&M library has a subscription to. It has a comprehensive list of children's literature, as the name kind of implies. If you look up books within this database, it'll tell you the title, the publisher, some of the publication data, book reviews, links to other sources about the title; basically, just give an overview of books that are published for children.

Q. Looking through that database and comparing that to the books on this syllabus, were you able to determine if the books on the English 360 syllabus that Dr. McCoul taught appeared on that comprehensive -- or the Children's Literature Comprehensive Database?

A. Yes, I looked up all of the books, just by title, and some of them had a -- another titled similar, so I looked for the author name. All of the books appeared.

Q. So given that all of those books were on the database and just your general expertise and experience, do you think that the books and Dr. McCoul's syllabus

Page 257

would be considered appropriate for a children's literature class?

A. I do.

Q. Do you think it was unreasonable to include these books and these materials on this syllabus?

A. No, not at all.

MS. BABINEAUX: Thank you. Thank you for your time today. Those are all the questions I have.

CHAIR MCDONALD: Just a sec. Let me catch up here. Trying to write. Are you ready?

MR. GIBSON: I'm ready.

CHAIR MCDONALD: You're good. So...

EXAMINATION

BY MR. GIBSON:

Q. Hi, Ms. Pattis- -- or Dr. Pattison. I am Darren Gibson, I'm the attorney for the university. Question, I think you testified that if a student has concerns with the books that are being in a syllabus, that they can transfer out of the class; is that correct?

A. I don't see why not.

Q. Do you think it should be up to the student to transfer out of a class when a course is misaligned with what their expectations were based on a course description and that they have to then transfer out,

potentially miss out on the opportunity to take that class altogether?

A.   I don't see why the course would misalign with their expectations.  The course description is very broad.  I think it's, like, five words long at that point.  And if they were registering for the course before the course even started, then they should be able to tell what -- they shouldn't necessarily need to know, but they have the book list from the previous, even if I have that don't have a copy of the syllabus before the class starts.

Books are -- book orders are due mid semester before, so they should at least be able to see the book list and ex- -- have some expectation based on the book list already.

Q.   But they -- they don't understand how the tea- -- course is being taught until they get the syllabus, correct?

A.   No, I wouldn't say that.  They can get the book list from -- if they want to do research on what is going into the course, yes, they can wait until the syllabus is taught.  But they can see the book list from the previous seme- -- like, from the middle of the previous semester for what's going to be taught in the class.

Page 259

UNIDENTIFIED SPEAKER:  Uh-huh.

CHAIR MCDONALD:  Will that work?  And you are a -- overruled.  You're overruled (inaudible).

You ready?

MS. BABINEAUX:  Yes.

CHAIR MCDONALD:  Okay.

(This witness was not sworn in on the recording.)

DR. MARY ANN O'FARRELL,

testified as follows:

EXAMINATION

BY MS. BABINEAUX:

Q.  Okay.  Dr. O'Farrell, you mentioned you're an associate professor with the English Department.  Could you expand a little bit on just your teaching experience here at A&M?

A.  Yeah.  I've been here for a very long time, since the early '90s, so a really long time.  I work on 19th Century British literature, so I'm the person who would be assigning you the big, fat Dickens novels and Jane Austen and things like that.  I teach lots of undergraduates and lots of graduate students.  And at the risk of sounding like a nent, I have gotten four teaching awards in my time here, so I'm someone who feels comfortable and happy talking about teaching,

Page 273

so...

Q. That's great.

A. Yeah.

Q. And given your extensive experience at A&M, is it, in your opinion, typical for professors to post their syllabi onto the Howdy system for students to access --

A. Yes.

Q. -- before a semester begins?

A. Yes. Yes.

Q. Okay. And any student can access the syllabus --

A. That's right.

Q. -- from Howdy?

A. Yeah.

Q. Okay. Could you talk a little bit about your familiarity with Dr. McCoul?

A. I was the chair of Dr. McCoul's promotion committee when she was promoted to senior lecturer in '22/'23. And, you know, like, sort of by way of doing that, I read extensively in her teaching materials, you know, sort of, syllabi, course assignments, evaluations from other faculty members, student evaluations, so on and so forth.

