**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DR. MELISSA MCCOUL,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:26-CV-00865** |
| | § | |
| **THE TEXAS A&M UNIVERSITY** | § | |
| **SYSTEM, ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S MOTION FOR LEAVE TO EXCEED PAGE LIMIT**

Comes now, Plaintiff, and files this Motion for Leave to Exceed Page Limit. In support, Plaintiff would respectfully show the Court as follows.

### I.     Applicable Rule

Judge Hanen's Civil Procedure Rule 7.L. provides that "all briefs, legal memorandum, motions, and pleadings of any kind shall be limited to 20 pages, unless permitted by the Court to exceed this limit."

### II.     Reasons for Excess Pages

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants asserted a qualified immunity challenge to Plaintiff's First Amendment and Due Process causes of action brought pursuant to 42 U.S.C. §1983 against several individual defendants. Defendants attached evidence to the motion, so the motion must be treated as one for summary judgment, and all parties must be given a reasonable opportunity to present all material that is pertinent to the motion. FED. R. CIV. P. 12(d).

Prior to this litigation, Plaintiff exhausted her internal remedies by proceeding to a hearing before the University's Committee on Academic Freedom, Responsibility, and Tenure (CAFRT),

Plaintiff's Response to Defendants' Motion to Dismiss – Page 1

and submitted an open records request in connection with that hearing. Consequently, there is more evidentiary "fodder" than would typically be responsive to a motion to dismiss.

The undersigned has attempted to be as succinct as possible, but the range of issues and the volume of relevant evidence required more than 20 pages to address. The Response (Dkt. No. 21) is 64 pages inclusive of table of contents, table of authorities, and exhibit list.

Per Judge Hanen's Civil Procedure Rule 3 the undersigned will ensure carrier delivery of Plaintiff's Response with exhibits for delivery on Monday, June 1.

## PRAYER

For these reasons, Plaintiff respectfully requests that this Motion be granted, and that Plaintiff be permitted to exceed the Court's page limit by 44 pages.

Date: May 29, 2026                                    Respectfully Submitted,

/s/ *Amanda L. Reichek*
Amanda L. Reichek
Texas State Bar No. 24041762
S.D. Texas Bar No. 840975
areichek@tillotsonlaw.com
Jeffrey M. Tillotson
Texas State Bar No. 20039200
S.D. Texas Bar No. 27831
jtillotson@tillotsonlaw.com
Sara Babineaux
State Bar No. 24125102
S.D. Texas Bar No. 3959037
sbabineaux@tillotsonlaw.com
**TILLOTSON JOHNSON & PATTON**
1201 Main Street, Suite 1300
Dallas, Texas 75202
(214) 382-3041 Telephone
(214) 292-6564 Facsimile

**Attorneys for Plaintiff**

## Certificate of Service

The undersigned hereby certifies that on May 29, 2026 a true and correct copy of the foregoing was served on Defendants' counsel of record via CM/ECF.


/s/ *Amanda L. Reichek*
Amanda L. Reichek

## Certificate of Conference

The undersigned emailed counsel for Defendants after business hours on May 28 to confer on this motion but as of this filing has not heard back concerning Defendants' position on this motion. The undersigned will file a certificate of conference with the court upon learning Defendants' position on this motion.


/s/ *Amanda L. Reichek*
Amanda L. Reichek

Table of Contents

Table of Authorities…………………………………………………………………………...5

Summary of the Argument………………………………………………………………...9

Procedural Status and Applicable Legal Standard………………………………………...9

Background……………………………………………………………………………13

    A. Dr. McCoul is an accomplished professor at the top
       of her professional game……………………………………………………………13

    B. Dr. McCoul has a long history of "excellent" teaching
       at Texas A&M University…………………………………………………………..13

    C. Dr. McCoul taught ENGL 360 in the summer of 2025……………………………..15

    D. Dr. McCoul becomes an unwitting pawn in a culture war
       waged by politicians against "woke" themes in higher education………………………16

    E. Governor Abbott calls for Dr. McCoul's termination……………………………………19

    F. Texas A&M did not comply with its due process procedures
       in terminating Dr. McCoul…………………………………………………………….21

    G. President Welsh publicly assumes responsibility for terminating
       Dr. McCoul……………………………………………………………………………24

    H. Chancellor Hegar, on behalf of himself and the Board of Regents,
       publicly vows to hold Dr. McCoul responsible…………………………………….24

    I. Two internal bodies determined that the University failed to
       establish cause to terminate Dr. McCoul, and failed to follow
       its own due process policies…………………………………………………………..25

        1. Texas A&M's CAFRT unanimously finds that the University
           failed to show Dr. McCoul failed to follow directives, and
           that it violated its own due process policies in firing her……………………25

        2. Texas A&M's Academic Freedom Council issues a report
           finding that A&M violated Dr. McCoul's academic freedom
           and due process Rights……………………………………………………26

J.  Interim President Williams and Vice Chancellor Hallmark
uphold Dr. McCoul's termination with full knowledge of the
University's Due Process and First Amendment violations…………………………………26

K.  Dr. McCoul's free speech rights, as codified by University policy,
were violated……………………………………………………………………………..27

    1.  Texas A&M's policies and procedures reflect Defendants'
understanding that academic freedom is protected by the
First Amendment…………………………………………………………………..27

    2.  The reasons given by the University for Dr. McCoul's
termination are either a proxy for the exercise of Dr.
McCoul's right to free speech, or blatantly pretextual………………………………29

        i.  The themes explored by Dr. McCoul are standard
fare for a Children's Literature course, not
"indoctrination."……………………………………………………………….30

        ii.  The themes explored by Dr. McCoul were
in full compliance with the course description,
syllabus, and University approval…………………………………………..32

        iii.  Dr. McCoul was summarily terminated despite
the absence of "serious misconduct"…………………………………….34

        iv.  Dr. McCoul was summarily terminated despite
no policy violations……………………………………………………………35

        v.  Dr. McCoul never failed to follow directives…………………………36

Argument…………………………………………………………………………………...38

I.  Dr. McCoul's Claims are not Barred by Sovereign Immunity………………………38

A.  Dr. McCoul seeks monetary damages against Defendants
in their individual capacities only……………………………………………… 38

B.  Dr. McCoul's request for declaratory relief against Defendants
is permitted by *Ex parte Young*…..…………………………………………..39

C.  *Ex parte Young* does, in fact, remove sovereign immunity
from the Board of Regents defendants………………………………………….. 41

II.  Dr. McCoul's First Amendment Claims are not Barred by
Qualified Immunity…………………………………………………………………42

A.  Dr. McCoul's right to academic freedom, as protected by the First Amendment, was clearly established at the time of her termination………………………………………………………………43

B.  Texas A&M's own policies and procedures reflect that academic freedom is protected by the First Amendment………………………...49

C.  It "is clear" that Dr. McCoul was terminated because of her speech…………………………………………………………..51

    1.  Defendants' own statements reflect that Dr. McCoul was terminated based on her speech………………………………………52

    2.  The undisputed chain of events reveals that Dr. McCoul was terminated based on her speech……………………..53

    3.  The reasons set forth in Dr. McCoul's termination letter are unsupported………………………………………….. 54

    4.  Dr. McCoul was summarily terminated despite no policy violations…………………………………………. 55

    5.  Defendants' allegation that Dr. McCoul violated directives was a pretext, not a mistake……………………………….55

    6.  Texas A&M's own internal, independent faculty bodies determined that Plaintiff's termination was not supported by policy…………………………………………56

III.    Dr. McCoul's Due Process Claims are not Barred by Qualified Immunity…………………………………………..57

A.  Dr. McCoul is not an "at-will" employee……………………………………..57

B.  Dr. McCoul has a property interest in her continued employment…………………………………………………59

Prayer………………………………………………………………….63

## Table of Authorities

**Cases**

*Acosta v. Univ. of Texas at El Paso*,
No. EP-06-CA-408, 2007 WL 9701442, at *2, W.D. Tex. April 11, 2007)………………..40

*Aguirre v. City of San Antonio*,
995 F.3d 395, 405 (5th Cir. 2021)……………………………………………………51, 57

*Ashcroft v. Iqbal*,
129 S. Ct. 1937, 1940 (2009)…………………………………………………………10, 48

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007)……………………………………………………………………10

*Board of Regents of State Colleges v. Roth,*
408 U.S. 564, 578 (1972)………………………………………………………59, 68, 69

*Brennan v. Stewart*,
834 F.2d 1248, 1252 (5th Cir.1988)………………………………………………………45

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019)……………………………………………………….45, 47

*Connick v. Myers*,
461 U.S. 138, 147-50 (1983)……………………………………………………………46, 52

*Cooper v. Benavides*,
No. 416CV00860ALMCAN, 2017 WL 9285512, at *5 (E.D. Tex. July 3, 2017)………40

*Davis v. Tarrant Cnty., Tex.*,
565 F.3d 214, 228 (5th Cir. 2009)………………………………………………………..39

*Dean v. Timpson Indep. Sch. Dist.,*
486 F. Supp. 302, 308 (E.D. Tex. 1979)………………………………………………..48

*Deville v. Marcantel*,
567 F.3d 156, 169 (5th Cir. 2009)………………………………………………………...38

*Edelman v. Jordan*,
415 U.S. 651, 664 (1974)……………………………………………………………………45

*Epperson v. Arkansas*,
393 U.S. 97 (1968)……………………………………………………………………………10

*Ex parte Young,*
        209 U.S. 123, 155–56 (1908)……………………………………………………9, 40, 41, 42

*Fass v. Benson,*
        2023 WL 3860441, at *6 (Tex. App. – Dallas June 7, 2023, no pet.)………………….....62

*Ferguson v. Thomas,*
        430 F.2d 852 (5th Cir.1970)……………………………………………………………60

*Garcetti v. Ceballos,*
        547 U.S. 410 (2006)……………………………………………………………44, 45, 51

*Gilbert v. Homar,*
        520 U.S. 924, 928-29 (1997)…………………………………………………………..59, 61

*Green v. Mansour,*
        474 U.S. 64, 68 (1985)…………………………………………………………………46

*Grutter v. Bollinger,*
        539 U.S. 306, 329 (2003)………………………………………………………………49

*Hamad v. Gary DeShazo & Associates,*
        95 F.3d 1149 (5th Cir. 1996)……………………………………………………….....39

*Hardy v. Jefferson Cmty. Coll.,*
        260 F.3d 671, 682 (6th Cir. 2001)…………………………………………………….....47

*Harlow v. Fitzgerald,*
        457 U.S. 800, 818 (1982)………………………………………………………………52

*Healy v. James,*
        408 U.S. 169, 180-81 (1972)…………………………………………………………..49

*Hillis v. Stephen F. Austin State Univ.,*
        665 F.2d 547, 553 (5th Cir. 1982)……………………………………………………..45

*Hope v. Pelzer,*
        536 U.S. 730, 741 (2002)………………………………………………………………49

*In re Dinnan,*
        661 F.2d 426, 430 (5th Cir. 1981)…………………………………………………….....48

*Jackson v. Wright,*
        82 F. 4th 362, 365 (5th Cir. 2023)…………………………………………………41, 48

*Joseph v. Bartlett*,
      981 F.3d 319, 330 (5th Cir. 2020)…………………………………………………...43

*Kerr v. Hurd*,
      694 F. Supp. 2d 817, 842-43 (S.D. Ohio 2010)…………………………………...47

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
      385 U.S. 589, 603 (1967)…………………………………………………… 43, 44

*Kirkland v. Northside I.S.D.*,
      890 F.2d 794 (5th Cir. 1989)……………………………………………44, 55, 51

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
      507 U.S. 163 (1993)…………………………………………………………...10

*Logan v. Zimmerman Brush Co.*,
      455 U.S. 422, 428 (1982)……………………………………………………59

*Lucas v. Chapman*,
      430 F.2d 945 (5th Cir.1970)........................................................................60

*Matagorda Cnty. Hosp. Dist. v. Burwell*,
      189 S.W.3d 738 (Tex. 2006)…………………………………………………...67

*Nelson v. Univ. of Tex. at Dallas,*
      535 F.3d 318, 321–22 (5th Cir. 2008)…………………………………………45

*Off. for Prot. & Advoc. v. Stewart*,
      563 U.S. 247, 255 (2011)……………………………………………………42

*Perry v. Sindermann,*
      408 U.S. 593, 602–603 (1972)………………………………………………59

*Pickering v. Bd. of Educ.*,
      391 U.S. 563, 568 (1968)…………………………………………..46, 52

*Port Drum Co. v. Umphrey*,
      852 F.2d 148, 151 (5th Cir. 1988)…………………………………………...40

*Pratt v. Harris Cnty.*,
      822 F.3d 174, 180 (5th Cir. 2016)…………………………………………38, 44

*Ridgely v. FEMA*,
      512 F.3d 727, 735 (5th Cir. 2008)…………………………………………...59

*Senegal v. Jefferson Cty.*,

785 F. Supp. 86 (E.D. Tex. 1992)……………………………………………………59

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)…………………………………………………………29, 54, 51

*Truman v. United States*,
26 F.3d 592, 594 (5th Cir. 1994)……………………………………………………10

*Va. Office for Prot. & Advocacy v. Stewart*,
563 U.S. 247, 255-56 (2011)………………………………………………………...40

*Warnock v. Pecos Cty.*,
88 F.3d 341, 343 (5th Cir. 1996)……………………………………………………40

*Wells v. Dallas Indep. Sch. Dist.*,
793 F.2d 679 (5th Cir.1986)…………………………………………………………60

*Whitley v. Hanna*,
726 F.3d 631, 638 (5th Cir. 2013)………………………………………………...38

*Wilkerson v. Univ. of N. Tex.*,
223 F. Supp. 3d 592, 605 (E.D. Tex. 2016)…………………………………………60

*Williamson v. Tucker*,
645 F.2d 4047, 412-13 (5th Cir. 1981)……………………………………………10

*Yates v. Bd. of Regents*,
654 F. Supp. 979 (E.D.Tex.1987)………………………………………………...60

## Constitutional Provisions and Statutes

42 U.S.C. § 1983……………………………………………………………… *Passim*

TEX. EDUC. CODE §51.352……………………………………………………..57

TEX. EDUC. CODE §51.942……………………………………………………..60

## Federal Rules

FED. R. CIV. P. 8(a)(2)…………………………………………………………10

FED. R. CIV. P. 12(b)(1)………………………………………………………...9, 10

FED. R. CIV. P. 12(b)(6)………………………………………………………10, 11

FED. R. CIV. P. 12(d)……………………………………………………………11

**Summary of the Argument**

This lawsuit has important implications for the future of free speech on college campuses across the State of Texas. Dr. Melissa McCoul, a high-performing professor at Texas A&M University, was terminated because a student, and then influential elected officials, disagreed with the "woke" nature of her course content. In their haste to appease these individuals, Defendants ran roughshod over Dr. McCoul's due process rights, summarily terminating her employment without a shred of the due process she was owed. Two independent faculty bodies confirmed these violations, yet Texas A&M refused to yield, upholding her termination.