Q. Did you have an opportunity to observe any of

Page 274

her classes?

A. I did. I visited a class, yeah.

Q. And what were your impressions of Dr. McCoul as a professor?

A. I'd say the first thing -- the first thing that I would say is that she is super-prepared in both the, kind of, global and local sense, which is to say that her syllabi and course materials were really full and really lucid, and a kind of thing that I think would be really useful and also kind of comforting for certain kind of nervous students.

And when I visited the class, the class -- like, the sheer amount of work that got done in a 75-minute period was pretty fabulous. And during that period, she used a lot of different pedagogical methods so that they, kind of, spoke to different teaching needs, you know what I mean? So there were, like, little mini lectures, and there were moments when students wrote for a couple of minutes. And, you know, there were moments when students talked to each other. And so it -- it -- it, kind of, felt like there was a, sort of, thoughtfulness and consideration about students.

I'd say another thing that I really noticed about Melissa's teaching in, kind of, reviewing the file

Veritext Legal Solutions
800-336-4000

was that a lot of her assignments were pretty imaginative. One of the assignments for the class is a -- it asks the students to sort of imagine that the course goes on for an extra month, which is a little hard to, you know, ask students to contemplate, but they did. And in that extra month, like, what would their teaching unit be?

And I thought that was, like, imaginative, it, sort of, like, allowed students to have a certain amount of agency over their, kind of, intellectual development and, you know, like, implied a -- a, kind of, openness, like, it a little bit meant that if you were the sci-fi kid in the class, you could make it a sci-fi unit or, you know, that -- that sort of dealt with the skills and concepts that were being developed in the course, but brought to bear in your own set of interests. So, like, I thought she was pretty great.

Q. So safe to say, you didn't have any concerns about promoting her?

A. I did not.

Q. Okay. Now, switching gears a little bit to, kind of, the -- the summer of 2025, did you have an opportunity to interact at all with Dr. McCoul in that late summer, early fall time frame regarding, kind of, the subject matter that's brought us here today?

Page 276

A.  Yes.  Melissa and I had been asked by our department to put together a little, sort of, series of talks and brown bags about a particular kind of interpretive method.  And so we met two or three times to talk about that.

Q.  Uh-huh.  And did you talk at all about the shift that was going to be occurring in the fall from 361 to some potential options?

A.  We did.

Q.  Okay.

A.  Yeah, we did.

Q.  Do you remember what Dr. McCoul's demeanor was during that conversation?  For example, did she seem resistant at all to these proposed changes?

A.  Yeah.  No, I thought she seemed remarkably, remarkably calm.  You know, I -- I asked a little bit about whether she felt anxious about the, kind of, last-minute shift in the courses and just -- she was, like, very even about the whole thing.  And when I asked about it, she said, I love my job and, you know, I want to keep it.  So there was a, kind of, you know, an understanding that she was doing the things that were asked because she loved her job and wanted to keep it.

Q.  Right.  On that note, you took the words out of my mouth.

Page 277

A. Yeah.

Q. Did she say anything in that conversation, do anything that indicated to you that she was not going to try to address A&M's concerns?

A. No, really the opposite.

Q. What was your last interaction that you had with Dr. McCoul prior to the termination?

A. It was one of these meetings to discuss the planned, you know, series of brown bags and lectures. And we talked a little bit about what was going on.

Q. Uh-huh.

A. Yeah. Yeah. And one of the -- we were -- the -- the thing that we were talking about is the kind of reading method that's called "close reading." And it's a way of -- you know, when it's in the classroom, it's a, sort of, way of helping students not just get the gist of something, but they're kind of the full complexities of a text that they're with working and the subtleties of the text that they're working with.

And in the course of that conversation, Melissa, like, just talked a little bit about a moment, a teaching moment when she had been, kind of, using this method and somebody in the class had one of those moments when you, kind of, go, like, Oh, you know, like a little head exploding kind of moment. And -- and

Page 278

DR. O'FARRELL:  Yes.

DR. ALI:  One of -- item of this and the material including the student feedback and student evaluation attached from the (unintelligible), did you -- did you notice any odd comment or feedback --

DR. O'FARRELL:  Uh-huh.