As follows, Dr. McCoul's claims are not barred by sovereign immunity, because she seeks monetary relief from the University officials in their individual capacities only. Her request for prospective relief against all defendants, including the members of the Board of Regents, is squarely permitted by *Ex parte Young*. Finally, because Dr. McCoul's rights to free speech and due process of law are crystal clear, and since there is ample and compelling evidence that Defendants violated both rights, the University officials she has sued are not entitled to qualified immunity. Plaintiff's claims must proceed.

**Procedural Status and Applicable Legal Standard**

Defendants have filed a motion to dismiss under FED. R. CIV. P. 12(b)(1), asserting that (1) sovereign immunity bars Plaintiff's claims for monetary relief against the University officials that she has sued; and (2) *Ex parte Young* does not apply with respect to these University officials, including members of the Board of Regents, and therefore Dr. McCoul's claims against them are barred by sovereign immunity. Defendants have also asserted a qualified immunity challenge with

respect to Dr. McCoul's individual capacity claims under FED. R. CIV. P. 12(b)(6). Defendants also assert that state law bars Dr. McCoul's breach of contract claim.[1] *See* Def. Mot. at 2-3.

Rule 12(b)(1) permits a party to challenge the exercise of the Court's subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). The Court generally will accept all well-pleaded allegations in the complaint as true, and construe those allegations in a light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). The Court may, however, consider affidavits and other evidence outside the pleadings in resolving a motion to dismiss under Rule 12(b)(1). *Williamson v. Tucker*, 645 F.2d 4047, 412-13 (5th Cir. 1981).

With respect to FED. R. CIV. P. 12(b)(6), a complaint must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must set forth enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). These pleading requirements apply to claims alleging a right to recover under 42 U.S.C. § 1983. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

While a 12(b)(6) motion is ordinarily decided on the pleadings, if matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. FED. R. CIV. P. 12(d). Defendants have presented matters beyond the pleadings in support of its motion (Dkt. No. 14-1, 14-2, and 14-3), so Plaintiff does as well:

---

[1] Dr. McCoul hereby nonsuits her breach of contract claim against all Defendants and will amend her Complaint accordingly. Thus, this court need not reach Defendants' argument contained at pages 16 through 20 of their motion.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 12

| Exhibit | Description |
|---------|-------------|
|         |             |
| 1       | Excerpts from Certified Transcription of CAFRT Hearing |
| 2       | Declaration of Amanda Reichek |
| 2-A     | Dr. Marah Gubar Curriculum Vita (DEF 312-326) |
| 2-B     | Tweet: @GregAbbott_TX, X (October 19, 2025, 11:49 AM), http://x.com/GregAbbott_TX/status/1979953044977598674 |
| 2-C     | Tweet: @brianeharrison, X (July 10, 2025, 10:20 AM), https://x.com/brianeharrison/status/1943329558863974875?s=20 |
| 2-D     | Tweet: @brianeharrison, X (September 8, 2025, 11:44 AM), https://x.com/brianeharrison/status/1965093859488399406 (DEF 266-275) |
| 2-E     | Texas A&M Office of the President, "A Statement from Texas A&M University President Mark A. Welsh, III", FACEBOOK (September 8, 2025), https://www.facebook.com/TAMUPresident/posts/1167025155238396?rdid=URty47l dCOXWQArv#. |
| 2-F     | Tweet: @TAMU, X (September 8, 2025, 10:15 PM), https://x.com/TAMU/status/1965252609033327010?s=20 |
| 2-G     | Tweet: @GregAbbott_TX, X (September 9, 2025, 12:29 PM), https://x.com/GregAbbott_TX/status/1965467515485860093, also produced by Defendant as DEF 258-265 |
| 2-H     | Tweet: @TAMU, X (September 9, 2025, 6:47 PM), https://x.com/TAMU/status/1965562640769437956 |
| 2-I     | Tweet: @Glenn_Hegar, X (September 8, 2025, 7:00 PM), https://x.com/Glenn_Hegar/status/1965203549945811437?s=20 |
| 2-J     | Dr. McCoul's CAFRT request |
| 2-K     | November 18, 2025 "Findings and Recommendation of the CAFRT Hearing Panel for Dr. Melissa McCoul" |
| 2-L     | Texas A&M University's Academic Freedom Council's September 25, 2025 Case Evaluation Regarding Dr. Melissa McCoul and ENGL 360 |
| 2-M     | December 23, 2025 email from Texas A&M University's Director of Faculty Compliance with attached "final decision in the matter of Dr. Melissa McCoul as issued by the Chancellor." |
| 2-N     | Texas A&M University System Policy 01.01: System Policies and Regulations, and Member Rules and Procedures |
| 2-O     | Texas A&M University System Policy 02.02: Office of the Chancellor |
| 2-P     | Bylaws of the Board of Regents of The Texas A&M University System |
| 2-Q     | "First Amendment Freedoms at Texas A&M University," published by the Division of Student Affairs |
| 2-R     | "Expressive Activity on Campus" published by the Division of Student Affairs |
| 3       | Declaration of Dr. Melissa McCoul |
| 3-A     | Dr. McCoul Curriculum Vita (DEF 3-13) |
| 3-B     | June 2, 2023 promotion letter and related notifications (DEF 22, 23, 528) |
| 3-C     | August 5, 2025 email correspondence between English Department Chair Dr. Emily Johansen (DEF 544-545) |
| 3-D     | Request for Salary Adjustment from Dr. Ives to Provost Fierke (DEF 527) |

Plaintiff's Response to Defendants' Motion to Dismiss – Page 13

| 3-E | Teaching Philosophy (DEF 29-30) |
|---|---|
| 3-F | 2024 Annual Review (DEF 24-25) |
| 3-G | 2022 Annual Review (DEF 18-19) |
| 3-H | 2021 Annual Review (DEF 16-17) |
| 3-I | 2020 Annual Review (DEF 14-15) |
| 3-J | PICA scores from 2017 through Spring of 2020 (DEF 31-32) |
| 3-K | May 16, 2022 classroom observation (DEF 20-21) |
| 3-L | 2025-2026 Reappointment Letter (DEF 1-2) |
| 3-M | July 10, 2025 email from Dr. Johansen to Dr. McCoul (DEF 102-107) |
| 3-N | Dr. Joanna Goodey-Pellois's July 28, 2025 classroom observation notes (DEF 550-551) |
| 3-O | Summer 2025 ENGL 360 Syllabus (DEF 61-74) |
| 3-P | Texas A&M University Student Rule 21 – Classroom Behavior |
| 3-Q | Texas A&M University Student Rule 24 – Student Conduct Code |
| 3-R | Dr. Johansen's July 30, 2025 classroom observation notes (DEF 185-187) |
| 3-S | August 1-3, 2025 email exchange between Dr. Johansen and Dr. McCoul |
| 3-T | Fall 2025 ENGL 394 Syllabus |
| 3-U | August 14-24, 2025 email exchange among Dr. Johansen, Dr. Katz, Dr. Goodey-Pellois, and Dr. McCoul (DEF 206-220) |
| 3-V | September 9, 2025 email from Dr. Lupiani to Dr. McCoul |
| 3-W | September 9, 2025 Notice of Summary Dismissal (DEF 564-566) |
| 3-X | University Policy 12.01 – Academic Freedom, Responsibility and Tenure (DEF 170-182) |
| 3-Y | University Rule 12.01.99.M1 – University Statement on Academic Freedom, Responsibility, Tenure, and Promotion (DEF 276-305) |
| 3-Z | A true and correct copy of Texas A&M University's Minimum Syllabus Requirements (DEF 51-60) |
| 3-AA | President Welsh's August 2, 2023 Statement from President Welsh addressing "Our Commitment to Academic Freedom" (DEF 389-391) |
| 3-BB | August 2, 2023 guidance on academic freedom, maintained by the Office of Faculty Affairs |
| 4 | ENGL 360 Submission Packet for KLPC foundational component area approval (DEF 495-526) |
| 5 | ENGL 360 and 361 course descriptions (DEF 43) |
| 6 | Email exchange between Dr. Cynthia Werner and Wayne Versaw (DEF 539-543) |
| 7 | Email exchange between Dr. Cynthia Werner and Dr. Emily Johansen (DEF 552-558) |
| 8 | September 9, 2025 "Update from President Mark A. Welsh III" (DEF 309-311) |
| 9 | Tex. Educ. Code § 51.942 |
| 10 | Declaration of Student A.Z. |
| 11 | Declaration of Student R.O. |
| 12 | Declaration of Dr. Regina Mills |
| 13 | Declaration of Student F.M. |
| 14 | Declaration of Dr. Laura Mandell |
| 15 | Declaration of Student D.W. |

**Background**

**A.  Dr. McCoul is an accomplished professor at the top of her professional game.**

1.  In 2017, Dr. Melissa McCoul earned a PhD in English and a Graduate Minor in Gender Studies from Notre Dame University. She also has a Master's degree in English, focusing on the 18th and 19th centuries, and Bachelor's degrees in both English and Elementary Education. *See* Exhibit 1, P. 98;[2] Exhibit 3, ¶2. She has over fourteen years of collegiate teaching experience, including eight years as a full-time faculty member at Texas A&M University, teaching four courses per semester in writing, 19th century novels, and children's literature. Exhibit 2, at ¶3.

2.  Although as a lecturer, service was not a large component of Dr. McCoul's job, she nevertheless took service to the University seriously. *Id.* at ¶5. Her colleague, Dr. Laura Mandell, describes Dr. McCoul as a "highly revered member of [her] department, and [is] irreplaceable because of her collegiality, versatility, and intellectual work. *See* Exhibit 14, ¶7.

**B.  Dr. McCoul has a long history of "excellent" teaching at Texas A&M University.**

3.  Dr. McCoul's immediate supervisor, English Department Chair Dr. Emily Johansen, described Dr. McCoul as an "excellent" professor. *See* Exhibit 1, at P. 147. In fact, Dr. McCoul had recently been promoted to Senior Lecturer, which would not have occurred had she not been an "excellent" professor. *Id.*; *see also* Exhibit 3-B (describing Dr. McCoul's promotion as a "professional accomplishment" based on her "past performance" and "tremendous potential").

4.  Even Texas A&M President Mark Welsh, who claimed responsibility for terminating Dr. McCoul and is a defendant in this lawsuit, told Dr. Johansen that he supported Dr. McCoul's work,

---

[2] As set forth *infra*, Dr. McCoul appealed her termination pursuant to Texas A&M's University Rules and Procedures, and on November 3, 2025, a hearing was held before the Committee on Academic Freedom, Responsibility, and Tenure (CAFRT). Witnesses were placed under oath for this hearing. Testimony referenced herein is from the CAFRT hearing. *See* Exhibit 1.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 15

and "the thoughtfulness and care [she] extend[s] to both [her] course design and [her] students." *Id.* at PP. 148-149; *see also* Exhibit 3-C; Exhibit 3-E.

5.   Dr. McCoul's ENGL 360: Children's Literature course, one of the two at issue in this lawsuit, was extremely popular, often filling within hours of class registration going live, with students often waiting many semesters for a spot to become available. *See* Exhibit 1, PP. 96-97; Exhibit 3, ¶9; Exhibit 3-D.

6.   In fact, many students took multiple courses from Dr. McCoul, and still others took self-directed independent study with her, a testament to her pedagogical effectiveness. *See* Exhibit 3, ¶10.

7.   Historically, Dr. McCoul's student satisfaction scores were "well above" satisfactory, and she was also recognized for her commitment to mentoring students and service to student organizations. Her most recent annual evaluation noted she "exceeded expectations." *See* Exhibit 1, PP. 94-97; Exhibit 3-F.

8.   Dr. Mary Ann O'Farrell, who chaired Dr. McCoul's promotion committee and therefore is familiar with Dr. McCoul's past student evaluations, described them as "overwhelmingly positive," "all very good," with students noting the "extent and generosity of her feedback on their writing," and that she "didn't register negative comments," *See* Exhibit 1, P. 282; *see also id.* at PP. 154-155 (any student criticism not rising to a level of concern).

9.   Student R.O., who took Dr. McCoul's children's literature course, describes her as a "fair, thoughtful, and effective educator" whose expertise was evident. *See* Exhibit 11, ¶¶2, 4, 8. Student A.Z., who took children's literature and young adult literature with Dr. McCoul, as well as Honor's Research and Independent Study under Dr. McCoul's guidance, similarly describes her as "a great professor," who is "kind, understanding, and knowledgeable about children's literature." *See*

Exhibit 10, ¶¶1, 2. Dr. McCoul sparked Student F.M.'s interest in reading and writing, and she's now the "proud owner of a small library" because of Dr. McCoul. *See* Exhibit 13, at ¶7,10.

10. Dr. McCoul has been commended for, among other things, her contributions to the University both within and outside her department, the strength and clarity of her syllabi, high quality instruction, commitment to accessibility and equity, and overall commitment to her students' learning. *See* Exhibits 3-F, 3-G, 3-H, 3-I, 3-J, and 3-K.

11. Dr. McCoul's colleagues shared the view that she was an excellent lecturer. Dr. Kalani Patterson, who had observed Dr. McCoul's classes, described her as a "really good instructor," Exhibit 1 at PP. 254-255, and Dr. O'Farrell testified that Dr. McCoul is a "super prepared", "imaginative" professor, whose syllabi and course materials were "really full" and "lucid," and whose classes were rigorous, implemented a variety of effective pedagogical methods, who exhibited a "thoughtfulness and consideration about students." *Id.* at PP. 274-276.