DR. ALI:  -- against Dr. McCoul in this package?

DR. O'FARRELL:  Yeah.  The -- the -- the comments from students were overwhelmingly positive. Her numbers -- you know, we were sort of at that moment when you were, like, a little shifting from PICA to AEFIS numbers, you know.  But her -- her evaluation numbers were all very good and students commented a lot on the extent and generosity of her feedback on their writing.  They talked a lot about the assignment that I just talked about as a thing that they particularly liked.  And I didn't re- -- I didn't register negative comments.

DR. ALI:  Thank you so much.

CHAIR MCDONALD:  Any other questions for Dr. O'Farrell?

Thank you, ma'am.  I'll walk you out.

DR. O'FARRELL:  Thank you all for doing this work.

Page 282

CHAIR MCDONALD:  Thank you very much.
Okay.  Would you introduce yours- --

MS. REICHEK:  I will.  I will.

Hello, Dr. Eckel.  How you doing?

DR. ECKEL:  Hello.

MS. REICHEK:  Hi.  This is Amanda Reichek, counsel for Professor McCoul, and I'm here with my co-counsel, Sara Babineaux.

DR. ECKEL:  Hello.

MR. GIBSON:  Oh, Darren Gibson.  I'm with Michael Best, and I'm part of the team representing the university, along with my colleague, Ryder Smith.

MR. SMITH:  Hi, Dr. Eckel.  Ryder Smith again.  Looking forward to speaking with you.

DR. ECKEL:  Hello.

CHAIR MCDONALD:  And Carla's back here.

MS. VOGEL:  Carla Vogel, Office of General Counsel.  Good to see you.

CHAIR MCDONALD:  Okay.

DR. CATHERINE ECKEL, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. REICHEK:

Q.  Okay.  Dr. Eckel, besides being a distinguished professor of economics, do you serve on any committees?

Page 288

A. I'm sorry. My dog is barking. Yes. I chair -- so I'm on the -- the Executive Committee of the Distinguished Professor, and I chair the Senior Faculty Advisory Committee.

Q. And what does the Senior Faculty Advisory Committee do?

A. Well, we were constituted by President Banks, and President Welsh inherited us. We act as a, kind of sou- -- we're a broad selection of faculty, tenure track and nontenure track faculty from across many different colleges. And we act as a, kind of, a -- a sounding board or advisory group for the president. We don't have a portfolio, so we just -- we just talk to him about whatever he wants to talk about.

Q. And you're advisory, and that means that you're just giving an opinion to the president based on issues that he brings to you guys; is that right?

A. Correct. We have no decision-making authority.

Q. Okay. When did you first hear of an issue involving a class taught by Professor McCoul?

A. So on August 21st, the president called a meeting of the chairs of some of his committees, including me. And he said that he wanted to brief us on something that had happened, a decision that he'd made. He said we might not like it, but he wanted us to know

Page 289

of the English Department, and that at first, there was no response, and that he had to contact them again to say that this was important, that they -- that they needed to respond.

And so my understanding is that he had a meeting with the dean and department head and -- and -- and they decided to end the class early, giving the students the grade that they had earned so far.  He said that he wasn't fully happy with the decision that the dean in the English Department had made, because he was afraid that it made the instructor look like she had done something wrong, and he didn't think that was necessarily true.

He was concerned.  He was worried about her and about the university.  He was worried about her becoming a target and he wanted to protect her.

So then he had learned that the instructor was scheduled to teach another course in the fall in adolescent literature, and this course had many of the same themes and books.  And he was concerned that -- that the same thing was going to happen again.  So he called a meeting, including the department head, as -- as I recall, the department head, the dean and the provost.

And during this meeting, they came up with

a solution, and the solution was that Dr. McCoul would teach -- would be taken out of that adolescent literature course and put in something like a topics course instead, where she could teach that material in a way that would -- that -- that would be -- so that the students would understand what it was about before they took it.  And the course would not be a core course.