12. Dr. Marah Gubar, a nationally recognized expert in Children's Literature and an Associate Professor within the Literature Department at Massachusetts Institute of Technology, noted Dr. McCoul's "excellent" curriculum, and the "incredible care and creativity and scholarly expertise" with which Dr. McCoul organized her course. *See* Exhibit 1, PP. 405, 310-311; Exhibit 2-A.

**C. Dr. McCoul taught ENGL 360 in the summer of 2025.**

13. Dr. McCoul was assigned to teach ENGL 360, Children's Literature, in the summer of 2025; this was her thirteenth time teaching this course at Texas A&M. *See* Exhibit 1, PP. 98, 103; Exhibit 2, ¶11. Dr. McCoul had never been reprimanded for the way she taught this course, or directed to change a single thing. Exhibit 1, PP. 98, 120. She taught the summer 2025 course just as she had in the past. *Id.* at PP. 119-120.

**D. Dr. McCoul becomes an unwitting pawn in a culture war waged by politicians against "woke" themes in higher education.**[3]

14. The summer session of ENGL 360 was rocking along when, on July 10, 2025, Texas State Representative Brian Harrison retweeted a post from an account called "Son of Aragon," which accused Dr. McCoul of "pushing LGBTQ & Sexually Inappropriate books on students" and engaging in a "full onslaught of woke propaganda." *See* Exhibit 2-C. Representative Harrison, for his part, proclaimed "[l]iberal progressives have been put in charge of Texas public universities like @tamu. Texans are being taxed out of their homes to fund liberal indoctrination. Every one of my bills to end it has been stopped by the liberal Austin uniparty. I will not stop fighting!" *Id.* He also posted a PowerPoint slide from Dr. McCoul's course entitled "Why talk about queerness at all?" *Id.*

15. Dr. McCoul learned about this from Dr. Johansen, who told Dr. McCoul "I wanted to reach out to affirm that the department, college, and university strongly support and take incredibly serious your academic freedom to teach this course in the manner you see fit based on your expertise". *See* Exhibit 1, at PP. 132; Exhibit 3-M.

16. Dr. McCoul was not told she should alter her course curriculum or that she had erred in any way. *See* Exhibit 1, at PP. 105-106.

17. On July 28, Associate Dean for Faculty Success in the College of Arts and Sciences Joanna Goodey-Pellois observed Dr. McCoul's Children's Literature course. *Id.* at PP. 106-107; Exhibit 3-N. That day the class discussed *Jude Saves the World,* an assigned reading that explores themes of gender identity and sexuality, and Dr. Goodey-Pellois had only good things to say about the class. *See* Exhibit 1, at PP. 108; Exhibit 3-O; Exhibit 3-N.

---

[3] *See*, *e.g.*, Texas Governor Greg Abbott's October 19, 2025 tweet, stating that "Texas is 'targeting' professors who are more focused on pushing leftist ideologies rather than preparing students to lead our nation. We must end 'indoctrination' and return to education fundamentals at all levels of education." Exhibit 2-B.

18. The following day, as Dr. McCoul was reviewing the prior day's lessons on *Jude Saves the World*, Student K.W., who had been absent the day before, suddenly interrupted class by standing up, and, while recording on her phone, stated it wasn't "legal" to teach these lessons, because according "our President, there's only two genders," and that he would "freeze agencies' funding" that promote "gender ideology".[4] *See* Exhibit 3, ¶14.

19. K.W. indicated that she wouldn't participate in the lesson because it went against "the President's laws."[5] *Id.* at ¶15. Dr. McCoul explained that K.W. was incorrect, but K.W. continued to debate with her, at one point stating that the teaching of "transgenderism" is "illegal", which prompted a tense exchange with another student in the class, who ultimately got up and left class. *Id*. Dr. McCoul told K.W. that if she was uncomfortable she was free to leave and address her concerns to the department chair or the head of undergraduates. *Id.* at ¶16. At that point K.W. stated that she had already been in contact with the President of A&M and had a meeting scheduled with him the next day where she will share all of "documentation" with him, but she did not leave class and instead continued to interrupt the lesson whilst recording the interaction. Ultimately, Dr. McCoul told K.W. it was "time to leave," and she did. *Id*.

20. K.W.'s disruptive conduct was a clear violation of Texas A&M Student Rule 24.4.15. *See* Exhibit 3-Q. Removal of K.W. from the class was fully supported by Texas A&M Student Rule 21.1, which permits professors to remove students from class when they interfere with the professor's ability to teach, or other students' ability to profit from the instructional program.[6]

---

[4] A video of this exchange is viewable at https://x.com/brianeharrison/status/1965093848520294565.

[5] Notably, although Dr. McCoul invites students to share any discomfort they have with course materials so that she can accommodate that, Exhibit 1 at PP. 123-124, K.W. had never spoken with Dr. McCoul about her discomfort with the subject matter of the course before wrongfully disrupting and recording the class. *Id.* at P. 125.

[6] K.W. also violated Texas A&M Student Rule 24.4.18 by recording the class without authorization, but Dr. McCoul was unaware of the recording when she directed K.W. to leave the classroom. Exhibit 1, at P. 125; Exhibit 3-Q.

Exhibit 1, at P. 114; Exhibit 3-P. K.W. continued to interrupt and prevent Dr. McCoul from proceeding with the lesson, and she clearly interfered with other students' ability to profit from the instruction, as one student had felt compelled to leave class because of K.W.'s comments. Exhibit 3, at ¶15.

21. K.W. then had a meeting with President Welsh, and surreptitiously recorded her conversation with him, too. Exhibit 1, at PP. 160-161. K.W. demanded that Texas A&M terminate Dr. McCoul.[7]

22. Ultimately, K.W. was not required to complete the semester, and the course ended a few days early for the other students in the class as well. *Id.*

23. By all appearances the incident was over, and Dr. McCoul was looking forward to teaching ENGL 361, Young Adult Literature, in the fall. Exhibit 3, at ¶19. Dr. McCoul's ENGL 361 course explored many of the same themes as ENGL 360. *Id.*

24. Before the semester started, however, Provost Sams heard from K.W., and reached out to Dr. Johansen with concerns that K.W. would post the video she took during the summer course if Dr. McCoul proceeded with teaching ENGL 361. Exhibit 1, PP. 143. In response, Dr. Johansen presented Dr. McCoul with three options, one of which was to teach ENGL 361 as planned. *Id.* at P. 144; Exhibit 3-U. Dr. McCoul exercised that option, with the full support of both Department Chair Johansen and Associate Dean Goodey-Pellois. *Id.*

25. After further discussion among university officials (not involving Dr. McCoul), and just five days before the fall semester was to begin, Dr. McCoul was told that her ENGL 361 course would have to be taught as ENGL 394, "Genres in Literature," and she could teach her Young

---

[7] An excerpt from this conversation is available at https://x.com/brianeharrison/status/1965093859488399406?s=46.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 20

Adult Literature course content under that designation. Exhibit 1, PP. 149-150, 246; Exhibit 3-U. Dr. McCoul willingly complied with this decision. *Id.*

26. This switch from ENGL 361 to ENGL 394 was made, all but one student[8] enrolled in ENGL 361 re-enrolled in ENGL 394, Dr. McCoul began teaching her course, and the fall semester was off and running. *Id.* at ¶¶23, 24.

27. This came to a halt on September 8, when Dr. McCoul started receiving angry and threatening calls and emails from strangers in the middle of class. *Id.* at ¶24. As it turns out, K.W., unhappy that Dr. McCoul was still teaching subject matter that offended her, apparently released her secretly recorded videos, and Representative Harrison posted these and additional course content on Twitter along with more "anti-work" commentary.[9] *See* Exhibit 2-D.

**E.  Governor Abbott calls for Dr. McCoul's termination.**

28. On September 8, Texas A&M removed Drs. Johansen and Zoran from their administrative posts (but did not terminate their employment), and President Welsh issued a public statement announcing this decision on both Facebook and Twitter/X. *See* Exhibit 2-E, 2-F.

29. Dr. Catherine Eckel, who serves as the Chair of the Senior Faculty Advisory Committee and who spoke with President Welsh the morning of September 9 in that capacity, testified that as of that morning, President Welsh did not intend to terminate Dr. McCoul. Exhibit 1, at P. 294. Provost Sams also testified that as of the morning of September 9, no decision had been made to terminate Dr. McCoul. *Id.* at P. 212.

---

[8] The student that did not enroll in ENGL 394 declined to do so because of a scheduling conflict. *See* Exhibit 3, ¶23.

[9] These clips can be viewed at https://x.com/brianeharrison/status/1965093848520294565?s=20, https://x.com/brianeharrison/status/1965093859488399406?s=20 and https://x.com/brianeharrison/status/1965093861690409452?s=20.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 21

30. At 12:29 pm, Governor Abbott retweeted President Welsh's Twitter post, with the statement "Good. Now, fire the professor who acted contrary to Texas law.":



31. This reckless, transparently false tweet was viewed 2.2 million times, shared 1,600 times, generated 772 "replies" (many critical of Governor Abbott), and "liked" over 14,000 times. *See* Exhibit 2-G.

32. Dr. McCoul was "summarily dismissed" less than five hours later. *See* Exhibits 3-V, 3-W.

**F.   Texas A&M did not comply with its due process procedures in terminating Dr. McCoul.**

33.  Texas A&M University has detailed policies in place to implement faculty due process rights.

34. Importantly, the very morning of Dr. McCoul's termination, President Welsh was reminded, by his own Senior Faculty Advisory Committee,  of the procedures that the University is to follow "where a faculty member is accused of doing something wrong," and was asked by them to "please take it slow here and follow the procedure that we have … in place." *See* Exhibit 1, at P. 294.

35. Sadly, it is undisputed that Texas A&M not only failed to follow these procedures, but affirmatively elected not to do so. President Welsh's Chief of Staff, Dr. Tim Scott, testified that Texas A&M *did not follow* its own procedures in terminating Dr. McCoul. *Id.* at P. 55. Dean Zoran concurred. *Id.* at P. 176. Provost Sams not only agreed that the University *did not follow* its procedures in terminating Dr McCoul, but also testified that he was *told by his "superiors" not to perform an investigation*, and invoked the attorney-client privilege when asked who his "superiors" were. *Id.* at P. 217, 222-223.

36. Even without these admissions it is obvious the University failed to follow its due process procedures in terminating Dr. McCoul.

37. As noted above, Dr. McCoul was "summarily dismissed" from her employment. *See* Exhibits 3-V, 3-W.

38. "Summary dismissal" is a creature of Texas state law. Chapter 51.942 of the Texas Education Code provides "summary dismissal" procedures for faculty upon a finding of "serious misconduct, as defined by the institution's policies."[10] *Id.* at (c-4); *see* Exhibit 9.

39. Chapter 51.942 also contains detailed procedural requirements for effecting a summary dismissal, and is crystal clear that these procedures are meant to "ensure that the institution provides the faculty member with **appropriate due process**." *Id.* (Emphasis added). Said due process includes (1) written notice of the allegations against the faculty member together with an explanation of the evidence supporting dismissal; (2) an opportunity for the faculty member to respond to the allegations in a hearing with a designated administrator; (3) a written determination whether the institution will proceed with the summary dismissal based on this hearing; and (4) provision of the written determination to the faculty member, that includes the effective date of the dismissal and information regarding the faculty member's opportunity for a post-dismissal appeal. *Id.* at (c-4) (1)-(4).

40. These provisions are codified within Texas A&M University's policies and rules. A lecturer whose term appointment has not expired, like Dr. McCoul, may be subject to summary dismissal if (1) the stated cause for dismissal is a finding of "serious misconduct", (2) which has been "substantiated by an investigation and decision conducted in accordance with system policy." *See* Exhibit 3-X, at §8.2.2; Exhibit 3-Y, at §9.2.1 ("a non-tenured faculty member whose term appointment has not expired may be dismissed for serious misconduct at the conclusion of an investigation process and decision thereof").

---

[10] Although the statute speaks in terms of "tenured" faculty the statute makes clear that the procedures a university must follow are meant to effectuate due process rights, and Texas A&M made lecturers subject to its own summary dismissal procedures.

41. "Serious misconduct" includes infractions like sexual harassment, scientific misconduct, fraud, and violence or threat of violence in the workplace.  *See* <u>Exhibit 3-X</u>, at §8.2.1.

42. The mandated "investigation process" is as follows:

<u>First</u>, "[p]rior to issuing the notice of intent to summarily dismiss, the department head shall seek approval from the College/School Dean. To this end, the department head shall provide the Dean with the written charges for the dismissal and an explanation of the evidence." *See* <u>Exhibit 3-Y</u>, at §9.2.2. <u>This did not occur</u>. *See* <u>Exhibit 1</u>, at P. 178.

<u>Second</u>, "[u]pon approval by the Dean, the faculty member will be provided by the department head with a notice of intent to summarily dismiss which shall contain the written charges for the dismissal, explanation of the evidence, and an opportunity to respond to the Provost within five (5) business days from receipt of the notice of intent to summarily dismiss." *See* <u>Exhibit 3-Y</u>, at §9.2.3. <u>This did not occur</u>. *See* Exhibit 3, ¶31.

<u>Third</u>, "[t]he Provost … is designated to hear a faculty member's response to the charges prior to summary dismissal, and to determine, after considering the faculty member's response, whether to proceed with summary dismissal." *See* <u>Exhibit 3-Y</u>, at §9.2.3. <u>This did not occur</u>. *See* Exhibit 3, ¶32.

<u>Fourth</u>, "[s]hould the Provost determine to proceed with the summary dismissal, the faculty member will be notified, and a formal notice of dismissal shall be issued by the department head." *See* <u>Exhibit 3-Y</u>, at §9.2.3. <u>This did not occur</u>. *See* Exhibit 3, ¶33.

<u>Fifth</u>, "[s]hould the faculty member who receives a notice of intent to summarily dismiss not exercise the opportunity to be heard by the Provost within the prescribed five (5) business days, a notice of dismissal shall be issued by the department head." *See See* <u>Exhibit 3-Y</u>, at §9.2.3. <u>This did not occur</u>. *See* Exhibit 3, ¶34.