Q.  And during this meeting, did he say anything about Dr. McCoul failing to follow any directives?

A.  The -- this is the first meeting.  No, he did not.

Q.  Did he identify any wrongdoing on her part?

A.  No.

Q.  What happened next, as far as you're concerned?

A.  Well, we were -- so he was afraid that this was going to go viral.  And nothing happened, you know, we didn't hear anything.  I kept my eye on the news, and so I thought it had probably blown over.  But then on September 9th, he called a meeting early in the day to -- to tell us what had happened.

And I -- I also -- I also heard -- I -- I probably heard somewhere else that something had happened, that the dean and department head had been demoted, but I can't remember exactly who told me that or when that happened.  But on September 9th, the

Page 292

president again called this meeting of the chairs of his committees. And also, the provost was there. And he said that -- he said that he had reconvened the -- he -- well, he said that he had removed the -- sorry. He said he removed the dean and department head from their positions and -- and he said that the reason for it was that they had reached the solution and that the solution had not been implemented.

So he was upset because the solution that they came up with, which was for her to teach a special topics class, was not the one that was implemented; and that instead, she was in another course called Genres. And in this genres class, this -- this was not the course that he had -- that they had agreed that she would be teaching.

So he had -- he told us that it had all gone viral on Twitter and that he was -- he was very worried about what was going to happen. He was very worried about her and her -- her physical safety. And he -- he talked about having to -- having to protect her.

Q. During that meeting, did he indicate he planned on firing her?

A. You know, he -- he did not. There -- there was -- there was a -- there was -- so there was

Page 293

discussion that -- that she -- that she could be fired. So Provost Sams made some statements, like -- he said something, like, there are three strikes, or she's had three chances or something like that. And I didn't know what that -- that meant.

And there was a discussion that -- about whether she could be fired because she was APT, and those -- and so she doesn't have tenure. And there was a discussion in the group. The group urged the president to follow the procedures that -- that we have for situations where a faculty member's accused of doing something wrong.

And so that was -- that was kind of the theme of the discussion, is to -- to please take it slow here and follow the procedures that we have -- that we have in place. But he said that he didn't -- he said again that he didn't want to fire the -- the instructor. Does that make sense?

Q. Yes, it does. Thank you very much.

MS. REICHEK: I think I'm about out of time, so I pass the witness. Thank you very much.

CHAIR MCDONALD: Ryder, (inaudible).

EXAMINATION

BY MR. SMITH:

Q. Dr. Eckel, good to speak with you again. Just

Page 294

A.  We didn't talk so much about the course description in the August meeting, but -- but that's what he said here.  He said here that the -- the course material was not consistent with the course description.

MR. SMITH:  Okay.  No further questions.

CHAIR MCDONALD:  Thank you.  Are there questions from the CAFRT panel, the faculty members for Dr. Eckel?  Yes, please, go.

UNIDENTIFIED SPEAKER:  Hi.  This is (unintelligible) College of Engineering.  Knowing what you know now, are there aspects in this memo that you would change?

DR. ECKEL:  Well, since it's a -- a recounting of the meeting, I wouldn't change the memo, but I -- I -- I've changed my thinking about some things that are in the memo, yes.

UNIDENTIFIED SPEAKER:  Can you give us some details what you would change?

DR. ECKEL:  So if you look at -- I didn't -- on -- on the day of this meeting, I didn't go and look at the course description or anything like that.  But, you know, the course -- these course descriptions are so brief.  In fact, it used to be that we only had like 88 characters or something that we could use for the -- for the course description.

Page 299

And so it's impossible to put everything in there that -- that you're going to teach in a class. And -- and -- and really, you could say that almost all of our classes are going to be inconsistent in some way with what's in the course description, or rather that nothing is consistent with the course description because they are so vague.

So it's -- this just seems to me like -- I mean, it just can't be true that -- that that's the reason.

UNIDENTIFIED SPEAKER:  Thank you.

CHAIR MCDONALD:  Any other questions for Dr. Eckel?

MS. BUDZISE-WEAVER:  I have one thing.

MR. GIBSON:  Tina, go ahead.

MS. BUDZISE-WEAVER:  Tina Budswize-Weaver from College of Performance, Visualization and Fine Arts.  Did you look at the syllabus before writing these notes.