**G. President Welsh publicly assumes responsibility for terminating Dr. McCoul.**

43. Although Dr. McCoul's notice of termination was signed and issued by Vice Provost Dr. Blanca Lupiani,[11] Exhibit 3-V, 3-W, President Welsh claimed sole responsibility for the decision to terminate Dr. McCoul, and described the decision as "[his] alone." *See* Exhibit 2-H.

44. The reason, per President Welsh, was that he had learned "yesterday that despite [his earlier 'directive' that course content must match catalog descriptions] 'the college' continued to teach content that was inconsistent with the published course description for another course this fall." *Id.* As explained *infra*, this explanation for Dr. McCoul's termination does not make sense for a variety of reasons, and is a pretext for retaliation for Dr. McCoul exercising her academic freedom in a manner that the University found politically inexpedient.

**H. Chancellor Hegar, on behalf of himself and the Board of Regents, publicly vows to hold Dr. McCoul responsible.**

45. Glenn Hegar is the Chancellor of the Texas A&M University System. As Chancellor, Mr. Hegar is considered the Chief Executive Officer of the system. *See* Exhibit 2-P, Art. V, Sec. 2. Chancellor Hegar reports to the Board of Regents and is responsible for implementing the policies adopted by the Board of Regents, as well as establishing system regulations. *See* Exhibit 2-N, Sec. 3.1. It is Chancellor Hegar's responsibility to ensure that employees like those who carried out Dr. McCoul's termination are trained in the application of the policies, regulations, rules, and procedures that are pertinent to their responsibilities. *Id.* at Sec. 8.2. Chancellor Hegar manages and operates the Texas A&M University System under the direction of the Board of Regents. *See* Exhibit 2-O.

---

[11] As noted above, Dr. Lupiani first asked Dr. Werner to issue Dr. McCoul's notice of summary dismissal, but Dr. Werner refused because she "had a conscience". Exhibit 1, at P. 237.

46. On September 8, the same day Representative Harrison posted K.W.'s videos and Dr. McCoul's course content, Chancellor Hegar posted a statement on his own Twitter/X page "from The Office of Chancellor Glenn Hegar," and, referencing Dr. McCoul, stated "I will work _with the Board of Regents_ to make certain that the A&M System _takes the disciplinary action_ necessary to ensure that _this does not happen again at one of our campuses_." _See_ Exhibit 2-I.[12]

### I. Two internal bodies determined that the University failed to establish cause to terminate Dr. McCoul, and failed to follow its own due process policies.

47. The Committee on Academic Freedom, Responsibility, and Tenure (CAFRT) is the hearing body for faculty appeals made to the President of Texas A&M. _See_ Exhibit 3-Y, Sec. 11. A faculty member who has been summarily dismissed has the right to a hearing before the CAFRT. _Id_. at Sec. 9.2.7. Dr. McCoul timely invoked her right to a CAFRT hearing. _See_ Exhibit 2-J.

48. Texas A&M also maintains a separate body, the Academic Freedom Council (AFC), which is the advisory body for evaluating situations that involve academic freedom issues within the University. _See_ Exhibit 3-Y, at Sec. 12.

### 1. Texas A&M's CAFRT unanimously finds that the University failed to show Dr. McCoul failed to follow directives, and that it violated its own due process policies in firing her.

49. The CAFRT Committee held a full-day hearing on November 3, and issued its findings November 18. _See_ Exhibit 2-K.

50. The eight-member CAFRT Committee rejected all three policy violations asserted by the University as supporting Dr. McCoul's termination, and concluded, "[o]verall, the CAFRT committee unanimously agreed that the summary dismissal of Dr. McCoul was not justified." _Id_. (emphasis added).

---

[12] This post can more easily be viewed at https://x.com/Glenn_Hegar/status/1965203549945811437?s=20.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 27

51. Addressing the facts of Dr. McCoul's case, the CAFRT Committee found, among other things, that (1) the University's witnesses acknowledged that the University did not follow the processes contained in section 9 of Rule 12.01.99.M1 (2) this likely led to a great deal of confusion among University officials as reflected in the internal consistencies among their testimony; (3) the procedures set forth in Section 9.1.1 of TAMU Rule 12.01.99.M1 is meant to ensure "basic due process" to faculty members; and (4) there was no evidence that Dr. McCoul was included in conversations about the fall course designation. *Id.*

**2.   Texas A&M's Academic Freedom Council issues a report finding that A&M violated Dr. McCoul's academic freedom and due process Rights.**

52. On September 18, an anonymous complaint was submitted to the Texas A&M University System Ethics Point Hotline concerning Dr. McCoul's termination, and the Academic Freedom Council convened a subcommittee to evaluate the case. *See* <u>Exhibit 2-L</u>.

53. On September 25, the Academic Freedom Council issued its findings. *Id.* Noting that "a university cannot respect the academic freedom of faculty and students while also violating due process rights pertaining to academic freedom," the Council found a "clear violation" in how TAMU terminated Dr. McCoul. *Id.*

54. More to the point, it determined Dr. McCoul "was fired for the content of her class. *Even if every procedural step had been followed, her termination would be a violation of academic freedom*…" *Id.* (emphasis added).

**J.   Interim President Williams and Vice Chancellor Hallmark uphold Dr. McCoul's termination with full knowledge of the University's Due Process and First Amendment violations.**

55. Pursuant to University Policy 12.01.99.M1, the recommendation of the CAFRT Committee was conveyed to the President. By that point, President Welsh had resigned, and Interim President

Tommy Williams was in place. On November 26, President Williams upheld Dr. McCoul's termination. *See* Exhibit 2-M.

56. The appeal then proceeded to Chancellor Hegar, who appointed Vice Chancellor James Hallmark as his designee. *Id.* On December 19, Mr. Hallmark also upheld Dr. McCoul's termination. *Id.*

57. These gentlemen upheld Dr. McCoul's termination, despite the fact that <u>two</u> independent faculty bodies – the CAFRT and the Academic Freedom Council – determined that there had been significant due process failures and that the University had failed to establish the propriety of Dr. McCoul's termination.  They also did so despite the Academic Freedom Council's express finding that Dr. McCoul's termination constituted a violation of her right to academic freedom. Exhibit 2-L.

**K. Dr. McCoul's free speech rights, as codified by University policy, were violated.**

**1. Texas A&M's policies and procedures reflect Defendants' understanding that academic freedom is protected by the First Amendment.**

58. Dr. McCoul's right to academic freedom is reflected in University Rule 12.01.99.M1, §2.1, which couldn't be clearer:

> Institutions of higher education exist for the common good. The common good depends on an uninhibited search for truth and its open expression. Hence, it is essential that faculty members be free to pursue scholarly inquiry and creative scholarship without undue restriction, and to voice and publish individual conclusions concerning the significance of evidence that they consider relevant. <u>Each faculty member must be free from the corrosive fear threat (sic) that others inside or outside the university community because their views may differ, threaten the faculty member's professional career or the material benefits accruing from it</u>.

> *See* Exhibit 3-Y, §2.1 (emphasis added).

59. And if that weren't clear enough, University Rule 12.01.99.M1, §2.1 continues: "[e]ach faculty member is <u>entitled to full freedom in the classroom in discussing the subject being taught</u>.

…", and §2.2 acknowledges that "[t]he <u>rights</u> and privileges of faculty members extended by society and <u>protected by governing boards and administrators through written policies and procedures on academic freedom</u> and tenure, <u>and as further protected by the courts</u>, require reciprocally the assumption of certain responsibilities by faculty members." *Id.* (Emphasis added). *Id*. at §2.2.

60. Texas A&M's "Minimum Syllabus Requirements" similarly reference academic freedom, and permit professors to include the following statement on their syllabi:

> Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. However, as a community of scholars, the university has an aspirational expectation that such discourse will be conducted in accordance with Aggie Core Values. In this "marketplace of ideas" we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and **Free Speech** on the University's website about the **First Amendment**.

> *See* <u>Exhibit 3-Z</u>.

61. Following the links for "Free Speech" and "First Amendment" brings one to a website maintained by the Division of Student Affairs entitled "First Amendment Freedoms at Texas A&M University" which cites the First Amendment, which contains a link to <u>Exhibit 2-R</u>, which states "Texas A&M is a public university. As such, faculty and staff are government actors … The U.S. Constitution and, in particular, First Amendment rights … are guaranteed when government actors (faculty and staff) interact with individuals (students). The free expression of ideas and the right to associate are American values *fiercely protected* by the Supreme Court. The First Amendment right to free expression … at public universities has been explored in *classic case law* that came into being largely as a result of court cases related to the student unrest of the 1960s." (emphasis added).

Plaintiff's Response to Defendants' Motion to Dismiss – Page 30

62. These principles are embodied in Texas A&M's own guidance on academic freedom as well, published by President Welsh and maintained by Texas A&M University's Office of Faculty Affairs. *See* Exhibits 3-AA, 3-BB. This guidance provides, of relevance, that "Texas A&M will not penalize or discipline members of the faculty because they exercised academic freedom," and "the protection of freedom of expression in a teaching and learning environment" is one of four pillars of academic freedom that faculty exercise. *Id.* This guidance also speaks to the importance of students' academic freedom, condemning exactly what happened in this case: "It is not the proper role of the university or any outside agency to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive. Engaging with new ideas and perspectives helps students grow intellectually and is part of the educational process." *Id.*

63. This internal University guidance cites *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), Exhibit 3-BB, which speaks at length on the longstanding principle that academic freedom is a special concern of the First Amendment. *Id.* at 250.

64. Finally, the By-Laws of the Texas A&M University Board of Regents reflect the importance of academic freedom, and vest the Regents with responsibility for protecting faculty from outside influence: "Section 51.352 of the Texas Education Code states that the state's higher education boards are expected to '[p]reserve institutional independence and to defend its right to manage its own affairs through its chosen administrators and employees". *See* Exhibit 2-P.

**2. The reasons given by the University for Dr. McCoul's termination are either a proxy for the exercise of Dr. McCoul's right to free speech, or blatantly pretextual.**

65. The reasons proffered by the University have evolved since the day she was terminated, with the latest iteration reflected in Defendants' Motion to Dismiss. Every reason is either unlawful on its face, or entirely lacking in evidence and credibility. Moreover, none amount to a violation

of University policy, let alone the "serious misconduct" required to support a summary dismissal under University policy.

### i. The themes explored by Dr. McCoul are standard fare for a Children's Literature course, not "indoctrination."

66. Dr. McCoul taught themes of gender, gender identity, sexuality, race, and disability in ENGL 360 because "[she teaches] contemporary children's literature and those are necessary themes that are increasingly common in the literature published for children." Exhibit 1 at PP. 104-105. This is based on "the idea of Windows, Mirrors, and Sliding Glass Doors, a foundational article … that all students of all ages need to have both representation of themselves ('mirrors'), and also representation of those unlike them ('windows'), to see into the lives of others". *Id.*; *see also* Exhibit 3 at ¶12.

67. Dr. Johansen felt strongly that Dr. McCoul's course content and the way she taught it was appropriate. *Id.* at P. 170.

68. Dr. Gubar testified at length about the diversity inherent in contemporary Children's Literature but can be summarized thus:

> This is what contemporary children's literature looks like. It's very diverse. And there's a whole different range of different viewpoints and types of families and children being represented." *Id.* at P. 310. She described the readings Dr. McCoul assigned her students as "middle of the road", "par for the course in any college-level children's literature course," and "the kinds of texts that …are being taught all over the country, everywhere there's a children's lit classes being offered in colleges. You know, places like Kansas State University, University of Florida, Pitt, MIT, UConn, you name it.

*Id.* at P. 309.

69. Although Defendants suggest (without reference to any evidence) that Dr. McCoul sought to impose her views on her students, Dr. McCoul welcomed spirited debate, and included in her syllabus that students were not required to agree with her, or with other students, but that they were

required to respect the conversation and one another. *Id.* at PP. 111-112; *see also* Exhibits 3-O, 3-T.

70. Her students agree. Student A.Z., who took four courses with Dr. McCoul, "never felt "indoctrinated" in her classes, and relates that Dr. McCoul is an understanding instructor, who listened to and acknowledged various perspectives from students that may not agree with her. No belief was forced upon the classroom, and students were welcome to disagree with her or other students if they felt the need to do so. Dr. McCoul's expectations and class topics are also clearly outlined in the syllabus and discussed on the first day of class, where she makes it clear that students are free to disagree with her or other students as long as they remain respectful toward the other students in her class." *See* Exhibit 10, ¶3. Dr. McCoul directed A.Z.'s research and independent study, and A.Z. "never felt that [she] was forced to agree with Dr. McCoul's personal beliefs." *Id*. at ¶4. Student R.O. agrees, relating that Dr. McCoul "did not require that you hold a certain view, nor did she talk about hers." *See* Exhibit 11 at ¶6-7. Dr. McCoul honored her students' academic freedom. *See* Exhibit 13, ¶¶6, 8, 9. In fact, F.M. recalls Dr. McCoul rarely lectured in the traditional sense, and only spoke at length on services available to students like University Counseling and the Pocket Pantry. *Id.* at ¶9. D.W. concurs, recalling that Dr. McCoul "mostly guided [us] through conversation throughout the lesson, allowing us to take the lead in conversation. The class felt just as much like it was each ours, as it was Dr. McCoul's." *See* Exhibit 15, ¶3. D.W. likewise rejects the notion that Dr. McCoul "indoctrinated" her students or imposed her views on them. According to D.W., "Dr. McCoul always helped students feel empowered to voice their opinions and thoughts in class. I never even got the impression of disapproval if I didn't enjoy a text or didn't agree with another student's close reading. We were encouraged to have thoughts, with no boundaries except respect for fellow students and other humans." *Id.* at ¶4.

**ii.      The themes explored by Dr. McCoul were in full compliance with the course description, syllabus, and University approval.**

71. ENGL 360 was considered part of Texas A&M's "core curriculum." Exhibit 1, at PP. 98-99. Courses in the core curriculum must meet one of eight "foundational component areas," and "Language, Philosophy, and Culture" (LPC) is one of those. *Id*.