DR. ECKEL:  I did not look at the syllabus before writing them, but I looked at the syllabus after.

MS. BUDZISE-WEAVER:  Would you say that 4 out of 12 books being LGBTQ would be -- what was the term?  I think it was -- I'm sorry, I -- I moved away from the document.

Page 300

DR. ECKEL:  Almost 100 percent.

MS. BUDZISE-WEAVER:  (Inaudible.)

DR. ECKEL:  Yeah.

MS. BUDZISE-WEAVER:  LGBTQ themed.

DR. ECKEL:  Yeah, no.

MS. BUDZISE-WEAVER:  Like, would you classify the class that way now after going back to the syllabus?

DR. ECKEL:  No, I would not.  I -- I looked at the syllabus, and I thought it was really a very interesting course.  It's clear that the instructor took very seriously her -- her job.  It's -- it's a much more complete and engaging syllabus than I ever wrote.  The books are not 100 percent LGBTQ literature, and -- and the ones that are are prize winners, you know, things that -- that won literary prizes.

So I was actually pretty impressed with the -- with the syllabus itself.  I thought it looked like a great course.

CHAIR MCDONALD:  Any other questions for Dr. Eckel?  No.  Hearing none, Dr. Eckels [sic], thank you very, very much for your time in meeting with everybody today.

DR. ECKEL:  You're welcome.

CHAIR MCDONALD:  Have a great rest of your

Page 301

MR. SMITH: Ryder Smith with Michael Best, representing the university.

MR. GIBSON: And his colleague, Darren Gibson.

DR. GUBAR: Nice to meet you.

CHAIR MCDONALD: And the rest of it is a bunch of faculty members in here listening.

DR. GUBAR: Nice.

CHAIR MCDONALD: So thank you for being here, wherever you are located.

DR. GUBAR: Thank you. I'm in Cambridge, Massachusetts right now.

CHAIR MCDONALD: Sara, you need to talk to her. She'll -- she'll help you. She's in Cambridge, Mass.

MS. BABINEAUX: Oh, I -- I could go visit.

CHAIR MCDONALD: You could go visit.

Sorry. We'll have to ta- -- okay. I'll be quiet.

Amanda.

DR. MARAH GUBAR, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. REICHEK:

Q. All right. Dr. Gubar, thank you for being here

Page 304

with us today virtually. I'm going to not go in your back- -- into your background because we have very limited time, but I would direct the members of the CAFRT to Exhibit No. 43 of McCoul, which is your CV. But could you briefly describe your experience with teaching children's literature?

A. Sure. So when I was at Pitt, I directed a children's literature program, and so I had experience teaching many different kinds of children's literature classes, from picture books all the way up to YA. Most of the students in -- in the children's lit classes I taught at Pitt wanted to be elementary school teachers, child psychologists, librarians, social workers.

And then now that I'm at MIT, I teach also a lot more American and contemporary children's literature; whereas, I started off teaching more British children's literature. And I also write a lot about philosophical issues related to how we define children's literature, how we think about what it means to be a child and so on.

Q. In your experience, are there any misconceptions about what a course in children's literature is?

A. Oh, yes. I think there are many misconceptions.

Page 305

Q. Okay. What -- what is one of them?

A. Oh, sorry.

Q. What are they?

A. Well, to begin with, I think people don't realize how diverse children's literature is, in terms of all the different kinds of books that are out there. The literary critic, Roger Sale, once said, Everybody knows what children's literature is until they're asked to define it.

But the minute you try and actually say, This is what it is, it's actually really impossible because children's lit has varied so much over time and across different genres and cultures. And, of course, the kinds of books a culture writes for its children, it varies because the kinds of ways different cultures think about what it means to be a child, what children are like, what they can and can't do varies over time. And so the books they produce for children also vary, very greatly. And so, too, does how childhood gets represented in those books.

So just as an example, here in America, back in the 1930s and the '40s and the '50s, American children's literature was very focused on what we might think of as Dick-and-Jane-style families. So you remember the Dick and Jane schoolbooks where all the

families depicted in those books were white, middle class, they had their own house, often in the country, they were presumptively Christian, heterosexual, living in these, sort of, one -- you know, nuclear, suburban, single-family households, as if those were the only kinds of families, kind of, out there. That was the dominant mode.