72. Because of the nature of the course, ENGL 360 satisfies the LPC foundational component area. *Id.* And, because ENGL 360 qualified for an LPC credit, it was *required* to "involve the exploration of ideas that foster aesthetic and intellectual creation in order to understand the human condition across cultures," and "focus on how ideas, value, beliefs, and other aspects of culture express and affect human experience." *Id.* at P. 99; Exhibit 4.

73. Further, as part of the LPC core curriculum, ENGL 360 was *required* to "explore various ideas conveyed in the texts", and "the historical development, social and cultural context of children's fiction, how novels for young readers have changed and/or stayed the same in the intersections among gender, politics, and children's fiction." Exhibit 1, at PP. 99-100; Exhibit 4.

74. Finally, and of particular significance to this case, ENGL 360 was *required*, by the University, to "reveal how wider social forces shape the philosophical outlooks and aesthetic sensibilities of writers of literature for children, and how writers of different racial, ethnic, gender, regional backgrounds, and sexual orientation may approach and interpret the world differently for readers of children's literature." Exhibit 1, P. 100; Exhibit 4 (emphasis added).

75. `Dr. Werner confirmed that to satisfy the LPC foundational component area, it was important that ENGL 360 include themes like gender, race, regional backgrounds, and sexual orientation, in order to "give students an opportunity to learn about the human experience, broadly defined. And this would include experiences over time and over space and subcultural differences." Exhibit 1, P. 229.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 34

76. Dr. McCoul designed her syllabus, and taught her course, to meet these objectives. *Id.* at P. 100.

77. Dr. McCoul's course was also aligned with its course description, *Id.* at PP. 255-256, which is skeletal by design to allow professors the ability to tailor the course to their interests, and adapt content to developments in their respective fields. *Id.* at PP. 110, 259. Dr. Catherine Eckel stated the obvious: "[t]hese course descriptions are so brief. … And so it's impossible to put everything in there that – that you're going to teach in a class. And – and – and really, you could say that almost all of our classes are going to be inconsistent in some way with what's in the course description, or rather that nothing is consistent with the course description because they are so vague." *Id.* at PP. 289, 299-300. Dr. Mandell agrees. *See* Exhibit 14, at ¶¶2-6.

78. As Dr. Patterson similarly explained, it is standard practice for professors to choose a theme that interested them as a way to narrow the breadth of the field. *Id.* at PP. 255-256. Also, the way Dr. McCoul structured her course was in keeping with the way the course was meant to be taught, and her readings were all contained in the Children's Literature Comprehensive Database, a library of children's literature to which A&M has a subscription. *Id.* at PP. 257-258.

79. Drs. Johansen and Werner both confirmed that there is no expectation that Dr. McCoul's syllabus align with Dr. Robinson's syllabus. *Id.* at PP. 149, 231-234, 250-252.

80. As does Dr. Regina Mills, who worked closely with Dr. McCoul while they were on faculty within the English department. Exhibit 12, at ¶2-3. According to Dr Mills, both Dr. McCoul's ENGL 360 and ENGL 394 courses were perfectly aligned with the course descriptions for the class; the description for ENGL 394 ("Studies in Genre") permits faculty to choose the genre to teach, and allows them to "feature[] current faculty research." Since Dr. McCoul conducts research on how representations of gender and sexuality have evolved within children's and young adult

literature, both her choice of genre and the inclusion of her research in the course content are in line with the catalog description. *Id.* at ¶5. Similarly, the course description for ENGL 360 provides that the course will cover "representative writers, genres, texts, and movements," and this focus is reflected in Dr. McCoul's syllabus. *Id*. at ¶6.

81. Notably, Dr. McCoul's ENGL 360 syllabus, referencing these same themes on its face, had been successfully submitted by the English department for a previous recertification of ENGL 360 for the LPC foundational component area.  Exhibit 1, PP. 102-103. And this is no surprise, as Dr. McCoul had crafted an outstanding syllabus. Dr. Eckel, who reviewed Dr. McCoul's syllabus, described it as "a very interesting course. It's clear that [Dr. McCoul] took very seriously her job. It's a much more complete and engaging syllabus than I ever wrote. The books are not 100 percent LGBTQ literature, and the ones that are, are prize winners… So I was actually pretty impressed with the – with the syllabus itself. I thought it looked like a great course." *Id*. at P. 301.

### iii.    Dr. McCoul was summarily terminated despite the absence of "serious misconduct"

82. As set forth *infra*, Dr. McCoul has a protected interest in her employment by virtue of Chapter 51.942 of the Texas Education Code, which provides that faculty cannot be summarily terminated absent "serious misconduct." *See* Exhibit 9. This right is codified in University Rule 12.01.99.M1 as well. *See* Exhibit 3-Y.

83. The CAFRT unanimously found that Dr. McCoul did not engage in "serious misconduct." *See* Exhibit 2-K. The Academic Freedom Council determined that Dr. McCoul did not engage in "serious misconduct." *See* Exhibit 2-L. Referencing University Policy 12.01, §8.2.1, Dean Zoran testified that Dr. McCoul did not engage in the types of conduct that constitute "serious misconduct." *See* Exhibit 1, P. 180.

84. Similarly, Associate Dean Werner testified, unequivocally, that Dr. McCoul had done nothing wrong:

> Q:  What did you hear next?
>
> A:  About two and a half hours later, I got a second call from Blanca Lupiani, and she said that there'd been a change of plans and that they were going to summarily dismiss her from her faculty position.
>
> Q:  Did she ask you to do anything?
>
> A:  She also asked me to sign that letter, and I said I cannot – I can't sign it.
>
> Q:  Why didn't you want to sign that letter?
>
> A:  **Because I have a conscience, and I knew that she had done nothing wrong and I – it's my own assessment that she'd done nothing wrong, and I shared that assessment … with my team, I'd shared it with other administrators. I just felt like it wasn't appropriate.**

*See* Exhibit 1, P. 237.

### iv.   Dr. McCoul was summarily terminated despite no policy violations

85. Dr. McCoul's termination email set forth three alleged policy violations – University Rule 12.01.99.M1, §§6.3.2, 6.3.5, and 6.3.7:[13]

> 6.3.2 Continuing or repeated failure to perform duties or meet responsibilities to the institution or to students or associates;
>
> 6.3.5 Violation of system policies, system regulations, system academic institution rules, or laws substantially related to the performance of faculty duties;
>
> 6.3.7 Unprofessional conduct adversely affecting to a material and substantial degree the performance of duties or the meeting of responsibilities to the institution, or to students or associates, including research misconduct or professional misconduct.

*See* Exhibit 3-W; 3-Y.

---

[13] These provisions of Rule 12.01.99.M1 implement, and are a mirror image of, Section 4.3(b), (e), and (g) of System Policy 12.01, also cited in Dr. McCoul's termination letter. *Compare* Exhibit 3-X, § 4.3(b), (e), and (g), with 3-Y, §§6.3.2, 6.3.5, and 6.3.7.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 37

86.   Provost Sams, who reviewed McCoul's termination memo before it was issued to her, testified that Sections 6.3.2 and 6.3.5 were coterminous with Dr. McCoul's failure to follow directives. Exhibit 1, PP. 207-208. Chief of Staff Dr. Scott, who was present for the meetings concerning these issues, testified that Section 6.3.7 was inapplicable to Dr. McCoul. *Id*. at 46. Even without this admission it cannot be seriously suggested that Dr. McCoul violated this policy.

87. And, as noted, the CAFRT unanimously rejected all three policy justifications for Dr. McCoul's termination. *See* Exhibit 2-K.

**v.      Dr. McCoul never failed to follow directives.**

88.   Although the University's position is unclear with respect to what precise directives were even at issue, one that was discussed by University witnesses was that Dr. McCoul was supposed to teach her content as ENGL 489 but instead taught ENGL 394. Exh. 1, P. 39-44.

89.   But Dr. Johansen, who was present for conversations among Drs. Sams, Zoran, Scott, and other University officials about the fall semester, denies there was *ever* a consensus or agreement that Dr. McCoul would teach the content for ENGL 361 as ENGL 489, and she directed the undergraduate office to change Dr. McCoul's ENGL 361 class to ENGL 394. *Id.* at PP. 144-146. Dr. Zoran similarly denied that he ever communicated to the Provost, or Johansen, that Dr. McCoul's ENGL 361 course would be recast as ENGL 489 that fall. *Id.* at P. 171.

90. As set forth above, Dr. Werner testified that ENGL 394 was a completely suitable, and actually better, alternative than ENGL 489. *Id.* at PP. 246.

91.   Although the purported directives Dr. McCoul failed to follow varied among Texas A&M officials who testified at the CAFRT hearing, none of the University's officials had firsthand (or even secondhand knowledge) of *any directive given to Dr. McCoul*. Dr. Scott had no knowledge of any directive that was conveyed to Dr. McCoul. *Id*. at PP. 39-44. Johansen testified that Dr.

McCoul never failed to follow a directive, nor did she violate even a single University policy. *Id.* at P. 151. Dean Zoran testified that he was unaware of whether Dr. McCoul was told she could not teach the content in question as a fall course. *Id.* at P. 182. Provost Alan Sams testified that he had no firsthand knowledge of a directive given to Dr. McCoul. *Id.* at PP. 205-207. Dr. Werner testified that Dr. McCoul was not aware of any directive that was given to Dr. McCoul. *Id.* at PP. 234-235.

92. The only decision that was made by University officials *and* conveyed to Dr. McCoul was that she would teach her ENGL 361 content as an ENGL 394 course, and she willingly complied with that decision. *Id*. at 149-150; Exhibit 3 at ¶37.

93. This is consistent with statements President Welsh conveyed to the Senior Faculty Advisory Committee in late August when he briefed them on these developments; while he was not "fully happy" with the Drs. Johansen and Zoran for ending the ENGL 360 course early, he was displeased because "he was afraid that it made [Dr. McCoul] look like she had done something wrong, and he didn't think that was necessarily true." *See* Exhibit 1 at P. 291. With respect to Dr. McCoul, he expressed only worry "about her becoming a target and he wanted to protect her." *Id.* He also told the Committee that the fall content was being taught under a different course number, and he did not identify any wrongdoing on Dr. McCoul's part, or indicate she had failed to follow any directives in connection with this change. *Id.* at P. 292. He did not wish to terminate Dr. McCoul as of the morning of the day she was actually terminated. *Id.* at PP. 293-294.

94. Dr. McCoul testified, unequivocally, that she never received any directive, and contemporaneous evidence fully supports that testimony. *Id.* at P. 91; *see also* Exhibit 3-U. Dr. O'Farrell, who had conversations with Dr. McCoul throughout these events, described her as "remarkably calm," and "very even" about the last-minute shift in her courses." Exhibit 1, P. 277. When asked if Dr. McCoul told Dr. O'Farrell that she did not intend to address the University's

concerns, Dr. O'Farrell testified, "[n]o, really the opposite." *Id.* at P. 278. Dr. Mills concurs, stating that "Dr. McCoul seemed adamant that if she followed the rules and worked with the university administrators, everything would work out, and things would go back to normal." Exhibit 12, at ¶7.

## Argument

### I.    Plaintiff's Claims are not Barred by Sovereign Immunity

Title 42 U.S.C. § 1983 authorizes plaintiffs to bring claims "against persons in their individual or official capacity, or against a governmental entity." *Pratt v. Harris Cnty.*, 822 F.3d 174, 180 (5th Cir. 2016) (cleaned up). A party has a colorable claim under section 1983 if the plaintiff can "allege a violation of a right secured by the Constitution or laws of the United States and demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

### A. Dr. McCoul seeks monetary damages against Defendants in their individual capacities only.

Defendants note that monetary damages are not obtainable against the Texas A&M University System and against the Texas A&M officials she has sued in their official capacity. *See* Def. Mot. at 3-4. This is accurate, and Plaintiff does not argue otherwise. Dr. McCoul does not seek monetary damages against the Texas A&M University System or its officials in their official capacities. Rather, she seeks monetary damages against President Welsh, President Williams, Chancellor Hegar, and Vice Chancellor Hallmark in their individual capacities only. *See Original Complaint and Jury Demand*, at ¶78 (Dkt. No. 1). This relief is appropriate. *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009).

An individual sued in their personal capacity can be held liable under §1983 if personally involved in the acts causing the deprivation of a constitutional right, or a causal connection exists

Plaintiff's Response to Defendants' Motion to Dismiss – Page 40

between the act and the allege constitutional violation. *Hamad v. Gary DeShazo & Associates*, 95 F.3d 1149 (5th Cir. 1996). As set forth above, <u>President Welsh</u> publicly claimed responsibility for terminating Dr. McCoul. *See* <u>Exhibit 2-H</u>. President Williams upheld Dr. McCoul's termination in spite of the CAFRT's unanimous determination that her termination was improper. *See* <u>Exhibit 2-M</u>. <u>Chancellor Hegar</u> likewise publicly promised to "take[] the disciplinary action necessary to ensure [the teaching of instructional materials that are 'irreconcilable with the values of the Texas A&M University System'] does not happen again at one of our campuses." *See* <u>Exhibit 2-I</u>. Then, Chancellor Hegar delegated that decision to <u>Vice Chancellor Hallmark</u>, who upheld Dr. McCoul's termination with full awareness of the First Amendment and Due Process violations that two independent faculty bodies had documented. *See* <u>Exhibit 2-M</u>. That decision was issued by Chancellor Hegar. *Id.* Incidentally, Chancellor Hegar is responsible for "[r]ecommending necessary policies and rules to the governing Board of the System to ensure conformity with all laws and rules …" *Id.* He is responsible for implementing the policies adopted by the Board of Regents, and he is also responsible for establishing system regulations. *See* <u>Exhibit 2-N</u>, Sec. 3.1. It is Chancellor Hegar's responsibility to ensure that employees like those who carried out Dr. McCoul's termination are trained in the application of the policies, regulations, rules, and procedures that are pertinent to their responsibilities. *Id.* at Sec. 8.2. He clearly failed to do this, and he was apparently a driving force behind her termination. *See* <u>Exhibit 2-I</u>.

**B. Dr. McCoul's request for declaratory relief against Defendants is permitted by *Ex parte Young*.**

Defendants further argue that declaratory relief is unavailable against these Texas A&M officials in their official capacity. Def. Mot. at 4. This is not accurate, because the Eleventh Amendment does not bar claims for prospective relief against state officials acting in their official capacity. *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 228 (5th Cir. 2009).