And so in the 20th Century, what happens is critics like Nancy Larrick and Rudine Sims Bishop point this out. And so the 20th Century in America witnesses this amazing diversification of the kinds of families being represented in children's books, so that all different kinds of kids could see themselves represented in children's books, even kids who lived in cities could see themselves represented, if they lived in an apartment building, that was radical; nonwhite kids, Jewish kids, like me when I was growing up; kids with disabilities, kids growing up in families with two mommies. Right? All different kinds of kids could suddenly see themselves represented in children's literature.

And I -- I think there was, like, a misconception in the past that there was, like, some more innocent time when, you know, children's books were totally free of, say, gender or race ideology.

Page 307

And people feel like, oh, now people are, like, forcing this stuff on children; but -- and in the past, you know, they didn't. But that's definitely not true. That is a misconception because those books like Dick and Jane maybe felt free of gender and class and racial messages, but that was only to the people whose lives really matched up very closely with those experiences that, you know, of what families are like.

Other people who didn't feel that way did not feel like they were not -- you know, did not feel like that was the -- the only way to be a family. And so the problem there was that if you only got books that represented families one way, that starts to seem like the only option and also an ideal, like, not even just this is the only kind of family, this is what a family looks like, but this is what the ideal family looks like. And, of course, that's really problematic.

Q. Okay. Thank you for that.

Have you reviewed any documents in connection with Dr. McCoul's termination?

A. I did, yeah.

Q. What did you review?

A. I reviewed the syllabi and the PowerPoint slides from multiple classes, including the ones she was using during the disrupted class.

Page 308

Q. Did anything you reviewed raise any kind of red flag in terms of what's appropriate for a children's literature class?

A. No, not at all. It all seemed very middle of the road to me, very par for the course in any college-level children's literature course. You know, the kinds of texts that Dr. McCoul is teaching are being taught all over the country, everywhere there's children's lit classes being offered in colleges. You know, places like Kansas State University, University of Florida, Pitt, MIT, UConn, you name it.

Q. Okay. Are you -- are you familiar with the book that she was teaching at the time of the disruption, Jude Saves the World?

A. I am, yeah.

Q. How would you assess the appropriateness of this book for a children's literature course?

A. I think it's totally appropriate. I mean, it -- you pretty much can't get more mainstream than Scholastic, which is the press that published that book. That's the same press that published the Harry Potter books. It's just mainstream, 20th Century, middle grade children 's literature, so it's aimed at, like, 8 to 12 year olds.

And that book really -- I read it. It

Page 309

features a really beautiful message about how kids who are feeling like outsiders, whether they're at home or in school, can love and help one another.  They don't have to just depend on adults for support.  They can do that, but they can also help -- help each other.  It's a really -- a, kind of, a love-thy-neighbor sort of story about marginalized kids finding community and helping each other.

Q.  So you -- you looked at her -- some of her curriculum.  What are your overall thoughts on Dr. McCoul's curriculum?

A.  I think of it's -- I thought her material was excellent.  As I say, I mean, I think it was very par for the course in terms of, like, the content.  I didn't see anything that raised my eyebrows.  And I would also say, you know, especially courses that cover contemporary children's literature, which she said she was going to do in the -- in the descriptions, this is what contemporary children's literature looks like.  It's very diverse.  And there's a whole different range of different viewpoints and types of families and children being represented.

And then the other thing I would say, and I really mean this, is that I thought that these materials showed that she was an excellent instructor, someone who

Page 310

organizes her courses with incredible care and creativity and scholarly expertise. And I just want to say, I was not surprised by that 'cause, you know, Texas universities in general, and Texas A&M in particular, are nationally known for having really great children's literature courses and instructors.

In fact, one of my own mentors in the field, who some of you may have known, Claudia Nelson, taught children's lit at Texas A&M for many years, and so I think of Dr. McCoul as part of that proud Aggie tradition.