This doctrine was first recognized in *Ex parte Young,* 209 U.S. 123, 155-556 (1908), where the Supreme Court permitted prospective injunctive relief against state officials for ongoing federal law violations. *Cooper v. Benavides*, No. 416CV00860ALMCAN, 2017 WL 9285512, at *5 (E.D. Tex. July 3, 2017), report and recommendation adopted in part, No. 4:16-CV-860, 2017 WL 4968643 (E.D. Tex. Nov. 2, 2017). The *Ex parte Young* exception was designed to end continuing violations of federal law as necessary to vindicate the federal interest in assuring the supremacy of federal law. *Green v. Mansour*, 474 U.S. 64, 68 (1985). "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255-56 (2011). Reinstatement constitutes prospective relief. *Warnock v. Pecos Cty.*, 88 F.3d 341, 343 (5th Cir. 1996) (noting, as well, that "[c]laims for [attorneys'] fees associated with prospective relief and fees that may be awarded as costs are not barred by the Eleventh Amendment").

Dr. McCoul seeks declaratory relief that (1) she did not violate state law; (2) she did not violate a directive; (3) she did not violate policy; and (4) she was, instead, terminated for exercising her right to academic freedom as guaranteed to her by the First Amendment. *See Original Complaint and Jury Demand*, at ¶102 (Dkt. No. 1). She also seeks reinstatement and injunctive relief. As this declaratory relief is prospective, it is not barred by sovereign immunity.

Citing *Acosta v. Univ. of Texas at El Paso*, No. EP-06-CA-408, 2007 WL 9701442, at *2, W.D. Tex. April 11, 2007), Defendants point out that the Declaratory Judgment Act does not waive sovereign immunity. *See* Def. Mot. at 4-5. Notably, though, *Acosta* relies on *Port Drum Co. v. Umphrey*, 852 F.2d 148, 151 (5th Cir. 1988) for this principle, and *Port Drum* stands only for the

proposition that the Act serves to enlarge the range of remedies available in the federal courts and, on its own, does not extend or expand jurisdiction. Instead, the court must have an independent basis for asserting subject matter jurisdiction over the matter of a case. Here, that independent basis exists.

**C.** ***Ex parte Young* does, in fact, remove sovereign immunity from the Board of Regents defendants.**

Defendants argue that *Ex parte Young* does not remove sovereign immunity from the Board of Regents Defendants, whom Dr. McCoul has sued in their official capacities. Def. Mot. at 6-7. But *Jackson v. Wright*, 82 F. 4th 362, 365 (5th Cir. 2023) is dispositive, and resolves this argument in Dr. McCoul's favor. In *Jackson* the court examined the *Ex parte Young* exception to sovereign immunity, and held that it applied to the Board of Regents defendants sued in that case. Finding that the plaintiff had "sue[d] the right defendants and ask[ed] for the right remedy," the court affirmed the district court's denial of defendants' motion to dismiss the Regents from the lawsuit. *Id.* at 367.

First, the court held that the claims against the Regents met the "some connection with the enforcement of the challenged law or policy" requirement of *Ex parte Young*. Noting that "[a]ll that is required is a mere 'scintilla of enforcement' by the relevant state official with respect to the challenged law," the court observed that the Regents had governing authority over the University, and direct governing authority over the university officials that are allegedly continuing to violate the plaintiff's First Amendment rights. *Id.* The Board of Regents of Texas A&M exercises similar governing authority. As the By-Laws for the system make clear, "[t]he governance of the System is vested in the Board of Regents." *See* <u>Exhibit 2-P</u>, at §2. Like the Regents in *Jackson*, the Texas A&M Regents "shall make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." *Id.* at §4. In

Plaintiff's Response to Defendants' Motion to Dismiss – Page 43

addition, and of particular significance to this case, the By-Laws vest the Regents with responsibility for protecting faculty from outside influence: "Section 51.352 of the Texas Education Code states that the state's higher education boards are expected to '[p]reserve institutional independence and to defend its right to manage its own affairs through its chosen administrators and employees." *Id.* This case is nothing if not an example of a failure of institutional independence.

And like the Regents in *Jackson*, the Texas A&M Regents have "direct governing authority" over Chancellor Hegar, who upheld Dr. McCoul's termination in spite of full knowledge of the University's First Amendment and Due Process violations. *Id.*; Exhibit 2-O. Finally, and most significantly, Chancellor Hegar made it clear that he would "work with the Board of Regents to make certain that" Dr. McCoul was disciplined, and "ensure this does not happen again at one of our campuses." *See* Exhibit 2-I. Prospective relief, as authorized by *Ex parte Young*, is appropriate based not only on the Regents' apparent role in Dr. McCoul's termination, but its ongoing role in upholding practices that violate the First Amendment.

Finally, like the professor in *Jackson*, Dr. McCoul has asserted the correct remedy against the members of the Board of Regents, as she seeks only declaratory and injunctive relief against them. *Jackson*, 82 F. 4th at 368, *citing Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011); *see also Original Complaint and Jury Demand*, at ¶¶79, 91, 99-102 (Dkt. No. 1).

## II.    Dr. McCoul's First Amendment Claims are not Barred by Qualified Immunity

The doctrine of qualified immunity provides an affirmative defense against these claims to government officials who make reasonable but mistaken judgments about "open" legal questions. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To overcome the affirmative defense of qualified

immunity, Dr. McCoul must show that there is a "genuine dispute of material fact" and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury; and the "plaintiff's version" of those disputed facts must also constitute a violation of clearly established law. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020).

Defendants argue that qualified immunity bars Dr. McCoul's First Amendment retaliation claims brought against Williams, Welsh, Hegar, and Hallmark in their individual capacities because (1) Dr. McCoul's First Amendment right to academic freedom was not "clearly established" at the time of her termination; and (2) it is "not clear" that Dr. McCoul was terminated because of the subject matter of her course. *See* Def. Mot. at 9-11. Dr. McCoul addresses each argument in turn.

### A. Dr. McCoul's right to academic freedom, as protected by the First Amendment, was clearly established at the time of her termination.

When settled constitutional principles apply with obvious clarity to give "fair warning" of a constitutional violation, the "clearly established" prong of qualified immunity is established. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Our nation's courts have long recognized the applicability of the First Amendment to the college classroom, as has Texas A&M University itself.

Nearly sixty years ago the Supreme Court held that academic freedom is a special concern of the First Amendment:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore ***a special concern of the First Amendment, which does not tolerate laws that cast a "pall of orthodoxy" over the classroom***. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multiple of tongues, rather than through any kind of authoritative selection."

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (cleaned up) (emphasis added). This principle has been reaffirmed time and time again since, by the Supreme Court and the Fifth Circuit Court of Appeals.

But Defendants hang their hat on two inapposite cases, *Kirkland v. Northside I.S.D.*, 890 F.2d 794 (5th Cir. 1989) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006), arguing that these cases foreclose the application of the First Amendment to the classroom context. In *Kirkland*, the school district non-renewed a high school teacher's probationary contract for substituting his own reading list for that approved by the school without following the policy to get approval to do so. *Id.* at 796. The court held, unremarkably, that Mr. Kirkland's decision to disregard the school district's protocol is not a matter of public concern and the First Amendment therefore did not apply. *Id.* at 802. This case does not support Defendants' position that professors enjoy no First Amendment rights when in the classroom; rather, it stands only for the idea that teachers may be disciplined for failing to follow school rules. In fact, *Kirkland* cautioned that it should not be read to "suggest that public school teachers foster free debate in their classrooms only at their own risk or that their classrooms must be 'cast with a pall of orthodoxy.'" *Id.* at 801-02. This is an explicit reference to *Keyishian* and the importance of the First Amendment to academic freedom, as well as the "pall of orthodoxy" that the First Amendment is meant to prevent. The pall of orthodoxy is now at our doorstep.

Defendants further suggest that the Supreme Court subsequently adopted *Kirkland*'s reasoning in *Garcetti*, by holding that public employees' statements made pursuant to their official duties are not protected by the First Amendment. *See* Def. Mot. at 10. But as Defendants concede, *Garcetti* explicitly exempted "academic freedom" from its holding. *Id.* Indeed it did, just like *Kirkland*. Answering a concern raised by the dissent that the majority's reasoning imperiled "First

Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to … official duties,'" the majority made clear "we need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 438, 425.

Defendants attempt a sleight of hand, attributing a holding to *Kirkland* that doesn't exist, representing that *Garcetti* adopted that holding even while acknowledging that it did not, only to glibly state that *Garcetti* "did not overrule existing precedent on this issue." Def. Mot. at 10. But there is no existing precedent that supports Defendants' position.

In *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 553 (5th Cir. 1982) the Fifth Circuit described academic freedom as "well recognized," and noted that its "roots have been found in the first amendment insofar as it protects against infringements on a teacher's freedom *concerning classroom content and method*." *Id.* (emphasis added). Although the *Hillis* court rejected the application of the First Amendment to the speech at issue in that case, this was because defendants did not seek to "cast a pall of orthodoxy" over Dr. Hillis's class. Instead, the speech at issue was Dr. Hillis's disagreement with his superior's directive to assign a student a particular grade, *i.e.*, an employment dispute. *Id.* at 553. Of course, casting a pall of orthodoxy in the classroom is exactly what Defendants have done in this case.

Essentially Defendants argue that if a statement is uttered in the course of teaching, that statement is not protected by the First Amendment. *See* Def. Mot. at 9-10 (*e.g.*, "[w]hen a public school teacher speaks in her role as an employee, not in her role as a citizen, that speech is not protected by the First Amendment."). This has never been the law, as *Garcetti* itself made clear. Instead, the parameters of the First Amendment as applied to the classroom setting were explored in *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), and its analysis is instructive. There, a

professor used profanity and referenced her sex life and those of her students while teaching her early childhood education course. The court applied a straightforward *Pickering-Connick* analysis to this classroom speech. *Id*. at 853. Noting that university professors are public employees, the court explained that to establish a § 1983 violation of the First Amendment right to free speech, they must show that (1) they were disciplined or fired for speech that is a matter of public concern; and (2) their interest in the speech outweighed the university's interest in regulating the speech.[14] *Id.* at 853, *citing Connick v. Myers¸*461 U.S. 138, 147-50 (1983) and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Speech involves a matter of public concern when it involves an issue of social, political, or other interest to the community. *Id*. It is clear that Dr. McCoul's speech involved a matter of public concern, as evidenced by the platforming of her course content on social media by Representative Harrison, which collectively garnered over **5.7 million** views, over 3,000 comments, shared over 15,000 times, and liked by over 45,000 people. *See* Exhibits 2-C, 2-D. This was followed by by Texas A&M's own efforts to quell public outcry over the content of her course by broadcasting to the world that it had removed Dr. Johansen and Dr. Zoran from their posts and/or terminated Dr. McCoul's employment. *See* Exhibits 2-E, 2-F, 2-H, and 2-I. The course content that was thrust into the public domain addressed underrepresentation of LGBTQ characters in contemporary children's literature. Her July 10 PowerPoint that was broadcast on Twitter was entitled "Why talk about queerness at all?" and included the following explanation of why contemporary children's literature tackles themes like gender identity and sexual orientation:

- Isn't that way too "adult" for little kids? Well, no.

- Thinking that homosexuality or queer people are always "x-rated" is an effect of heteronormativity, the idea that being heterosexual or straight is normal as well as normative. Normal, in the sense that lots of people are straight (true!), and normative, in the sense that being straight is obvious, necessary, or correct (not

---

[14] Defendants do not appear to address the balancing prong of this test. *See*, *generally*, Def. Mot. at 9-11.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 48

necessarily true!). This implies that being queer is abnormal, wrong, or out of the ordinary.

- Heteronormativity leads to compulsory heterosexuality, or the assumption that all people are, should be, or will be in straight relationships.

- Like anything, ideas about romantic love, marriage, and sexuality age up with children.

*See* Exh. 3-M. This slide demonstrates that ideas about romantic love and sexuality "age up" with children, and inclusion of characters that are not heterosexual in children's literature counteracts societal heteronormativity, or the "assumption that all people are, or should be, or will be in straight relationships." *Id.* The lesson Dr. McCoul was teaching on September 29 that prompted K.W. to confront Dr. McCoul and put in motion her termination was of the same ilk. *See id.*; Exhibit 3, at ¶14-16; Exhibit 3-O. Notably, when K.W. demanded that President Welsh terminate Dr. McCoul for teaching these lessons, President Welsh explained that there is good reason to teach lessons concerning LGBTQ individuals, because students go into professions like psychiatry, counseling, education, and non-profit work supporting the government, and these professions don't get to choose what clients they serve and they want to understand the issues affecting the people they will treat.[15] Defendants have thus admitted that there is a legitimate pedagogical reason to teach these issues.

The *Buchanan* court cited *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001) and *Kerr v. Hurd*, 694 F. Supp. 2d 817, 842-43 (S.D. Ohio 2010) with approval, both of which have implications for this case. *See Buchanan*, 919 F.3d at 853 n.20. In *Hardy*, a professor used vulgarity and racial slurs during an analysis of the historical use of oppressive and marginalizing language, which was held to be First Amendment protected speech. Of course, Dr. McCoul did

---

[15] https://x.com/brianeharrison/status/1965093861690409452?s=20.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 49

nothing like this, but the themes she covered, like those in *Hardy*, were part and parcel of the accepted course content and served a legitimate pedagogical goal. In *Kerr*, a discussion and advocacy of a medical technique for delivering babies was held to be a matter of public concern because it was relevant to national debate on best practices for delivering babies. There can be no question there is also a national debate concerning LGBTQ rights, as vividly demonstrated by this very case.