MS. REICHEK: Okay. Well, Dr. Gubar, those are the only questions I have for you. I thank you for your time. The -- the un- -- the lawyer representing the university has a few questions as well.

DR. GUBAR: Okay.

CHAIR MCDONALD: Darren, you ready?

MR. GIBSON: Yes, please, thank you.

CHAIR MCDONALD: Okay.

EXAMINATION

BY MR. GIBSON:

Q. Dr. Gubar, you've never taught in Texas or at Texas A&M, correct?

A. That is correct.

Q. And you have no knowledge of the process by

Page 311

CHAIR MCDONALD:  Okay.  And Carla, I'm not going to let you out.

MS. VOGEL:  Carla Vogel, I'm Office of General Counsel.  Good to see you.

DR. PILSCH:  Good to see you.

CHAIR MCDONALD:  Okay.  We're...

UNIDENTIFIED SPEAKER:  I think we're ready.

CHAIR MCDONALD:  About eight minutes.

UNIDENTIFIED SPEAKER:  That's fine.

CHAIR MCDONALD:  That works?  Okay.

DR. ANDREW PILSCH

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. SMITH:

Q.  Really short, I'm going to talk about the two instances we talked about previously.

A.  Okay.

Q.  Your awareness of the issues in the children's literature class.

A.  Right.

Q.  And you first became aware of this, at least you previously indicated, in late July or early August; is that correct?

A.  Yes, I believe so.

Q.  Do you remember how you first heard about this?

Page 318

A.  Yeah.

Q.  -- said during that (inaudible)?

A.  After the fact, yes.

MS. BABINEAUX:  Okay.  I think those are all my questions for you.  Thank you.

CHAIR MCDONALD:  Okay.  Questions from the -- Tina?

MS. BUDZISE-WEAVER:  Were you aware that Dr. McCoul was asked to change her course number to 394?

DR. PILSCH:  Yes.  I was -- I was -- I wasn't -- so you say that she was asked.  I was told to put her into a Section 394.

MS. BUDZISE-WEAVER:  Okay.

DR. PILSCH:  By Dr. Johansen.

MS. BUDZISE-WEAVER:  Okay.

DR. PILSCH:  So that was -- that's not -- that's not a decision that Dr. McCoul would have been able to make.

MS. BUDZISE-WEAVER:  Okay.  So that decision --

DR. PILSCH:  That would have been.

MS. BUDZISE-WEAVER:  -- was made for her.

DR. PILSCH:  As far as I -- it -- all -- all I know was Dr. Johansen literally said, We're going to put her in a 394.

Page 325

MS. BUDZISE-WEAVER:  Okay.

DR. PILSCH:  And so I e-mailed the scheduler to say, We're moving Dr. Johansen [sic] from the -- the 361 into the 394.

MS. BUDZISE-WEAVER:  Did you -- were you aware of any other directives by the university besides moving her course to 394, which we have an extensive notes in our files, but was there any other directives that she was asked to do?

DR. PILSCH:  Not to my knowledge.

MS. BUDZISE-WEAVER:  Okay.

CHAIR MCDONALD:  Any other questions?

All right.  No other question?

Oh, yes, sir, go ahead.

UNIDENTIFIED SPEAKER:  So I think your (unintelligible) -- (Unintelligible), College of Engineer.  Definitions are contextual.

DR. PILSCH:  Right.

UNIDENTIFIED SPEAKER:  So being in engineering, these are (unintelligible).

In College of Arts and Sciences, (unintelligible) in the English Department, what is the definition of a survey course?

DR. PILSCH:  A survey course?  I don't think we have a formal definition of a survey course.

Page 326

C E R T I F I C A T E

I, TERRI GARCIA, Certified Shorthand Reporter in and for the State of Texas, certify that the foregoing is a correct transcription from the audio/video recording provided.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was made, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to on this the 29th day of April, 2026.

TERRI GARCIA, CSR No. 6581

Expires 7/31/2027

VERITEXT LEGAL SOLUTIONS

Firm Registration No. 571

300 Throckmorton Street, Suite 1600

Fort Worth, Texas  76102

(817) 336-3042 (800) 336-4000

Page 344