The court in *Dean v. Timpson Indep. Sch. Dist.,* 486 F. Supp. 302, 308 (E.D. Tex. 1979) emphasized why the First Amendment is so incredibly important to learning. Discussing *Epperson v. Arkansas*, 393 U.S. 97 (1968), the court observed:

> *Epperson* teaches that a particular subject or theory may not be forbidden in the classroom simply because it offends the dominant views or beliefs of a community. The controversial subject at issue in *Epperson* was Darwin's theory of evolution. If Defendants' argument regarding community disruption was correct, evolution would never have been taught in Arkansas. Indeed, no subject which differed from the majoritarian view would ever be taught in the public schools. Every scientific advancement was at one time a new idea, and most new ideas are controversial. The process of education has been described as the shedding of dogmas. There is comfort in the security of old and familiar dogmas and, as demonstrated by the controversy that surrounded the teaching of the theory of evolution, many times the cloak of morality and even righteousness becomes intertwined with familiar values, perceptions and dogmas. To exclude a subject from the public school curriculum because it offends the community, or to discharge a teacher for objectively presenting that subject, runs counter to the spirit of the First Amendment, and poses a threat greater than the unsettling effect on the community precipitated by the students' intellectual exposure to matters that approach concepts long regarded as taboo.

*Dean*, 486 F. Supp. at 308.

Simply put, there is considerable support for the application of the First Amendment to Dr. McCoul's classroom speech. *See*, *e.g.*, *In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981) (academic freedom is "of transcendent value to all of us and not merely to the teachers concerned"); *Sweezy*, 354 U.S. at 249-50 ("The State Supreme Court thus conceded without extended discussion that

petitioner's right to lecture and his right to associate with others were constitutionally protected freedoms which had been abridged through this investigation. These conclusions could not be seriously debated. …These are rights which are safeguarded by the Bill of Rights and the Fourteenth Amendment. We believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread."); *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), *superseded on other grounds by Const. 1963, art. 1, § 26* ("[w]e have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."); *Healy v. James*, 408 U.S. 169, 180-81 (1972) ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.");

### B. TAMU's own policies and procedures reflect that academic freedom is protected by the First Amendment.

Although Dr. McCoul need not establish subjective awareness of the applicability of the First Amendment to classroom teaching, Texas A&M University's own policies reflect an understanding that academic freedom is a First Amendment concern. University Rule 12.01.99.M1, §2.1 provides, "[e]ach faculty member is entitled to full freedom in the classroom in discussing the subject being taught. …", and §2.2 acknowledges that "[t]he rights and privileges of faculty members extended by society and protected by governing boards and administrators through written policies and procedures on academic freedom and tenure, **and as further protected by the courts** …" *Id.* (Emphasis added). *See* Exhibit 3-Y, at §2.2.

Texas A&M's "Minimum Syllabus Requirements" similarly reference academic freedom, and permit professors to include the following statement on their syllabi:

> Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. … In this "marketplace of ideas" we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and **Free Speech** on the University's website about the **First Amendment**.

*See* Exhibit 3-Z. Following the links for "Free Speech" and "First Amendment" brings one to a website maintained by the Division of Student Affairs entitled "First Amendment Freedoms at Texas A&M University" which cites the First Amendment, and states "Texas A&M University is committed to being a community where the free and open exchange of ideas and information is valued, promoted, and encouraged. Fundamental to the educational mission in Texas, **we recognize all five First Amendment freedoms,"** one of which is "freedom of speech," defined as "[a]n individual … may articulate their opinions and ideas without fear of retaliation, censorship, or legal sanction." *See* Exhibit 2-Q; *see also* Exhibit 2-R, ("Texas A&M is a public university. As such, faculty and staff are government actors … **The U.S. Constitution** and, in particular, F**irst Amendment rights** … are guaranteed **when government actors (faculty and staff) interact with individuals (students)**. The free expression of ideas and the right to associate are American values **fiercely protected** by the Supreme Court. The First Amendment right to free expression … at public universities has been explored in **classic case law** that came into being largely as a result of court cases related to the student unrest of the 1960s.") (emphasis added).

These principles are also embodied in Texas A&M's own guidance on academic freedom as well, published by President Welsh and maintained by Texas A&M University's Office of Faculty Affairs. *See* Exhibits 3-AA, 3-BB. This guidance provides, of relevance, that "Texas A&M will not penalize or discipline members of the faculty because they exercised academic freedom," and "the protection of freedom of expression in a teaching and learning environment" is one of four pillars of academic freedom that faculty exercise. *Id.* This guidance also speaks to the importance

of students' academic freedom, condemning exactly what happened in this case: "It is not the proper role of the university or any outside agency to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive. Engaging with new ideas and perspectives helps students grow intellectually and is part of the educational process." *Id.* As noted, this internal University guidance cites *Sweezy*, Exhibit 3-BB, which, as set forth *supra*, speaks at length on the longstanding principle that academic freedom is a special concern of the First Amendment. *Sweezy*, 354 U.S. at 250.

Finally, the By-Laws of the Texas A&M University Board of Regents reflect the importance of academic freedom, and vest the Regents with responsibility for protecting faculty from outside influence: "Section 51.352 of the Texas Education Code states that the state's higher education boards are expected to '[p]reserve institutional independence and to defend its right to manage its own affairs through its chosen administrators and employees". *See* Exhibit 2-P.

At the time President Williams, Chancellor Hegar, and Vice Chancellor Hallmark upheld Dr. McCoul's termination, all three of them were put on notice that Dr. McCoul's right to free speech had been infringed, by virtue of the report by the Academic Freedom Council. *See* Exhibit 2-L.

**C. It "is clear" that Dr. McCoul was terminated because of her speech.**

Although Defendants complain that it's "not clear" that Dr. McCoul was terminated because of the subject matter of her course, *see* Def. Mot. at 11, this is not the standard to which Dr. McCoul is held at this juncture. Instead, she must establish only that "there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury". *Aguirre v. City of San Antonio*, 995 F.3d 395, 405 (5th Cir. 2021). Also, as in the normal summary judgment context, in determining whether a plaintiff has met this burden, all facts are to be viewed

Plaintiff's Response to Defendants' Motion to Dismiss – Page 53

"in the light most favorable to the non-moving party" with "all justifiable inferences" drawn in the non-movant's favor. *Id*. (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Notwithstanding this lenient standard, it actually *is* clear that Dr. McCoul was terminated because of her in-class speech.

**1. Defendants' own statements reflect that Dr. McCoul was terminated based on her speech.**

Although at the CAFRT hearing Texas A&M argued mainly that Dr. McCoul was terminated for violating directives, it has now pivoted and focuses on the content of Dr. McCoul's course, even suggesting that they may have been "mistaken" that Dr. McCoul had violated a directive. *See* Def. Mot. at 11. Whether couched as "an agenda to indoctrinate students in her preferred gender ideology" or "[indoctrination of] her students into transgender and LGBTQ ideology" both are proxies for protected First Amendment speech. *Id.* at 1, 2. This is because Dr. McCoul was engaged in education, not indoctrination.  As noted above, Dr. McCoul is an accomplished senior lecturer and expert in children's literature. This truism is supported by her annual evaluations, student evaluations, recent promotion to senior lecturer, and sworn testimony by her colleagues, supervisors, and students. *See* Exhibit 1, PP. 94-98, 123-124, 147-149, 154-155, 254-255, 274-276, 282; Exhibit 3, ¶¶2-7; Exhibit 3-B; Exhibit 3-E; Exhibit 3-F, Exhibit 3-G, Exhibit 3-H; Exhibit 3-I; Exhibit 3-J; Exhibit 3-K; Exhibit 10, ¶¶1, 2; Exhibit 11, ¶¶2, 4, 8; Exhibit 13, ¶7, 10.

As testified by multiple experts in literature, the themes explored by Dr. McCoul are embedded within children's literature, whether these themes are welcome across the student population of Texas A&M or not. *See* Exhibit 1, PP. 104-105, 108, 111-112, 170, 306-309; Exhibit 3 at ¶12; Exhibit 3-N, Exhibit 3-O, Exhibit 3-T; Exhibit 10, ¶3-4; Exhibit 11, ¶6-7.

This is also reflected in the credit that Children's Literature satisfies within Texas A&M University's core curriculum. As explained above, Children's Literature satisfies the "knowledge,

philosophy, and culture" foundational component area of the core curriculum. *See* <u>Exhibit 1</u>, PP. 98-99, 229; <u>Exhibit 4</u>. By its terms, this course was required to "reveal how <u>wider social forces</u> shape the philosophical outlooks and aesthetic sensibilities of writers of literature for children, and <u>how writers of different racial, ethnic, gender, regional backgrounds, and sexual orientation may</u> <u>approach and interpret the world differently for readers of children's literature.</u>" <u>Exhibit 1</u>, P. 100; <u>Exhibit 4</u> (emphasis added). Dr. McCoul designed her syllabus, and taught her course, to meet these objectives. *See* <u>Exhibit 1</u>, P. 100.

Despite Defendants' assertion to the contrary, Dr. McCoul's course was also aligned with its course description, *Id.* at PP. 255-256, which is skeletal by design to allow professors the ability to tailor the course to their interests, and adapt content to developments in their respective fields. *Id.* at PP. 110, 259, 289, 299-300.

Texas A&M's claim that there was an improper variance between Dr. McCoul's ENGL 360 syllabus and that of her peer, Dr. Elizabeth Robinson's, ENGL 360 syllabus, which had recently been submitted for ENGL 360's continued inclusion in the core curriculum, also fails. This claim was easily rebutted at the CAFRT hearing by multiple witnesses who know better, including Department Chair Johansen, Associate Dean Werner, and Dr. McCoul's colleagues within the English department. *Id*. at PP. 101-102, 109-111, 120-121, 231-234, 250-252, 255-258; <u>Exhibit 12</u>, at ¶2-3.

## 2. The undisputed chain of events reveals that Dr. McCoul was terminated based on her speech.

As set forth above, Governor Abbott has made no bones about his plan to "target" professors who "push[] leftist ideologies" and to "end indoctrination" in higher education. *See* <u>Exhibit 2-B</u>. As of September 8, Dr. McCoul had begun teaching ENGL 394 and the semester was off to a good start. That day, Representative Harrison posted the videos K.W. took from the ENGL 360 course

over the summer and screenshots of other course content, tagging Governor Abbott's X account. *See* Exhibit 3, at ¶24; Exhibit 2-D. General Welsh issued a public statement announcing this decision to remove Drs. Johansen and Zoran on both Facebook and Twitter/X. *See* Exhibit 2-E, 2-F. As of the morning of September 9, however, President Welsh had no plan to terminate Dr. McCoul. *See* Exhibit 1, at P. 212, 294. At 12:29 pm, Governor Abbott retweeted President Welsh's Twitter post, with the statement "Good. Now, fire the professor who acted contrary to Texas law." *See* Exhibit 2-G. Dr. McCoul was "summarily dismissed" less than five hours later. *See* Exhibits 3-V, 3-W. This is compelling timing, and it tells a story. Governor Abbott "targeted" Dr. McCoul for her course content, called on Texas A&M to terminate Dr. McCoul based on her course content, and Texas A&M complied.

**3. The reasons set forth in Dr. McCoul's termination letter are unsupported.**

Texas A&M "summarily terminated" Dr. McCoul. *See* Exhibit 3-W. As set forth in University Rule 12.01.99.M1 and Chapter 51.942 of the Texas Education Code, faculty cannot be summarily terminated absent "serious misconduct." *See* Exhibit 3-Y; Exhibit 9. The CAFRT unanimously found that Dr. McCoul did not engage in "serious misconduct." *See* Exhibit 2-K. The Academic Freedom Council also determined that Dr. McCoul did not engage in "serious misconduct." *See* Exhibit 2-L. Referencing University Policy 12.01, §8.2.1, Dean Zoran testified that Dr. McCoul did not engage in the types of conduct that constitute "serious misconduct." *See* Exhibit 1, P. 180. Similarly, Associate Dean Werner testified, unequivocally, that Dr. McCoul had done nothing wrong, and refused to sign Dr. McCoul's termination letter "because I have a conscience, and I knew that she had done nothing wrong and … I just felt like it wasn't appropriate. *Id.* at P. 237.

#### 4. Dr. McCoul was summarily terminated despite no policy violations

Dr. McCoul's termination notice set forth three alleged policy violations – University Rule

12.01.99.M1, §§6.3.2, 6.3.5, and 6.3.7:

> 6.3.2 Continuing or repeated failure to perform duties or meet responsibilities to the institution or to students or associates;

> 6.3.5 Violation of system policies, system regulations, system academic institution rules, or laws substantially related to the performance of faculty duties;

> 6.3.7 Unprofessional conduct adversely affecting to a material and substantial degree the performance of duties or the meeting of responsibilities to the institution, or to students or associates, including research misconduct or professional misconduct.

*See* Exhibit 3-W; 3-Y. Provost Sams, who reviewed McCoul's termination memo before it was

issued to her, testified that Sections 6.3.2 and 6.3.5 boiled down to her failure to follow directives,

Exhibit 1, PP. 207-208, and Dr. Scott testified that Section 6.3.7 was inapplicable to Dr. McCoul.

*Id.* at 46.

#### 5. Defendants' allegation that Dr. McCoul violated directives was a pretext, not a mistake.

Throughout the CAFRT hearing, University witnesses struggled to articulate what directives

were even issued and by whom, let alone how Dr. McCoul failed to comply with them. The fact

is, none of the University's witnesses was able to establish that Dr. McCoul ever received a single

directive. Dr. Scott had no knowledge of any directive that was conveyed to Dr. McCoul. *See*

Exhibit 1, PP. 39-44. Johansen testified that Dr. McCoul never failed to follow a directive, nor did

she violate even a single University policy. *Id.* at P. 151. Dean Zoran testified that he was unaware

of whether Dr. McCoul was told she could not teach the content in question as a fall course. *Id.* at

P. 182. Provost Alan Sams testified that he had no firsthand knowledge of a directive given to Dr.

McCoul. *Id.* at PP. 205-207. Dr. Werner testified that Dr. McCoul was not aware of any directive that was given to Dr. McCoul. *Id.* at PP. 234-235.

In fact, the only decision that was made by University officials *and* conveyed to Dr. McCoul was that she would teach her ENGL 361 content as an ENGL 394 course, and she willingly complied with that decision. *Id*. at 149-150; Exhibit 3 at ¶37. This is consistent with statements President Welsh conveyed to the Senior Faculty Advisory Committee in late August when he briefed them on these developments; while he was not "fully happy" with the Drs. Johansen and Zoran for ending the ENGL 360 course early, he was displeased because "he was afraid that it made [Dr. McCoul] look like she had done something wrong, and he didn't think that was necessarily true." *See* Exhibit 1 at P. 291.

Dr. McCoul testified, unequivocally, that she never received any directive, and contemporaneous evidence fully supports that testimony. *Id.* at P. 91; *see also* Exhibit 3-U. Dr. O'Farrell, who had conversations with Dr. McCoul throughout these events, described her as "remarkably calm," and "very even" about the last-minute shift in her courses." Exhibit 1, P. 277. When asked if Dr. McCoul told Dr. O'Farrell that she did not intend to address the University's concerns, Dr. O'Farrell testified, "[n]o, really the opposite." *Id.* at P. 278. Dr. Mills concurs, stating that "Dr. McCoul seemed adamant that if she followed the rules and worked with the university administrators, everything would work out, and things would go back to normal." Exhibit 12, at ¶7.

6. **Texas A&M's own internal, independent faculty bodies determined that Plaintiff's termination was not supported by policy.**

As set forth above, Texas A&M's Academic Freedom Council found that Dr. McCoul did not engage in serious misconduct, and it further determined that her termination violated her right to

free speech. *See* Exhibit 2-L. The CAFRT unanimously rejected the University's claim that Dr. McCoul failed to follow a directive and that she violated University policy. *See* Exhibit 2-K.

At this procedural juncture Dr. McCoul must establish only a genuine issue of material fact as to the unlawful impetus for her termination. *Aguirre*, 995 F.3d at 405. She does this and more. Defendants are not qualified to qualified immunity and her First Amendment claims against these University officials in their personal capacity must proceed.

### III.    Dr. McCoul's Due Process Claims are not Barred by Qualified Immunity.

At the CAFRT hearing, witness after Texas A&M witness testified, consistently, unequivocally, and under oath, that the University failed to adhere to its well-established procedures with respect to Dr. McCoul's termination. Dr. Scott testified that Texas A&M did not follow its own procedures in terminating Dr. McCoul. *Id.* at P. 55. Dean Zoran agreed. *Id.* at P. 176. Provost Sams not only agreed that the University did not follow its procedures in terminating Dr. McCoul, but also testified that he was told by his superiors not to perform an investigation. *Id.* at P. 217, 222-223. President Welsh, too, was on notice of these procedures, because he was reminded of them by his own Senior Faculty Advisory Committee the very morning he terminated Dr. McCoul. *Id.* at P. 294.

### A.  Dr. McCoul is not an "at-will" employee.

Stuck with this sworn and undisputed testimony, Defendants argue, without reference to a single case, that it didn't need to follow these procedures because Dr. McCoul was an "at-will" employee. *See* Def. Mot. at 13. This is a remarkable argument since Dr. McCoul was employed under a three-year term contract when she was terminated. *See* Exhibit 3-L. And this contract is clear: "[i]n accordance with the University Statement on Academic Freedom, Responsibility, Tenure and Promotion (University Rule 12.01.99.M1) this letter constitutes your official

notification of the terms and conditions of your appointment for the 2025-2026 academic year. Your appointment *is subject to* the rules and regulations of Texas A&M University (TAMU) as well as of the Texas A&M University System." *Id.* (emphasis added). This rule, incorporated by reference, contains requirements the University must meet in order to terminate Dr. McCoul's employment.

To make this meritless argument, Defendants rely on the "renewal" provision of Dr. McCoul's term contract, which states, in full:

> In accordance with System Regulation 12.07 section 3.2, your appointment meets the conditions outlined for a multi-year appointment. This appointment represents Year 2 of a 3 Year term, which will be annually renewed during the stated term. Renewal is contingent upon, but is not limited to, your continued satisfactory performance, the availability of continued funding, departmental and college needs, or any other unforeseen event.
>
> Your current multi-year appointment pertains exclusively to FY 2025 through FY 2027 and does not constitute an offer or promise of employment for future academic years beyond those specified herein.

*Id*. The agreement concludes with "faculty members are obligated to fulfill the terms of employment for the following year unless they resign prior to 30 days after receiving this notification." *Id.*

Despite this language, Defendants argue that the reference to "unforeseen event" in the <u>renewal</u> provision of her contract transforms her into an at-will employee, and as an at-will employee Dr. McCoul does not have a protected property interest in her employment. But this clause says nothing of the ability of Texas A&M to <u>terminate</u> the contract mid-term, which is what happened to Dr. McCoul. Defendants' argument should be rejected out of hand. *Id.* In fact, University Rule 12.01.99.M1 distinguishes between non-renewal of a contract on one hand, and termination of a contract on the other. *See* <u>Exhibit 3-Y</u>, §3.2.2 *et seq*., as compared with §5.1 *et seq*.

**B. Dr. McCoul has a property interest in her continued employment.**

It is clear that Dr. McCoul is <u>not</u> an at-will employee, and that her agreement gives her a property right in her continued employment.

Courts apply a well-known two-part test when analyzing due process: first, it is determined whether the plaintiff had a liberty or property interest entitled to procedural due process; if so, they next determine what process is due. See *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). To invoke the protections of due process in a termination of employment decision, an employee must have a cognizable property interest in continued employment. *Senegal v. Jefferson Cty.*, 785 F.Supp. 86 (E.D. Tex. 1992) *aff'd*, 1 F.3d 1238 (5th Cir. 1993)). More specifically, an employee must have more than a unilateral expectation; she must have a claim of entitlement. *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008) ("In determining whether statutes and regulations limit official discretion, the Supreme Court has explained that we are to look for 'explicitly mandatory language ....' ").

It has long been the rule that public employees who can only be discharged for cause have a constitutionally-protected property interest in their employment and cannot be fired without due process. *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997), *citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 602–603 (1972). In *Roth*, the Supreme Court acknowledged that a <u>University rule or policy</u> may secure a professor's interest in their employment or create a legitimate claim to it. *Roth,* 408 U.S. at 578. In *Sindermann*, the Supreme Court held that a "cause" provision in a contract is evidence of an entitlement to continued employment. *Sindermann*, 408 U.S. at 600.

There is a long history within the Fifth Circuit of recognizing a protected interest in public employment based on state law, University rule or regulation, or even "long-standing custom and

practice … that non-tenured teachers who have multi-year appointments can rely on continued employment until the expiration of the full term of their contract as long as their job performance meets or exceeds expectations." *Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592, 605 (E.D. Tex. 2016). *See*, *e.g, Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679 (5th Cir.1986) (upholding district court's finding that professor did have a property interest in continued employment); *Lucas v. Chapman*, 430 F.2d 945 (5th Cir.1970) (finding that a professor's "long employment in a continuing relationship through the use of renewals of short-term contracts was sufficient to give him the necessary expectancy of re-employment that constituted a protectible interest"); *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970) (holding that a non-tenured professor may acquire a protectible property interest in continued employment if he has a reasonable expectation of the same); *Yates v. Bd. of Regents*, 654 F.Supp. 979 (E.D.Tex.1987) (finding that the court could "not rule as a matter of law that plaintiff had no property interest in continued employment").

Dr. McCoul absolutely had a legitimate claim of entitlement to continued employment while her contract was extant, which it was when she was terminated. First, Chapter 85.21 of the Texas Education Code provides that Texas A&M University's Board of Regents "shall make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services. The board shall regulate the course of study and prescribe the course of discipline necessary to enforce the faithful discharge of the duties of the officers, faculty, and students." Pursuant to that statutory authority, Texas A&M has promulgated University Rule 12.01.99.M1, which is incorporated by reference in the very first sentence of Dr. McCoul's term contract. University Rule 12.01.99.M1 states that it "appl[ies] … to faculty members…" *See* Exhibit 3-Y. As a senior lecturer, Dr. McCoul is considered an "academic professional track associate professor" and a "faculty member." *See id*., §1.1.1; Exhibit 3-L.

As set forth *supra*, University Rule 12.01.99.M1 makes it clear that "it is essential that faculty members be free to pursue scholarly inquiry and creative scholarship without undue restriction, and to voice and publish individual conclusions concerning the significance of evidence that they consider relevant. Each faculty member must be free of the corrosive fear that others inside or outside the university community because their views may differ, may threaten the faculty member's professional career or the material benefits accruing from it." *Id.* §2.1. Section 2.1 goes on to say that "[e]each faculty member is entitled to full freedom in the classroom in discussing the subject being taught." As set forth above, this is precisely what Dr. McCoul did, and for which she was fired.

University Rule 12.01.99.M1 really could not be clearer: "[t]he dismissal of a non-tenured faculty member (tenure track, academic professional track, or temporary or part time titles) with a term appointment[16] prior to the expiration of the appointment must be based on 'good cause' (such as listed in 6.3) …" *See* Exhibit 3-Y, §5.1 (emphasis added). And, Texas A&M's summary dismissal procedures provide that "a tenured faculty member or a non-tenured faculty member whose term appointment has not expired may be subject to summary dismissal *if* the stated cause for dismissal is a finding of serious misconduct." *Id*. at §9 (emphasis added); *see also id.* at §9. Thus, *Gilbert* is dispositive and this court need go no further in determining that Dr. McCoul had a protected property interest in her employment.[17] *Gilbert*, 520 U.S. at 928-29. But § 9.1 of University Rule 12.01.99.M1 makes this entitlement even clearer, reaffirming that a decision to dismiss a non-tenured member of faculty "shall" be consistent with §5.1, and imposing a

---

[16] Dr. McCoul's appointment letter reflects that her "term" is nine months. *See* Exhibit 3-L.

[17] Defendant relies on *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738 (Tex. 2006) for the proposition that an employer's policy that an employee "may" be fired for cause does not foreclose a termination without cause. *See* Def. Mot. at 12-13. But Texas A&M's policy, as incorporated in Dr. McCoul's appointment letter, provides that the termination of a faculty member with a term appointment prior to the expiration of the appointment "*must*" be based on good cause. *See* Exhibit 3-Y, §5.1. *Burwell* is inapposite.

Plaintiff's Response to Defendants' Motion to Dismiss – Page 63

requirement that the faculty member be given an opportunity to be heard before they are dismissed. *See* Exhibit 3-Y, §9.1.1. As set forth above, this did not occur.

Moreover, as also set forth above, Dr. McCoul was terminated pursuant to its "summary dismissal" procedures. Exhibits 3-V, 3-W. The requirements and procedures applicable to "summary dismissal" of faculty like Dr. McCoul are contained at University Rule 12.01.99.M1, §9.2 and entitle Dr. McCoul to even more robust due process rights by imposing a requirement that the University establish not only "good cause," but "serious misconduct," and making it clear that faculty may only be summarily dismissed "at the conclusion of an investigation process and decision thereof." *Id.* at §9.2.1 *et seq*. Notably, Chapter 51.942 of the Texas Education Code provides for "summary dismissal" procedures for faculty upon a finding of "serious misconduct, as defined by the institution's policies." *See* Exhibit 9. Chapter 51.942 also contains detailed procedural requirements for effecting a summary dismissal, and is crystal clear that these procedures are meant to "ensure that the institution provides the faculty member with **appropriate due process**." *Id.* at (c-4) (1)-(4) (Emphasis added).

These provisions are contained at University Rule 12.01.99.M1, §§9.2.2 through 9.2.4. As set forth in more detail above, none of these steps were followed. *See* Exhibit 1, at P. 178; Exhibit 3, ¶¶31-34.

Defendant also suggests that Dr. McCoul's due process claim is foreclosed by *Fass v. Benson*, 2023 WL 3860441, at *6 (Tex. App. – Dallas June 7, 2023, no pet.) (mem. op.), which stands for the proposition that "a state agency's failure to follow its own procedural rules governing employment will not create a property interest which otherwise does not exist." *See* Def. Mot. at 12. But the professor in *Fass* asserted an entitlement to his teaching assignment, an argument multiple courts have rejected in the absence of a contractual provision limiting a university's right

to reassign professors. *Fass*, at \*6 (cleaned up). Since Dr. Fass had not pleaded any contractual provision limiting the university's right to assign or reassign his classes, he had shown no entitlement to teach his chosen class. The court observed, correctly, that a state agency's failure to follow its own procedural rules governing employment will not create a property interest which otherwise does not exist. In McCoul's case, however, a property interest *does* exist since her employment could only be terminated "for cause" and/or "serious misconduct." *Roth,* 408 U.S. at 578. As the *Fass* court noted, "a property interest protected by procedural due process arises where an individual has a legitimate claim of entitlement that is *created, supported, or secured by* rules or mutually explicit understandings." *Fass*, at \*7. Unlike Dr. Fass, Dr. McCoul does not allege a property interest in the due process procedures themselves; she alleges a protected property interest in her employment, to which she was entitled based on the "cause" provisions of Section 5.1 of University Rule 12.01.99.M1.

### Prayer

Dr. McCoul seeks monetary damages against University officials in their individual capacities only. Her claims against these individuals, including the members of the Board of Regents, are properly asserted under *Ex parte Young.* For the reasons set forth herein, qualified immunity does not shield these officials from liability for their First Amendment and Due Process violations.

Accordingly, Dr. McCoul respectfully requests that Defendants' Motion to Dismiss be denied in its entirety.

Date: May 29, 2026                                    Respectfully Submitted:


                                                      /s/ *Amanda L. Reichek*
                                                      Amanda L. Reichek
                                                      Texas State Bar No. 24041762
                                                      S.D. Texas Bar No. 840975
                                                      areichek@tillotsonlaw.com
                                                      Jeffrey M. Tillotson
                                                      Texas State Bar No. 20039200
                                                      S.D. Texas Bar No. 27831
                                                      jtillotson@tillotsonlaw.com
                                                      Sara Babineaux
                                                      State Bar No. 24125102
                                                      S.D. Texas Bar No. 3959037
                                                      sbabineaux@tillotsonlaw.com
                                                      **TILLOTSON PATTON**
                                                      1201 Main Street, Suite 1300
                                                      Dallas, Texas 75202
                                                      (214) 382-3041 Telephone
                                                      (214) 292-6564 Facsimile

                                                      Attorneys for Plaintiff


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 29, 2026 a true and correct copy of the foregoing was served on Defendants' counsel of record via CM/ECF.


                                                      /s/ *Amanda L. Reichek*
                                                      Amanda L. Reichek


Plaintiff's Response to Defendants' Motion to Dismiss – Page 66